# In The Matter Of:

*Dashawn Gervin vs.*
*Pamela Florence, et al.*

---

*Pamela Florence*
*April 05, 2022*

---

*LYON REPORTING, INC.*
*Certified Court Reporters*
*P.O. Box 81124*
*Atlanta, Georgia 30366*
*770/458-5500    800/767-2030*

Original File Pamela Florence - 4-5-22.txt
**Min-U-Script® with Word Index**

Case 1:21-cv-00067-LAG    Document 15-4    Filed 05/16/22    Page 2 of 27

Dashawn Gervin vs.                                                Pamela Florence
Pamela Florence, et al.                                            April 05, 2022

---

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF GEORGIA
 2                    ALBANY DIVISION

 3

 4   DASHAWN GERVIN,            )
                                )
 5              Plaintiff,      )   CIVIL ACTION FILE
                                )
 6       vs.                    )   NO. 1:21-cv-00067-LAG
                                )
 7   PAMELA FLORENCE, HOKE      )
     HAMPTON, and TANDRIA       )
 8   MILTON, in their           )
     individual capacities,     )
 9                              )
                Defendants.)
10   - - - - - - - - - - - - - )

11

12            DEPOSITION OF PAMELA FLORENCE

13           (conducted remotely via Zoom)

14                  April 5, 2022

15                   10:03 a.m.

16

17

18

19   Sarah M. Bentley, RPR, CCR-B-1745  (via Zoom)

20

21

22

23              LYON REPORTING, INC.
                Certified Court Reporters
24      P.O. Box 81124, Atlanta, Georgia 30366
               770/458-5500  800/767-2030
25                www.lyonreporting.com
```

---

Page 2

```
 1          A P P E A R A N C E S

 2

 3   For the Plaintiff:

 4       ZACK W. GREENAMYER, ESQ.  (via Zoom)
         SAMANTHA J. FUNT, ESQ.  (via Zoom)
 5       Mitchell & Shapiro, LLP
         Suite 650
 6       3490 Piedmont Road
         Atlanta, Georgia  30305
 7       (404) 997-8972
         zack@mitchellshapiro.com
 8       sam@mitchellshapiro.com

 9

10

11   For the Defendants:

12       LAURA L. LONES, ESQ.  (via Zoom)
         Assistant Attorney General
13       Georgia Office of the Attorney General
         40 Capitol Square, S.W.
14       Atlanta, Georgia  30334-9057
         (404) 656-6710
15       llones@law.ga.gov

16

17

18

19   Also Present:

20       Frank Lemmon, Videographer
         (Mitchell & Shapiro, LLP)

21

22

23

24

25
```

---

Page 3

```
 1              I N D E X

 2

 3   EXAMINATION OF PAMELA FLORENCE          PAGE

 4     By Mr. Greenamyre                        5

 5

 6

 7

 8

 9          PLAINTIFF'S EXHIBITS
     NUMBER      DESCRIPTION             PAGE

10   1   Data Report System for Pamela Florence,  11
         8 pages; Bates SUB-66 through 73

11

12   2   Department of Community Supervision     20
         Policy & Procedure Statement, 13 pages;
13       Bates 1268 through 1280

14   3   Case Notes Entries for Dashawn Gervin,  25
         3 pages; Bates SUB-27 through 29

15   4   Final Disposition in State vs.          31
         Dashawn Gervin, 1 page

16

17   5   Affidavit and Warrant for Arrest of     33
         Probationer in State vs. Dashawn
18       Gervin, 2 pages

19   6   (Not marked)                            --

20   7   Greyhound Bus Lines receipt for         48
         Albany, Georgia to St. Louis, Missouri

21   8   Probation Revocation Hearing,           50
         9 pages

22

23   9   Timeline of Dashawn Gervin              51
         Docket 11-R-152, 8/30/2011 to
24       8/8/2019, 1 page

25
```

---

Page 4

```
 1          PLAINTIFF'S EXHIBITS
     NUMBER      DESCRIPTION             PAGE

 2

 3   10  10/8/21 e-mails between Lynn Baker and  55
         John Worsley regarding banishment,
 4       4 pages

 5   11  Release Notes, 2/18/20199, 4 pages      59

 6   12  Spreadsheet prepared by Lynn Hendon     65
         Baker with Offender Case Notes,
 7       3 pages

 8

 9              *      *      *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:21-cv-00067-LAG    Document 15-4    Filed 05/16/22    Page 3 of 27

Dashawn Gervin vs.                                          Pamela Florence
Pamela Florence, et al.                                      April 05, 2022

Page 5

```
 1        P R O C E E D I N G S
 2
 3
 4        MR. LEMMON: On the video record at
 5   10:03.
 6        MR. GREENAMYRE: All right.  This will be
 7   the deposition of Ms. Pamela Florence in the
 8   matter of Gervin vs. Florence, et al., Case
 9   No. 1:21-67-LAG, pending in the Middle District,
10   Albany Division, pursuant to notice and
11   agreement for all purposes permissible under the
12   Federal rules.
13        Can we swear the witness?
14        PAMELA FLORENCE,
15   having been first duly sworn to state the truth, was
16   examined and testified as follows:
17             EXAMINATION
18   BY MR. GREENAMYRE:
19        Q.    Ms. Florence, thank you for joining us
20   today.  My name is Zack Greenamyre.  I represent
21   Mr. Dashawn Gervin in this case.  It's nice to meet
22   you, and we appreciate you being here.
23        I don't think -- like I said, I don't
24   think this is going to go too terribly long, but I
25   just want to get your perspective on a couple of facts
```

Page 6

```
 1   in the case.  Before we do that, just a couple of
 2   things by way of background.  Have you ever given a
 3   deposition before?
 4        A.    No, I haven't.
 5        Q.    Give me one second.  I'm just trying to
 6   get my view right so I can see you.  All I can see is
 7   Ms. Bentley.
 8        Okay, so I'll do just a few quick ground
 9   rules.  If you have any questions at any time, you
10   know, about the question I'm asking or how this works,
11   don't hesitate to let me know.  Okay?
12        A.    Okay.
13        Q.    Although it will seem sometimes like a
14   regular conversation where we can finish each other's
15   sentences, for the sake of a record let's try and have
16   a clean break between when I speak and when you speak,
17   and that will make this work.
18        A.    Okay.
19        Q.    Will you tell me if I'm asking a
20   confusing question?
21        A.    Okay.
22        Q.    And I'll do my very best to not ask
23   confusing questions, but if you answer one of the
24   questions, would you agree that it's fair to assume
25   that you understood the question?
```

Page 7

```
 1        A.    Yes.
 2        Q.    Okay.  And your attorney will help out,
 3   too, if it's a question that could be ambiguous in
 4   some way.
 5        A.    Okay.
 6        Q.    And, you know, I want to -- I got a bunch
 7   of questions that I want to ask, but I also want to
 8   make sure that you have the chance to say everything
 9   that you think is important to say.  You know, and I
10   want to give you plenty of opportunity to do that, but
11   all I ask is that you just give us all the information
12   that you have here today while we're on the record.
13        A.    Yes.
14        Q.    And if you remember something as we go,
15   don't hesitate to interrupt me and say can we go back
16   to this question or that question, I've got something
17   that I forgot that I want to add.  There's no problem
18   with that.
19        A.    Okay.
20        Q.    And we've got a break or two that we'll
21   have to take, but if you want to take a break at any
22   time don't hesitate.  Okay?
23        A.    Okay.
24        Q.    And, further, by way of background, where
25   are you today?
```

Page 8

```
 1        A.    I'm in Camilla, Georgia.
 2        Q.    Are you at your home or the office?
 3        A.    I'm at my home, yes.
 4        Q.    In Camilla?
 5        A.    Camilla, Georgia, yes.
 6        Q.    All right.  Do you have any adult
 7   relatives within 150 miles of Albany?
 8        A.    Yes.
 9        Q.    Who are they?
10        A.    Adult relatives.  Do I name them?
11        Q.    Yeah, and just for reasons of if we take
12   this case to a jury trial, we want to make sure that
13   we have, you know, a jury that, you know, you don't
14   have a bunch of Gervin's family on the jury, and he
15   doesn't have a bunch of your family on the jury.
16        A.    Oh, okay.  You want the title behind the
17   name?
18        Q.    Yeah, I mean, I guess husband, his name
19   or, you know.
20        A.    Okay.  I have a brother, John Florence.
21        Q.    Uh-huh (affirmative).
22        A.    I have cousins; Harriet Shepard, Loretta
23   Dudley.
24        Q.    It looks like you froze.
25        A.    Am I still frozen?
```

Page 9

1    Q.    I heard -- I don't know if other people
2  have the same issue, but I heard the cousins,
3  Ms. Shepard and Dudley, and then I didn't hear
4  anything.
5    A.    I have a lot of cousins.  Let me just
6  name them all.
7    Q.    I don't --
8    A.    I have an uncle, his name is Fred
9  Frazier.
10    Q.    Do you have a spouse?
11    A.    No.
12    Q.    Okay.  Any adult children?
13    A.    No.
14    Q.    Okay.  All right.  Did you grow up in the
15  Middle Georgia or South Georgia area, or where did you
16  grow up?
17    A.    I grew up in Camilla, Georgia.
18    Q.    Okay.  And give me just a quick overview
19  of your education, when you went to -- when you
20  graduated high school and then what you did after
21  that.
22    A.    Graduated from high school in 1991,
23  Mitchell Baker High School, and then after high school
24  I went to Albany State University.  I graduated from
25  there.

Page 10

1    Other education.  Years later, after I
2  started my career, I went to Thomas University as
3  well.
4    Q.    And what degree or certificate did you
5  get at Thomas University?
6    A.    Thomas University is in rehabilitation
7  counseling.  Albany State University was in criminal
8  justice and master's degree in corrections.
9    Q.    Got it.  And tell me what -- what jobs
10  you've had other than in law enforcement.
11    A.    I've --
12    Q.    Yeah, go ahead.  Sorry.
13    A.    After high school my first job was with a
14  local store.  It was an apparel store.  They sell
15  clothes.  The name of the job was Foot Loose Apparel.
16    Q.    Okay.  And then anything else before you
17  started in law enforcement?
18    A.    I worked with the Latch Key Program in
19  Albany, Georgia; Georgia County School Systems.  It
20  was an after-school program.  That's when I was in
21  college, also, during the week.
22    And you say before law enforcement
23  itself?
24    Q.    Right, yes.
25    And then let me see.  I'll share with you

Page 11

1  what we'll mark as Exhibit 1.
2    (Plaintiff's Exhibit 1 was marked for
3    identification, attached at the end of the
4    original transcript.)
5  BY MR. GREENAMYRE:
6    Q.    Do you see this POST profile?
7    A.    Yes.
8    Q.    And does this look like your employment
9  history in law enforcement, at the bottom of the first
10  page?
11    A.    Yes.
12    Q.    And it looks like -- so what did you do
13  with the Daugherty County Police Department?
14    Were you just a beat officer, or what was
15  your role?
16    A.    Daugherty County Police back then, I was
17  a dispatcher.
18    Q.    Okay.  And -- okay.
19    A.    And what they did -- yeah.
20    Q.    Go ahead.
21    A.    I was a dispatcher.
22    Q.    And it looks like there was a period of
23  about ten months where you weren't working for them or
24  maybe -- no, fewer than that.
25    A.    Yes.

Page 12

1    Q.    Six or eight months.  What happened
2  there?
3    A.    When I started with Daugherty County
4  Police Department I went in as a dispatcher.
5    Q.    Uh-huh (affirmative).
6    A.    What they do, they certify their
7  dispatcher as peace officers, and I didn't make it
8  through the Academy so I didn't have a job.  And then
9  later on they rehired me.
10    Q.    Okay.  Have you completed the Academy or
11  the basic peace officer training, or they just changed
12  their requirement?
13    I know a lot of agencies don't have the
14  certified peace officers doing dispatch.
15    A.    At that time I believe they were changing
16  the requirements because I never went back to the
17  Academy while working for Daugherty County Police
18  Department.
19    Q.    Okay, got it.  And then it looks like you
20  worked -- well, there's this entry of working at Autry
21  State Prison.  How long was that that you worked
22  there?
23    A.    Yeah, I worked with them.  I went in as a
24  correction officer in June of 1999, and a couple of
25  months after that I applied for a counseling position

Dashawn Gervin vs.
Pamela Florence, et al.

Pamela Florence
April 05, 2022

Page 13

1  while at Autry, so I was a counselor.  And I stayed in
2  Autry from 1999 until 2003.
3     Q.   Okay.  And how long -- you may have said
4  this, but how long were you a correctional officer
5  before you became a counselor?
6     A.   I would say about six months.
7     Q.   Okay.  And is that the only period in
8  your career that you've been a jailer?
9     A.   Yes.
10    Q.   And then it looks like from 2003 to the
11  present you've been a probation officer; is that
12  right?
13    A.   That's correct.
14    Q.   Okay.  So you were with first, I guess,
15  Department of Corrections as a probation officer and
16  now the Department of Community Supervision, right?
17    A.   That's correct.
18    Q.   All right.  And has it always been in the
19  same area, in the Camilla area or, you know, I can't
20  tell from this, west region and southwest area,
21  whether that would be different parts of the state.
22    A.   Okay, Autry State Prison, all of that is
23  down here in the south, okay, so that's located in
24  Pelham, Georgia.  That's like maybe ten minutes from
25  Camilla.

Page 14

1     Q.   Uhm-uhm.
2     A.   Then once I received the position in
3  Albany probation, which is about 30 miles from
4  Camilla, so it's always been pretty much the same.
5  The Department of Corrections.  We were the Department
6  of Corrections from the time I started until 2016 when
7  partisan parole and probation merged together, okay.
8     Q.   Okay.
9     A.   So I've always been a correction officer.
10  No, I mean a probation officer since.
11    Q.   Understood.  Understood.  And tell me,
12  what did you do to prepare for your deposition today?
13         And I don't want to know, you know, just
14  to be clear I don't want to know any conversations you
15  would have had with Ms. Lones but, you know, any kind
16  of documents or video or anything that you would have
17  reviewed in preparation for today.
18    A.   No.  The only thing that I've done,
19  because all the paperwork that you've given, you know,
20  it was reviewed back when, but today to prepare the
21  only thing I pretty much looked at was my
22  documentation, my Scribe documentation.  That's about
23  it.
24    Q.   And when you say your Scribe
25  documentation, tell me what that -- what that is.

Page 15

1     A.   Oh, that's the documentation from -- with
2  the case, you know, when I took actions on the case.
3     Q.   Okay.  This is sort of -- there are a
4  couple documents that have your, you know, what you
5  did on a given day that has a date and then, you know,
6  a quick little narrative like, you know, tried to call
7  this person.
8     A.   That's correct.
9     Q.   Okay.  And you said the Scribe system.
10  That's what it was known as when it was in, you know,
11  the time period that we're going to be mostly talking
12  about today, 2012, as part of the Department of
13  Corrections; is that right?
14    A.   That's correct.
15    Q.   And then y'all got a new system when you
16  switched from the Department of Corrections to the
17  Department of Community Supervision that's now known
18  as Portal?
19    A.   Yes.
20    Q.   Okay.  And those are both systems for
21  keeping track of all your probationers, right?
22    A.   That's correct.
23    Q.   And in both systems you would have the
24  ability to, you know, make these narrative notes of
25  what you're doing on a given day?

Page 16

1     A.   Yes.
2     Q.   And in both of these systems you would
3  have the ability to input case documents for retrieval
4  later?
5     A.   Yes, pretty much.  What I'm -- when you
6  said what I'm doing on a given day --
7     Q.   Yeah.
8     A.   -- it's not, you know, every little thing
9  I've done all day long, but it's on a particular case.
10    Q.   Right, right, yeah, so there may be
11  for --
12    A.   Okay.
13    Q.   No, that makes sense.  I don't expect
14  that you would have done something every single day on
15  the Dashawn Gervin case from 2012 to 2019, but when
16  you do take some sort of action on a probationer's
17  case, that's something you would note in either Scribe
18  or Portal, right?
19    A.   That's correct.
20    Q.   And in Scribe or Portal you would input
21  or, you know, the case documents would already be in
22  the system, right?
23    A.   Yes.
24    Q.   And that would include, you know, the
25  criminal documents like the sentence, right?

Dashawn Gervin vs.
Pamela Florence, et al.

Pamela Florence
April 05, 2022

Page 17

1    A.    Yes.
2    Q.    And any probation violation statements or
3  things like that, right?
4    A.    Wait a minute.  Back up.
5    Q.    Yes.
6    A.    What was the question?
7    Q.    Yes, I'm trying to get a better
8  understanding of what documents would be in the Scribe
9  and Portal systems.
10   A.    Oh.
11   Q.    And I understand that the, you know,
12 criminal case documents would be in there but, also,
13 any -- you know, if someone from -- if a probation
14 officer, you know, took out a probation warrant, that
15 would also go in the Scribe system, correct?
16   A.    Well, in the Scribe system the paperwork
17 was -- the actual documents were not uploaded into the
18 system.  We had paper files.
19   Q.    You had paper files in the days of
20 Scribe?
21   A.    Yes.
22   Q.    Okay.  And the -- go ahead.
23   A.    I mean, however, once a person goes to
24 court, then the secretary would enter the disposition
25 in the court -- you know, from court, but as far as

Page 18

1  paperwork, that was not uploaded into the system.
2    Q.    It wasn't electronically uploaded, right?
3    A.    Right.
4    Q.    In Scribe?
5    A.    Right.
6    Q.    But it would be something a probationer
7  would have access to in the paper file?
8    A.    Yes.
9    Q.    Okay.  What is, in general terms, the
10 department policy about verifying sentence information
11 before issuing a probation revocation warrant?
12   A.    What is the policy about it?
13   Q.    Yeah, just as a probation officer what,
14 if anything, does department policy say about what
15 steps should be taken to verify sentence information
16 before a warrant is taken out?
17   A.    Usually before issuing a warrant, before
18 issuing a warrant we would have to -- I mean, of
19 course, we would have to have the information.
20   Q.    And how would you go about getting the
21 information?
22   A.    What, the sentence --
23   Q.    Yes.
24   A.    -- you're asking about?
25   Q.    Yes, correct.

Page 19

1    A.    The sentence?
2    Q.    Yes.
3    A.    Pretty much before issuing the warrant,
4  what I'm issuing the warrant for would have to be the
5  violation.  I'm not sure if we had the sentence.  I
6  mean, I don't know because when a person goes to court
7  we don't always have the paperwork right away either.
8          But I do know that he spent a little time
9  in jail once he got out.  So before I issued a warrant
10 to say that he can report, then I would go through the
11 steps that I took to try and locate him before I
12 issued a warrant.
13   Q.    Okay.  And I guess, you know, my question
14 is does the steps that you went through, did that
15 include looking at the sentence before you swore out
16 the warrant in this case?
17   A.    That I can't remember --
18   Q.    Okay.
19   A.    -- if I looked at the sentence or not.
20   Q.    I want to show you another
21 document because we were talking about, you know, sort
22 of what you did in this case and then, also, what the
23 policy is.  I want to show you the policy or a policy
24 at least, and can we mark DCS Policy 3.113 as
25 Exhibit 2.

Page 20

1          (Plaintiff's Exhibit 2 was marked for
2          identification, attached at the end of the
3          original transcript.)
4  BY MR. GREENAMYRE:
5    Q.    And looking at Page 5 of this where it
6  says Warrants, I'm just going to highlight some text.
7          DCS Portal Management will require the
8  supervising CSO to make sure that any and all
9  computations and adjustments are accurate for all
10 dockets in which a warrant is requested.
11         Do you see that?
12   A.    Okay, so it's talking about making sure
13 that end dates, pretty much, that's what I'm
14 understanding.
15   Q.    Okay.
16   A.    Saying that he's actually on probation,
17 and that he has an end date in the system, make sure
18 that our end dates are pretty much correct so, yes, we
19 do have -- I can't see it.
20   Q.    Oh, sorry.  You cut out for a second.
21 You said, We do have?
22   A.    Yes.  I mean, the part that you had
23 highlighted, that's what I was looking at.
24   Q.    And just so I understand what you were
25 saying --

Page 21

1    A.    They're on probation before we issue a
2  warrant.  We look at end dates before we issue a
3  warrant.
4    Q.    And does that, at least now, involve
5  looking at the sentence itself?
6    A.    Well, it's looking at the sentence to
7  make sure he's on probation.  Because it was
8  definitely a probation date and a timeframe.  There's
9  an end date so, yes, we looked at those things to make
10  sure that he's on probation prior to issuing a
11  warrant.
12    Q.    Understood.  And so this is the policy
13  that we've been provided in this case, which is
14  effective as of 2016, right?
15    We're talking about, you know, things
16  that happened back in 2012, so I guess my question for
17  you is was the policy different in 2012 or was it
18  essentially the same; that before taking out a
19  probation and a warrant you would look at the sentence
20  to see at least that the probationer was still on
21  probation?
22    A.    Yes, that's essentially the same.
23    Q.    Okay.  Take a step back, or I'm going to
24  take a step back with the next series of questions,
25  and I'm going to ask not about this case specifically

Page 22

1  but I'm going to ask sort of some background rules
2  about being a probation officer and taking out
3  warrants as a probation officer.
4    Do you agree that warrant affidavits must
5  be accurate, complete, and honest?
6    A.    Yes.
7    Q.    Do you agree that probation officers have
8  an obligation to fairly and accurately supervise and
9  administer probation?
10    A.    Yes.
11    Q.    Do you agree that fair and accurate
12  supervision of a probation officer requires a
13  probation officer to use the best information
14  reasonably available to them?
15    A.    Yes.
16    Q.    Do you agree that probation officers
17  working with either the Department of Corrections or
18  the Department of Community Supervision are expected
19  to follow DCS or DOC rules and procedures?
20    A.    Yes.
21    Q.    Do you agree that probation officers must
22  make a reasonable investigation using the information
23  available to them before obtaining a warrant?
24    A.    Yes.
25    Q.    Do you agree that a probation officer

Page 23

1  cannot guess when swearing out a warrant?
2    A.    Yes.
3    Q.    Do you agree that the Court sets the
4  terms of probation, not the probation officer?
5    A.    Yes.
6    Q.    And do you agree that the terms of
7  probation must be written on the sentence?
8    A.    Yes.
9    Q.    Do you agree that the United States
10  Constitution does not allow probation officers to
11  arrest people on probation when they are in full
12  compliance with the terms of their probation?
13    MS. LONES:  Before she answers I'm going
14    to object that you're asking her for a legal
15    opinion.  She can answer the question to the
16    best of her ability as someone who's not a
17    lawyer, but I do want that objection on the
18    record.
19  BY MR. GREENAMYRE:
20    Q.    You can go ahead.
21    A.    I actually want to go back to the
22  question prior to this one.
23    Q.    Yes.
24    A.    What was it again?  I just want to go
25  back because --

Page 24

1    MR. GREENAMYRE:  Ms. Bentley, can you
2  repeat it?  Because I am not 100 percent.
3    THE COURT REPORTER:  Yes.
4    (The record was read back by the court
5  reporter as follows:
6    "QUESTION:  And do you agree that the
7  terms of probation must be written on the
8  sentence?
9    ANSWER:  Yes.
10    QUESTION:  Do you agree that the United
11  States Constitution does not allow probation
12  officers to arrest people on probation when they
13  are in full compliance with the terms of their
14  probation?")
15    THE WITNESS:  Read the question again.
16    (The record was read back by the court
17  reporter as follows:
18    "QUESTION:  Do you agree that the United
19  States Constitution does not allow probation
20  officers to arrest people on probation when they
21  are in full compliance with the terms of their
22  probation?")
23    THE WITNESS:  Oh, that's correct.
24  BY MR. GREENAMYRE:
25    Q.    And I think, you know, this is a -- I

Page 25

1    mean, I'll concede that I'm not, as an attorney who
2    does these kind of cases, I don't know what the --
3    that the courts know for sure what the, you know, what
4    amendment governs that.
5            Do you have any thoughts on whether, you
6    know, that's a Fourth Amendment consideration that,
7    you know, you can't be arrested without probable cause
8    or whether that's an Eighth Amendment, you know, sort
9    of situation, since these people might be still
10   serving some kind of sentence, or whether that's a
11   Fourteenth Amendment, due process?
12           Do you have any thoughts on, you know,
13   what the source of that right not to be arrested when
14   you're not doing anything wrong on probation?
15   **A.    No, I don't know.**
16   Q.    That's fair enough.  I don't either.
17   **A.    Okay.**
18   Q.    All right.  I want to show you another
19   document.  This is a document that is three pages, and
20   it says, Case Note Entries.  Let's mark it as
21   Plaintiff's 3.
22           (Plaintiff's Exhibit 3 was marked for
23           identification, attached at the end of the
24           original transcript.)
25   **BY MR. GREENAMYRE:**

Page 26

1    Q.    Do you recognize this document?
2    **A.    I do.**
3    Q.    All right.  Is this what you reviewed
4    earlier when you were describing looking at your
5    materials on Scribe?
6    **A.    Yes.**
7    Q.    And it looks like this sort of goes in
8    reverse chronological order so on the top of the first
9    page we have 2014, but let's go to the bottom and talk
10   about what happened in 2012.
11           So is this -- let me maybe back up and
12   ask you a more basic question first.  Is this what the
13   notes would look like when they were in the Scribe
14   system?
15   **A.    Yes.**
16   Q.    Okay.  All right.  Who is Mattie Barnes?
17   **A.    She was the -- she was the -- one of the**
18   **secretaries or administrative staff.  She is the one**
19   **who went to court.  She took down the pleadings, and**
20   **she comes back and she creates the file in the system.**
21   Q.    Okay.  So when you say she was a
22   secretary, do I take from that that she was not a
23   probation officer, like not a POST-certified person
24   like you are?
25   **A.    That's correct.**

Page 27

1    Q.    All right.
2    **A.    Administrative, yes.**
3    Q.    Understood.  So this looks like she gets
4    this case, or the first entry we see is from March of
5    2012.  It says, Transfer requested.  What does that
6    mean?
7    **A.    Okay, so when Ms. Mattie Barnes went to**
8    **court, which was January, actually.  I don't know**
9    **why -- well, it was entered into the system.**
10   Q.    I think you may have froze again.
11   **A.    And this is one of the case notes that**
12   **she would put in here.**
13   Q.    Sorry about that.  I think you froze, so
14   I missed a lot of what you just said.
15   **A.    Okay.**
16   Q.    So let me start by asking a different
17   question, and then I'll get back to this.
18           When you're answering any of these
19   questions, if there are documents that would be
20   helpful to look at, by all means, right?
21   **A.    Okay.**
22   Q.    And I have a -- I'll show you whatever I
23   can so I can put it on the screen if you want, but it
24   looks like you're looking at some documents down to
25   your right.  That's no problem at all.

Page 28

1    **A.    Oh, down to my right is what I'm looking**
2    **at on the screen.  It's so tiny, so I am looking at**
3    **the same document.**
4    Q.    And it's not problem if you're looking at
5    different documents.  That's no problem.  That's fine.
6    **A.    And I got the date where he was put on**
7    **his sentence.**
8    Q.    Got it.
9    **A.    At the bottom where the jury signed, that**
10   **date.**
11           **Ms. Barnes's job would have been to go to**
12   **court, take down the plea or the sentence and with the**
13   **probation department.  So she would come back and she**
14   **would enter the information into the Scribe system,**
15   **which is -- was part of the Department of Corrections.**
16   **And once she does that, then our job would be to wait**
17   **until we receive the sentences from the Court.**
18   Q.    Okay.
19   **A.    We would make a file, a paper file.  She**
20   **was responsible for giving us a paper file.**
21   Q.    Got it.  And goes back to the question
22   from a minute ago where it says, Transfer requested.
23   What does that mean?
24   **A.    That is probably, or is when she entered**
25   **the information into the system.  It looked like he**

Page 29

1  was transferred into the system.  So this is when she
2  actually, she entered the information in, and then she
3  put a case note in.
4      Q.    Okay.
5      A.    When I say "transfer in", she's
6  transferring it to our service.  It's just different
7  steps that the administrative staff has to do once
8  they get a case.  They enter it into the Scribe
9  system, which is the Department of Corrections system,
10  and then the case action she used was transferring it.
11     Q.    Okay.  And so this is, where it says,
12  "Transfer requested", that's just transferring it to
13  a --
14     A.    Our server.
15     Q.    A probation officer like yourself,
16  correct?
17     A.    Probation office, yes, that's correct.
18     Q.    Okay.
19     A.    If he had -- for an example, if he had
20  got sentenced in Atlanta, then they would transfer it
21  into the Atlanta office.
22     Q.    Uh-huh (affirmative).  Okay.  You know,
23  because there are other possible kinds of transfers.
24  You know, like he could be transferred to a different
25  judicial circuit for probation.  You know, that

Page 30

1  happens relatively frequently, correct?
2      A.    That's correct.
3      Q.    And then I guess he could also be
4  transferred out of state through the interstate
5  compact, right?
6      A.    That's correct.
7      Q.    And where it says, Transfer requested,
8  banished from South Georgia Circuit, that wasn't --
9  she didn't mean either of those kind of transfers
10  where he was transferred to somebody else for
11  supervision, as you understand it?
12     A.    Right.  From my understanding he's not
13  transferred anywhere else.  He's being transferred
14  into our system at this time.
15     Q.    Got it.  Okay, and then when he gets
16  transferred into the system, y'all will make the paper
17  file.  You're awaiting the sentence documents so that
18  you as a probation officer can start accurately
19  administering his probation?
20     A.    That's correct.
21     Q.    So let's -- I think you said you
22  were looking at this a second ago, but let's look at
23  it now.
24            Was this the sentence document that you
25  were referring to, or that you were looking at

Page 31

1  earlier?
2      A.    The one that you have up?
3      Q.    Yes.
4      A.    Well, this?  Yes.
5      Q.    Okay, perfect.  And then maybe let's mark
6  the sentence as --
7      A.    Wait a minute.  No, this is the case
8  notes.  These are case notes right here.  What you
9  have pulled up, these are case notes from the Scribe
10  system.
11     Q.    Right.  And then -- oh, okay, sorry.  My
12  screen is doing something weird.  Let me swap.
13            Okay, now do you see the sentence?
14     A.    Yes.
15     Q.    Okay.
16            MR. GREENAMYRE:  And let's mark this as
17     4.
18            (Plaintiff's Exhibit 4 was marked for
19     identification, attached at the end of the
20     original transcript.)
21  BY MR. GREENAMYRE:
22     Q.    And that was what you were looking at a
23  moment ago, right?
24     A.    Yes.
25     Q.    Okay, perfect.  All right, so we'll come

Page 32

1  back to this.  A few more questions on the case notes.
2            It looks like your first note is from
3  April 18th, and it says, you know, received case this
4  date.  Do you see that?
5      A.    Yes.
6      Q.    And do you know whether you had the
7  criminal docket information at this time?
8      A.    Yes, probably.  I mean, I don't remember,
9  but I'm sure.  Probably so.  Probably, yes.
10     Q.    And it says, Banished from South Georgia
11  Judicial Circuit during probation, which you
12  presumably would have gotten from the sentence itself,
13  right?
14     A.    Yes.
15     Q.    Where it says, We have no information on
16  the subject.  What do you mean by that?
17     A.    We have no information on him; name,
18  addresses, phone numbers, where is he going.
19     Q.    Okay.  And so to try and figure that out
20  you called the Sheriff's Office, and it looks like
21  he -- they told you that he had been released three
22  and a half months earlier and was on a -- you know, on
23  a bus to Louisiana, right?
24     A.    Yes.
25     Q.    Okay.  And then, you know, the next

Dashawn Gervin vs.
Pamela Florence, et al.

Pamela Florence
April 05, 2022

Page 33

couple entries, we have efforts by you to try and
reach out to his family and find him; grandmother and
then sister, aunt. It says he might have been in
Missouri at some point. Do you see all this?

A. Yes.

Q. And then you talk with his father,
Mr. McCall, correct?

A. Yes.

Q. And then you learn that he was
incarcerated in North Carolina?

A. Yes.

Q. And then eventually you -- after you're
not able to find him, you apply for a warrant for
failure to report and failure to provide address,
correct?

A. Yes.

Q. All right. And then let's take a look at
that warrant.

And can you see this document?

A. Yes.

Q. All right.

MR. GREENAMYRE: And can we mark this as
Plaintiff's 5.

(Plaintiff's Exhibit 5 was marked for
identification, attached at the end of the

Page 34

original transcript.)

BY MR. GREENAMYRE:

Q. Do you recognize this to be the warrant
that you swore out in 2012 for arrest for violating
his terms of probation?

A. Yes.

Q. Before we get into this, some more
background. How did you come to be assigned to the
case?

A. A supervisor, someone must have assigned
me the case. I'm not sure.

Q. Fair enough. Who was your supervisor at
the time?

A. Supervisors? Let me see. I just started
there. It was either Mr. Worsley, or there was
another lady there. I'm not sure which was my
supervisor at that time. I just started working in
Camilla at that time.

Q. Okay. Did you ever meet Mr. Gervin
before taking out this warrant?

A. I did not.

Q. Have you ever met him or even laid eyes
on him since then?

A. I want to say -- well, I don't remember.
You know, I vaguely remember once he came back to go

Page 35

to court. I didn't go to court, but I remember him
reporting from the jail to the office and to see an
officer on his way back, wherever he was going.

Q. Okay.

A. You know, he came back for the
revocation.

Q. Okay.

A. I don't know what he looks like or
anything like that, but I vaguely remember him at this
time.

Q. This would have been after the revocation
hearing and he was released back onto probation,
correct?

A. Yes.

Q. Okay. And so the only person from the
probation office that would have been at his
sentencing would be Ms. Mattie Barnes?

A. Yes.

Q. All right, so looking at this warrant and
then at your case notes, it looks like this was a
document that you prepared and then, you know, had
signed on May 29th and then the judge doesn't sign
until May 31st.

I guess walk me through the process of, I
guess you get a -- were you -- let me ask you a better

Page 36

question, right?

So were you the person that prepared this
document?

A. I prepared the warrant. Then I have to
have the warrant notarized prior to submitting it to
the judge.

Q. All right.

A. So the secretary, another secretary, she
notarized the warrant and escorted it to the judge for
signature.

Q. Okay. And the judge, Judge Cato, signed
this based on what you wrote in the warrant, correct?

A. That's correct.

Q. This wasn't the kind of warrant where
you, you know, offered sworn testimony before Judge
Cato, correct?

A. Correct.

Q. Okay. And so are there any -- did you
take any steps to investigate Mr. Gervin's probation
prior to taking out the warrant other than what we see
in the case note entries?

A. No. I mean, not as far as what's in the
entry, that I know of.

Q. Let's look at the sentence again, and you
would agree with me that there's, you know, no

Page 37

1  checking of the general conditions or other conditions
2  of probation boxes, correct?
3      A.   Looking at the sentence, no, you're
4  right, there are no boxes checked.
5      Q.   And this -- do you understand that this
6  is Mr. Gervin's actual sentence for this case?
7      A.   Yes.
8      Q.   So walk me through, you know, or I take
9  it that now you understand that he was not, in fact,
10 required to report to the office or notify of any
11 change of address; is that right, what you know now?
12     A.   Well, I realize now that the boxes were
13 not checked, but I also realize that this is an
14 unusual sentence, you know, even if he had -- well,
15 no, not even if -- anything of that nature.
16         When a person is sentenced to probation
17 we have "X" number of days to do intake.  That's
18 number one.  Number two, we don't have the sentence on
19 hand.  Number three, when they come in to report, we
20 do the intake paperwork, whether we have the sentence
21 or not, and everyone is always read the general
22 conditions of probation.
23         So, you know, this is an unusual sentence
24 to say that a person is on probation.  Usually the
25 sentence is -- the sentences that I have seen in the

Page 38

1  past, if a person does not have to report or do any of
2  his conditions, the probative sentence would have been
3  suspended.
4          So with that being said, my job was to
5  get my information, and in getting my information then
6  I probably, just a conversation would have been able
7  to see this and know the rest.
8          But in the meantime, he was sentenced to
9  seven years probation, and as protocol we have to do
10 intake on these offenders, whether they are supervised
11 or not.  So it's just unusual that a judge wouldn't
12 check a box.  Even if he said banished from South
13 Georgia Circuit, he's still on probation but not on
14 probation.
15         So I see that no boxes are checked and
16 the warrant is based on him not reporting and me not
17 being able to find him.  And so I understand the
18 comparison.
19     Q.   Yeah, so I mean we'll talk a little bit
20 more about that, but can we agree now, you know, as of
21 today, 2022, that according to his sentence he did not
22 actually have to report in person or notify you of his
23 address?
24     A.   That's what I'm not sure about, is he was
25 actually sentenced to probation, you know, as far as

Page 39

1  him not giving us an address, so I don't know on that.
2      Q.   Okay.  I guess I asked you a -- arguably
3  asked you a two-part question, right?
4          Would you -- with both, I guess
5  Condition 4 and Condition 6, the general conditions,
6  and I take from your answer that you agree that he
7  didn't have to report to probation, correct?
8      A.   I agree that none of his boxes are
9  checked, are checked, and all the sentence says was
10 banished from South Georgia Circuit.
11     Q.   Okay.
12     A.   As far as a report, report, the sentence
13 says no boxes, and the warrant says he should have
14 reported and we should have known his whereabouts.
15     Q.   Okay.  Yeah, I guess I just want to
16 understand, you know, where -- what your -- I guess
17 what your thoughts are on this, right?
18         And I don't want to put words in your
19 mouth, but I take potentially from what you're saying,
20 and let me know if you agree or disagree with this,
21 all right, that when you swore out the warrant, you
22 assumed that, you know, Boxes 4 and 6 were checked
23 because that's what happens in most sentences if
24 someone is on probation.  They have to report and they
25 have to advise you of their address.

Page 40

1          But you didn't look at the sentence
2  itself and know that the boxes weren't checked; is
3  that fair?
4      A.   I don't know.  I mean, I don't know what
5  papers I had that day.  I don't know what I had on
6  hand, but I know he didn't report and I know I was
7  supposed to look for him.  It had been months.  I know
8  he was sentenced to do 12 months in jail and when he
9  was supposed to get out.  That's what I know.
10         So I can assume that I did look at the
11 paperwork and know that he was supposed to -- I was
12 checking to see if he was in jail because we are
13 supposed to check, but he wasn't anywhere to be found.
14 So I can say that the boxes are not checked.  I issued
15 the warrant based off of the incident report and I
16 can't find him.  And he was sentenced to probation.
17     Q.   So as best as you can tell at this point,
18 you know, in fairness, in 2022, ten years after the
19 fact, roundabout, almost ten years after the fact, you
20 don't know whether you looked at the warrant or the
21 sentence itself before you took out this warrant; is
22 that fair?
23     A.   I know I looked at a warrant because I
24 documented that I knew his sentence in the case notes.
25 I mean, I know I looked at the sentence.

Page 41

1    Q.   Okay.
2    A.   But I don't remember that day, but I'm
3 sure I looked at the sentence because that's what I
4 do.
5    Q.   Okay.  You know, with cases -- and I
6 guess this is a basic question, but all I've ever
7 seen, you know, from my own requests and from the
8 documents that I've gotten from the Attorney General's
9 Office is this version of the sentence.
10       You're not aware of any version of the
11 sentence that has these boxes checked, are you?
12   A.   Not of this sentence, no.
13   Q.   Obviously other people, you know, had the
14 boxes checked, right?
15   A.   Yes.  Okay, yes.
16   Q.   Okay.  And would you agree with me that,
17 you know, when a person is being sentenced the judge
18 will read off what the conditions of probation are to
19 the probationer?
20   A.   I haven't always been in court, you know,
21 and I was not aware because at the time of sentencing
22 and at the time that we make our files in the office
23 we don't have attorney's files.  In order for me to
24 know exactly what the judge said, and which I've
25 requested it in the past for people, then I would have

Page 42

1 to request a copy of the transcript.
2       So I'm not always in court, and I do
3 visit court now to know during trial week that the
4 judge do read off the sentence.  Back then I wasn't in
5 court to know what the judge read off because I wasn't
6 in trials.  I didn't go to trial.  I only went to
7 revocation hearings.
8       But yes, I am aware now that the judges
9 will read off the general conditions of probation.
10 The judge will read off special conditions of
11 probation.
12   Q.   Okay.  And it's your understanding that
13 that's how the probationer knows what the terms of
14 their actual probation are, is whatever the judge
15 says, right?
16   A.   Yes.
17   Q.   Okay.  And a second ago you said that
18 you -- at the time that you procured this warrant you
19 most likely didn't have the transcript of the
20 sentencing hearing; is that correct?
21   A.   That's correct.
22   Q.   Okay.  Did you ask anyone for the
23 transcript of the sentencing hearing?
24   A.   No.
25   Q.   Did you ask anyone for clarification

Page 43

1 about what the situation is where none of the boxes
2 are checked on the sentence?
3    A.   No.
4    Q.   When a person is sentenced to a term of
5 probation, you said a second ago that the judge will
6 inform them about what the terms of their probation
7 are.  Does the -- I guess back in 2012 did the
8 probation office also inform them of what their
9 probation, the terms of their probation were, or did
10 they rely on what the judge told them?
11   A.   Repeat that.
12   Q.   Yes.  So the probationer has to know what
13 the terms of their probation are, and one way that
14 they could learn that is what you testified a second
15 ago, is that the judge will tell them; you know, this
16 is what you sentenced to.
17       And my question to you is, as a matter of
18 practice back in 2012 did the probation office also
19 inform the probationer about what the terms of their
20 probation are?
21   A.   During intake probationers are informed
22 of their conditions of probation.  That is the purpose
23 of intake, is to meet with the probationers, to take
24 down their information, to read them their conditions
25 of their probation from the courts.  That's -- because

Page 44

1 that's what we supervise them by.  So in this case we
2 didn't have an intake.
3    Q.   When a person is sentenced to, you know,
4 a period of time in the county jail before they go on
5 probation, how do they know to report to the probation
6 office?
7    A.   If a person -- just repeat it.  I think I
8 know what you said, but would you repeat it, just to
9 make sure?
10   Q.   Yeah, no, absolutely.  That's a good
11 practice to do.
12       So if a person is sentenced to a period
13 of confinement in the county jail and then they go on
14 probation, how does the person know to report to
15 probation or where to report to probation or who their
16 probation officer is or anything like that?
17   A.   The staff member who's in court, they
18 will tell them.
19   Q.   Okay.  So in this case if we are looking
20 at the SEP, that would be Mattie Barnes would have
21 told Mr. Gervin?
22   A.   To report when he gets out.
23   Q.   Okay.  If that was part of his sentence?
24   A.   Right.  No, I mean, she's admin staff so
25 get his name, if she can.  Because, of course, if he

Page 45

1  was incarcerated, I don't know how much time she would
2  have had. I don't know if it's a trial week. They
3  probably had pleas back to back. I'm not sure.
4        At one point she would have seen him, but
5  she would be the one. Once they get sentenced, she
6  would tell them you need to report to probation once
7  you get out, and that would be her job.
8     Q.   Okay. And she would inform the
9  probationer about what the probationer's actual terms
10  were, correct?
11    A.   She would not.
12    Q.   Okay, so what would she tell them?
13    A.   Her job is -- her job was to take down
14  the sentence in the courts. And if they were coming
15  to probation, she'll tell them when to report to the
16  probation office. If they were going to spend some
17  county time in jail, she would tell them to report
18  when they get out, you know.
19        So if they were going to prison and they
20  got to do five years in prison, report after five
21  years to probation. She would tell them to report
22  upon release from prison. She wouldn't be the one to
23  go over their conditions of probation with them.
24    Q.   Okay. But it's not your understanding
25  that she would give people instructions to report to

Page 46

1  probation when they weren't on probation or didn't
2  have to report to probation?
3     A.   If they didn't have probation I don't
4  know what she would have told them, but I just know
5  that her job was to take down the sentences in court.
6        And if they were sentenced to probation,
7  she would tell them to report to probation upon being
8  released.
9     Q.   Okay. Just as a practical matter, if --
10  you know, looking at this sentence, if someone is told
11  not to return to the South Georgia Judicial Circuit --
12  first, what counties does that entail?
13    A.   He was sentenced in Mitchell County, so
14  South Georgia Circuit is Mitchell County, Calhoun
15  County, Baker County, Grady County, and Decatur
16  County.
17    Q.   Okay. And the South Georgia Judicial
18  Circuit's probation office, there's one in Camilla, in
19  Mitchell County, correct?
20    A.   At that time there was.
21    Q.   Okay.
22    A.   But, yeah.
23    Q.   So according to this sentence Mr. Gervin
24  couldn't have physically reported to the probation
25  office without violating the "Do not return to South

Page 47

1  Georgia Judicial Circuit" term of his probation,
2  correct?
3     A.   This goes to one of these cases. He got
4  out of jail, he was already in the circuit. Did he
5  stop by the office on his way out of the circuit? You
6  know, I don't want to think about what the jail would
7  do to people, but he's already in the circuit.
8     Q.   Do you -- go ahead. Go ahead. I don't
9  want to cut you off.
10    A.   When people are banished from the circuit
11  on probation and we have to transfer a case and so
12  forth, they can either just report straight to their
13  circuit and not come back to the circuit, or judges
14  just sentence people different ways. So he said, Do
15  not return.
16    Q.   Okay.
17    A.   Get out of jail, he was still in the
18  circuit.
19    Q.   Okay. And looking back at your notes, do
20  you see that he was -- the Sheriff's Office purchased
21  a bus ticket for him to get out of the judicial
22  circuit?
23        I got it highlighted on the screen.
24    A.   Oh, okay, so this is where information
25  was given to me.

Page 48

1     Q.   Right. So you knew as of April 18th that
2  he had been put on a bus, right?
3     A.   That's right.
4     Q.   Yes?
5     A.   That's right.
6     Q.   And do you see this document?
7     A.   The first time I've seen that. Yes.
8     Q.   We'll mark the Greyhound ticket as
9  Exhibit 7.
10        (Plaintiff's Exhibit 7 was marked for
11        identification, attached at the end of the
12        original transcript.)
13  BY MR. GREENAMYRE:
14    Q.   And I'll represent to you that this was
15  provided to us in the course of discovery, but it
16  looks like he goes straight from the jail to the bus
17  station. The deputies actually drove him to the
18  Greyhound station in Albany?
19    A.   Uh-huh (affirmative).
20    Q.   Does that refresh your recollection?
21    A.   The case notes, yes. Yes, uh-huh
22  (affirmative).
23        There are other ways to report. He could
24  have called by phone, you know.
25    Q.   Sure. And my question is just he

Page 49

1 couldn't have physically reported without violating
2 the "Do not return" condition unless -- you know,
3 after he had been put on the bus to Missouri, correct?
4        We can agree on at least that much?
5    A.    No, I can't. I didn't hear anything.
6    Q.    Okay.
7    A.    I didn't hear anything. I'm sorry.
8    Q.    Well, that will give me a chance to ask a
9 better question.
10    A.    Okay.
11    Q.    So a better question is, you were saying
12 that maybe he couldn't -- you know, there are other
13 ways to report. He can call in. But we can at least
14 agree that once he got put on the bus by the Sheriff's
15 Office and sent off to Missouri, he couldn't report
16 back physically to the probation office in Camilla
17 without violating the term of his sentence that said,
18 "Do not return"?
19    A.    Yes, that's correct.
20    Q.    All right. I want to show you another
21 document, the transcript of the probation revocation
22 hearing in this case.
23        Do you recognize this document?
24    A.    Yes.
25    Q.    Okay, and can we mark this as 8,

Page 50

1 Plaintiff's 8.
2        (Plaintiff's Exhibit 8 was marked for
3    identification, attached at the end of the
4    original transcript.)
5 BY MR. GREENAMYRE:
6    Q.    First, this indicates that the hearing
7 took place on February 2nd, 2021. We can agree that's
8 not right, correct; that his probation revocation
9 would have happened in 2019?
10    A.    This is -- this is for the revocation
11 hearing. Is this what you want to see?
12    Q.    Yeah, exactly.
13    A.    Okay.
14    Q.    And I'm just looking on this first page,
15 it says February 2nd, 2021, and my question is we know
16 that that's not right. We can agree that that hearing
17 didn't actually take place in 2021 because it took
18 place in 2019, correct?
19    A.    Oh, I'd have to go back and make sure.
20 No, it wasn't 2021, you're right.
21        Wait a minute. Back up to that page.
22 Let me see that front page.
23    Q.    Yeah, yeah.
24    A.    That one. I was just reading. Let's
25 see. Yeah, that's correct. I mean, the date is not

Page 51

1 correct.
2    Q.    All right. Thank you.
3    A.    I wanted to make sure that wasn't when it
4 was requested or something.
5    Q.    Yeah, and this is the probation
6 revocation when Ms. Milton testified.
7    A.    Okay.
8    Q.    And just I'll show you another document.
9 This is a timeline that looks like it was prepared in
10 the course of litigation that shows the probation
11 revocation hearing happening in August of 2019.
12        Do you see that?
13    A.    Yes.
14    Q.    Okay. Let's mark this timeline as
15 Exhibit 9.
16    A.    Okay.
17        (Plaintiff's Exhibit 9 was marked for
18    identification, attached at the end of the
19    original transcript.)
20 BY MR. GREENAMYRE:
21    Q.    Do you recognize this document?
22    A.    Yes.
23    Q.    Who prepared it?
24    A.    I believe I did. I went through the
25 notes.

Page 52

1    Q.    Got it. So we can agree that the
2 probation revocation hearing that we're about to look
3 at, that happened in August of 2019, correct?
4    A.    Yes.
5    Q.    Okay. All right, so let's look at that.
6    A.    Yes.
7    Q.    Okay. And we see at one point on Page 4
8 Ms. Milton is asked when he was placed on probation
9 was he made aware of his conditions, and she answered,
10 I'm not sure unless the judge said it when sentencing.
11    A.    Okay.
12    Q.    Do you see that?
13    A.    Yes.
14    Q.    Okay. Do you have any information that
15 would be different from what Ms. Milton testified to?
16    A.    I don't know. No, not that I know of. I
17 mean no.
18    Q.    At this point you were Ms. Milton's
19 supervisor; is that correct?
20    A.    Yes.
21    Q.    And as part of your supervisory duties of
22 probation officers would you ask that they prepare an
23 outline of their testimony when they were going to be
24 appearing in court?
25    A.    No. They don't always provide a copy of

Page 53

1 their testimony, no.

2 Q. Okay. But on occasion you would ask
3 Ms. Milton to prepare an outline of her testimony
4 prior to her appearing in court?

5 A. No.

6 Q. Have you ever asked Ms. Milton to prepare
7 an outline of her testimony prior to her appearing in
8 court?

9 A. Well, when we start supervising parolees,
10 yes.

11 Q. So that wouldn't apply to probationers?
12 Or tell me why --

13 A. I don't recall asking her to prepare me a
14 copy of her testimony. I don't recall asking her to
15 do that.

16 Q. Okay, but you knew she was going to be
17 offering testimony in this case, correct?

18 A. Yes.

19 Q. Okay. And what is a DR?

20 A. That's just a summery that's given to the
21 judge prior to court. It goes along with the
22 paperwork. It will pretty much have a summary of
23 behavior, the violation, what we're taking him back to
24 court for. It will have her recommendation.

25 Q. And what does "DR" stand for; delinquency

Page 54

1 report?

2 A. Yes.

3 Q. And you approved the DR that Ms. Milton
4 prepared in this case?

5 A. Yes. If my signature is on it, I did,
6 yes.

7 Q. And I want to scroll down a little bit.
8 Looking at Page 6 to this, we have, Argument from ADA,
9 Mr. Richardson. Do you see that?

10 A. Yes.

11 Q. Do you know Mr. Richardson?

12 A. Yes.

13 Q. And here he says, you know, As the Court
14 knows, Judge Cato always, always read the conditions
15 of probation from the bench.

16 Do you know that to be Judge Cato's
17 practice as well?

18 A. Does he read conditions? Yes.

19 Q. I want to show you another series of
20 documents. This is an e-mail chain. You're not on
21 the first one, but it looks like you show up a little
22 bit later. Do you see this?

23 A. Yes.

24 Q. Can we mark this e-mail chain as
25 Plaintiff's 10.

Page 55

1 (Plaintiff's Exhibit 10 was marked for
2 identification, attached at the end of the
3 original transcript.)

4 BY MR. GREENAMYRE:

5 Q. And, first, who is Ms. Baker?

6 A. She's our director for the South Georgia
7 Circuit. Well, yeah, for the whole district. She's
8 our director.

9 Q. Tell me, is district broader than just
10 the South Georgia Circuit?

11 A. No. She's for the district, this whole
12 area. Other circuits, too, for the area, south.

13 Q. So she would have a number of different
14 judicial circuits under her area of supervision,
15 correct?

16 A. That's correct.

17 Q. All right. What about Mr. Worsley, is
18 this the individual that you said was your direct
19 supervisor or one of your direct supervisors back in
20 2012?

21 A. I believe so, but he was the chief maybe.
22 I'm not sure because there were a supervisor there. I
23 mean, there wasn't a supervisor there so it would have
24 been him or Vaughn, but I believe it was Mr. Worsley.

25 Q. Okay. And then I guess as of now, you

Page 56

1 know, this e-mail is from 2021, but 2021 and through
2 now what is his position with DCS?

3 A. He's still my supervisor. He is the
4 coordinating chief of the circuit.

5 Q. Okay. And then we get a Charles Purvis,
6 who is he?

7 A. He must have been someone in legal.

8 Q. Maybe you don't know Charles Purvis?

9 A. I know Purvis. I just forgot the title
10 because you're asking me. I do that. Yeah, I know
11 Charles. I got to make sure. It was a question that
12 they asked him, apparently.

13 Q. Right. And you think he's an attorney?

14 A. He may be able to tell us what was what
15 with this violation. I'll let you know his title.

16 Q. That's fine. And it looks like there's
17 an e-mail on May 5th, 2021, that says the sentence
18 isn't uploaded in Portal; is that correct?

19 A. Yes, that's correct. That's what it
20 says.

21 Q. So it looks like they sent you to pick up
22 the sentence and other documents from the clerk's
23 office, correct?

24 A. Correct.

25 Q. And that was back in 2021, right?

Page 57

1  A.  Yes.
2  Q.  So that would mean as of 2019 during the
3  revocation proceedings the sentence wouldn't have been
4  in Portal, right?
5  A.  No, and it should have been put in the
6  Portal because we were in the process of discarding
7  the files along in that time, but it wasn't in the
8  Portal.  There should have been a paper file back in
9  2019, so prior to closing the office, because we
10  closed our office around the pandemic time, everybody
11  should have been uploading paperwork at that time into
12  the Portal before the files were discarded.
13  Also, along that time I think there
14  was -- I remember when he went to court we were not in
15  our office.  We were relocated due to renovations,
16  also, so --
17  Q.  Where were y'all working out of?
18  A.  The 911 building in Mitchell County.
19  They gave us a space to work in, you know, to meet
20  probationers, to do things like -- of that nature.
21  Q.  And what was the address of the 911
22  building?
23  A.  It was right beside the jail.  I don't
24  know the address, but it was right beside the jail on
25  Highway 37.

Page 58

1  Q.  And how close or far was it from the
2  courthouse?
3  A.  From the courthouse?
4  Q.  Yes.
5  A.  The revocation hearing, if you want to
6  know that, the revocation hearing was held in the
7  jail.  But the courthouse would be into town, maybe
8  about four miles, five, you know.
9  Q.  Not across the street but not far either?
10  A.  Right.  The jail is more in walking
11  distance, like right beside each other.  You don't
12  even have to meet in the road.  You can walk across
13  the parking lot.
14  Q.  And you would agree that as of, you know,
15  I guess 2017, 2018, 2019, there were systemwide issues
16  with the accuracy of the data that was in the Portal
17  system, correct?
18  A.  You say systemwide?
19  I would say that these documents was not
20  uploaded.  As far as the information about a case,
21  that was in the Portal.
22  Q.  Give me one second.  I just want to pull
23  another document.
24  (Plaintiff's Exhibit 11 was marked for
25  identification, attached at the end of the

Page 59

1  original transcript.)
2  BY MR. GREENAMYRE:
3  Q.  Okay, let me show you another document.
4  It's a four-page document.  I just want to scroll
5  through briefly and then ask you a couple questions.
6  Do you recognize this document?
7  A.  Yes
8  Q.  Okay.  Tell me what's your
9  understanding -- what it is, to your understanding.
10  A.  Okay.  This is just information saying
11  that the Portal will create a way for users to verify
12  computations.  The information in the system.
13  Q.  Go ahead.  Sorry.
14  A.  Like if something new has changed, and it
15  would give you instructions on how to find it, to
16  scroll down a little further or where to go to look
17  for pretty much a training to show you where it is in
18  the Portal, to show you how to get there.  You know,
19  tell the offices how to find it.  Anything new or
20  updated that they were doing in the system, merger,
21  they would always send out reports to show you, if it
22  was something new, how to operate.
23  Q.  And these are I guess a little click
24  screen about -- it seems that this is about,
25  especially about sentence computation, but you would

Page 60

1  agree that you would have to verify sentence
2  computation on docket and click a "Yes" before you
3  submit a warrant application?
4  A.  Yes, and the computation would be showing
5  with another person if he's on probation or not on
6  probation.
7  Q.  Right.  And the way that, according to
8  DCS policy, if someone determines whether they're on
9  probation or not on probation is by looking at the
10  warrant itself, correct?
11  Or the sentence itself.  Sorry.
12  A.  Right.  And the computation, it would say
13  whether they're on probation or not.  Clearly he said
14  it's the probation, so the dates in the system would
15  be that he's on probation.
16  Q.  Understood.
17  MR. GREENAMYRE:  Okay.  Let's take like a
18  five-minute break, if that's okay.
19  MR. LEMMON:  Going off the video record
20  at 11:31.
21  (A recess was taken from 11:31 a.m. to
22  11:40 a.m.)
23  MR. LEMMON:  Back on the record at 11:40.
24  BY MR. GREENAMYRE:
25  Q.  Okay.  Thank you, Ms. Florence.  I don't

Case 1:21-cv-00067-LAG    Document 15-4    Filed 05/16/22    Page 17 of 27
Dashawn Gervin vs.
Pamela Florence, et al.

Pamela Florence
April 05, 2022

Page 61

1 have too many more questions for you. A couple
2 things, and I'll bounce around a little bit.
3        So, you know, with the sentence I want to
4 get a little bit more clarity. Is it your
5 understanding that even though boxes aren't checked,
6 Mr. Gervin had the obligation to report to probation?
7    A.    **You say do I understand that he had or**
8 **did not? What did you ask?**
9        **Say that one more time.**
10   Q.    Yeah, the question is looking at the
11 sentence now and seeing that the boxes are not
12 checked, is it your understanding that even though
13 this box isn't checked, you know, General Condition
14 Number 4, that Mr. Gervin still had the obligation to
15 report to probation?
16   A.    **Oh, I'm just looking over my sheet. The**
17 **boxes aren't checked so, no.**
18   Q.    And the same question with Number 6, Do
19 not change present place of abode, move outside the
20 jurisdiction, or leave the state without permission.
21        You would agree now, because that box
22 isn't checked, Mr. Gervin didn't have to do what that
23 box says, correct?
24   A.    **According to the box, no.**
25        **You know, on probation, we also get into**

Page 62

1 **where, you know, he's on probation in another state.**
2 **If that's the case we have interstate rules as well.**
3 **So according to the box he's not supposed to do**
4 **anything but come back -- don't come to the circuit**
5 **because the boxes are not checked.**
6    Q.    Right. Yeah, to be clear, he left to go
7 to Missouri or North Carolina or Louisiana or
8 wherever, maybe all of those places, right, but he was
9 never on the interstate compact for supervision of
10 out-of-state probationers, was he?
11   A.    **He never reported to be put on there.**
12   Q.    And when you get put on interstate
13 compact for probation, you don't get to add new
14 probation requirements; you just have the same
15 probation requirements that you had in the sending
16 state enforced and monitored in the receiving state,
17 correct?
18   A.    **No. Some states you have to follow some**
19 **of their conditions as well.**
20   Q.    Okay.
21   A.    **In addition to, you know, our state. You**
22 **know, if I transferred somewhere out of state, you**
23 **know, they have general conditions that they can**
24 **require them to do as well.**
25   Q.    Okay, but we can agree that Mr. Gervin

Page 63

1 was never on the interstate compact, correct?
2    A.    **Right.**
3    Q.    The next deposition we're going to take
4 is of Mr. Hoke Hampton, who I believe his involvement
5 was he authored a tolling affidavit. Tell me what a
6 tolling affidavit is and why it would be done in a
7 case like this.
8    A.    **Pretty much after 30 days if an**
9 **individual has not been able to be located, then we**
10 **can toll the probation time. It means to stop their**
11 **probation time from running until they are located or**
12 **until they enter jail in another, you know, circuit or**
13 **state or something of that nature. Their time will**
14 **stop. Their actual probation time will stop until**
15 **they are apprehended.**
16   Q.    And that's -- a tolling would happen when
17 someone is violating the terms of their probation,
18 correct?
19   A.    **That's correct.**
20   Q.    And I want to make sure that I understand
21 the full scope of your involvement in this case. So
22 you took out the warrant back in 2012, and then it
23 looks like later in 2014 you are supervising
24 Mr. Hampton, correct?
25   A.    **Correct.**

Page 64

1    Q.    And you approved the tolling order that
2 he signed, correct?
3    A.    **Correct.**
4    Q.    And the same question that I asked before
5 about whether you reviewed the sentence prior to, you
6 know, taking out the warrant I want to ask for the
7 tolling agreement. And I understood your testimony
8 about reviewing the sentence before the warrant was
9 you probably did, because that's what you're supposed
10 to do, right?
11   A.    **That's correct.**
12   Q.    Did you review the sentence prior to
13 signing off on the tolling order?
14   A.    **I don't recall.**
15   Q.    Okay.
16   A.    **The tolling order is based off of the**
17 **warrant. What I would approve was the wording on the**
18 **tolling order, you know, and that would be based off**
19 **what was on the warrant.**
20   Q.    Okay.
21   A.    **So I approved it.**
22   Q.    But you don't -- I mean, to the specific
23 question of whether before you approved it, whether
24 you looked at the sentence or not, you're not sure one
25 way or the other; is that fair?

Dashawn Gervin vs.
Pamela Florence, et al.

Pamela Florence
April 05, 2022

Page 65

1    A.    I don't recall.
2    Q.    And then this looks like in 2014, that
3 gets to sort of the end of our time in the Scribe
4 system, and then we have a little bit more in the
5 Portal system.  Give me one second.
6        I want to show you this spreadsheet, and
7 we'll zoom in so you can see a little bit better.
8        Laura or even Sarah, do y'all have a
9 preference about how we mark a native file of a
10 spreadsheet?  I mean --
11        MS. LONES: Whatever works.
12        MR. GREENAMYRE: All right, we'll mark
13 this spreadsheet as 12, and I'll e-mail it to
14 you, Sarah, with all these exhibits.
15        (Plaintiff's Exhibit 12 was marked for
16        identification, attached at the end of the
17        original transcript.)
18 BY MR. GREENAMYRE:
19    Q.    So if we're looking here, it looks like
20 there -- if you can see the cells that I'm zoomed in
21 on or highlighted, it looks like we don't have any
22 interactions that -- after 2014 that you're involved
23 with until July of 2019; is that correct?
24    A.    Yes.
25    Q.    Okay.  And then here it just says that

Page 66

1 your action there was to approve the delinquency
2 report that we talked about earlier, right?
3    A.    Yes.
4    Q.    And the person who is doing most of the
5 work here is Ms. Milton, and you're her supervisor at
6 the time, correct?
7    A.    Correct.
8    Q.    All right.  Besides supervising
9 Ms. Milton in the ways that we've talked about, did
10 you do any other supervision of her related to the
11 Gervin case?
12    A.    I did not.
13    Q.    Same question for Mr. Hampton.  Besides
14 supervising him in connection with the tolling
15 affidavit did you do any supervision of Mr. Hampton?
16    A.    Okay, so, I mean, this is all in relation
17 to the Gervin case?
18    Q.    Yes, correct.
19    A.    Okay.  Right, that's correct.
20    Q.    Okay.  Yeah, obviously you're supervising
21 him on other matters, but --
22    A.    Right, okay.
23    Q.    -- with regard to Mr. Gervin, all you
24 supervised him for was the tolling affidavit, correct?
25    A.    Correct.

Page 67

1    Q.    And then as I understand it the only
2 other interaction you would have had with the Gervin
3 case prior to this lawsuit would be that you maybe saw
4 him when he reported to the office after being
5 discharged from jail after the probation revocation
6 hearing; is that correct?
7    A.    And I didn't see him.  I mean, I just
8 remember, you know.  I just vaguely remember.  He
9 probably saw someone else.  I'm not sure, but I
10 remember him reporting over to the 911 center where we
11 were located.
12    Q.    Got it.  All right, so I have asked I
13 think most or all of the questions I want to ask
14 besides a couple things to close.  I've tried to get
15 as good an understanding as I can about what happened
16 a long time ago, back in 2012, from your end for the
17 most part.
18        Is there anything that I haven't asked
19 you that you wish I would have asked you or anything,
20 any information that you want to add to so that we
21 have a more full picture of what happened?
22    A.    No.  I think those are the things that I
23 said in between as it.
24    Q.    Anything you want to, you know, after we
25 took that short break, anything you want to add or

Page 68

1 modify to any previous answers that we've had so far?
2    A.    No.
3    Q.    Okay.
4        MR. GREENAMYRE: Ms. Florence, I want to
5 thank you for joining us today.  I greatly
6 appreciate it, and I don't have any further
7 questions at this time.
8        THE WITNESS: Okay.  Thank you.
9        MS. LONES: Thank you, Ms. Florence.
10 There are no questions from me.
11        THE COURT REPORTER: Reading and signing,
12 did we talk about that?
13        MS. LONES: Yes, we will read and sign,
14 and I definitely want a copy.
15        MR. GREENAMYRE: All right.  Thanks so
16 much.  You are free to go at this point, and I
17 do appreciate it.
18        (The right of the witness to read and
19        sign the deposition transcript was reserved.)
20        (Proceedings concluded at 11:52 a.m.)
21            *    *    *
22
23
24
25

Page 69

1          E R R A T A

2   DASHAWN GERVIN,              )

3              Plaintiff, )  CIVIL ACTION FILE

4       vs.                 )  NO. 1:21-CV-00067-LAG

5   PAMELA FLORENCE, HOKE       )
    HAMPTON, and TANDRIA       )
6   MILTON, in their            )
    individual capacities,      )

7                              )

8   - - - - - - - - - - - - - )

9       I, the undersigned, PAMELA FLORENCE, do hereby

10  certify that I have read the foregoing transcript of

11  my deposition and that:

12  _____  1)   There are no changes noted.

13  _____  2)   Changes are noted below.

14      To assist you in making changes, please use this

15  form.  If additional pages are needed, please furnish

16  same and attach them to this sheet.

17  Page_____ Line_____ should read:_____

18  Reason for change:_____

19  Page_____ Line_____ should read:_____

20  Reason for change:_____

21  Page_____ Line_____ should read:_____

22  Reason for change:_____

23  Page_____ Line_____ should read:_____

24  Reason for change:_____

25

Page 70

1   DEPOSITION OF PAMELA FLORENCE

2   Page_____ Line_____ should read:_____

3   Reason for change:_____

4   Page_____ Line_____ should read:_____

5   Reason for change:_____

6   Page_____ Line_____ should read:_____

7   Reason for change:_____

8   Page_____ Line_____ should read:_____

9   Reason for change:_____

10  Page_____ Line_____ should read:_____

11  Reason for change:_____

12  Page_____ Line_____ should read:_____

13  Reason for change:_____

14  Page_____ Line_____ should read:_____

15  Reason for change:_____

16  Page_____ Line_____ should read:_____

17  Reason for change:_____

18  Page_____ Line_____ should read:_____

19  Reason for change:_____

20

21              PAMELA FLORENCE

22  Sworn to and subscribed before me this
    _____ day of _____, 2022.

23  _____

24  Notary Public
    My commission expires _____

25

Page 71

1          C E R T I F I C A T E

2

3

4       I, SARAH M. BENTLEY, Certified Court

5   Reporter, Registered Professional Reporter and Notary

6   Public, do hereby certify that previous to the

7   commencement of the examination, the witness was duly

8   sworn by me; that the said proceedings were taken in

9   machine shorthand by me at the time and place

10  aforesaid and were thereafter reduced to typewritten

11  form under my direction, Pages 1 - 71; that the

12  foregoing is a true, complete, and correct transcript

13  of said proceedings.

14      I further certify that I am not employed

15  by, related to, nor counsel for any of the parties

16  herein, nor otherwise interested in the outcome of

17  this litigation.

18      IN WITNESS WHEREOF, I have affixed my

19  signature and seal this 12th day of April, 2022.

20

21

22

23  _____
    SARAH M. BENTLEY, CCR-B-1745

24

25

## A

**ability (3)**
15:24;16:3;23:16
**able (5)**
33:13;38:6,17;56:14;
63:9
**abode (1)**
61:19
**absolutely (1)**
44:10
**Academy (3)**
12:8,10,17
**access (1)**
18:7
**according (5)**
38:21;46:23;60:7;
61:24;62:3
**accuracy (1)**
58:16
**accurate (3)**
20:9;22:5,11
**accurately (2)**
22:8;30:18
**across (2)**
58:9,12
**action (3)**
16:16;29:10;66:1
**actions (1)**
15:2
**actual (5)**
17:17;37:6;42:14;
45:9;63:14
**actually (8)**
20:16;23:21;27:8;
29:2;38:22,25;48:17;
50:17
**ADA (1)**
54:8
**add (4)**
7:17;62:13;67:20,25
**addition (1)**
62:21
**address (7)**
33:14;37:11;38:23;
39:1,25;57:21,24
**addresses (1)**
32:18
**adjustments (1)**
20:9
**admin (1)**
44:24
**administer (1)**
22:9
**administering (1)**
30:19
**administrative (3)**
26:18;27:2;29:7
**adult (3)**
8:6,10;9:12
**advise (1)**
39:25

**affidavit (4)**
63:5,6;66:15,24
**affidavits (1)**
22:4
**affirmative (5)**
8:21;12:5;29:22;
48:19,22
**after-school (1)**
10:20
**again (4)**
23:24;24:15;27:10;
36:24
**agencies (1)**
12:13
**ago (7)**
28:22;30:22;31:23;
42:17;43:5,15;67:16
**agree (28)**
6:24;22:4,7,11,16,21,
25;23:3,6,9;24:6,10,18;
36:25;38:20;39:6,8,20;
41:16;49:4,14;50:7,16;
52:1;58:14;60:1;61:21;
62:25
**agreement (2)**
5:11;64:7
**ahead (7)**
10:12;11:20;17:22;
23:20;47:8,8;59:13
**al (1)**
5:8
**Albany (7)**
5:10;8:7;9:24;10:7,
19;14:3;48:18
**allow (3)**
23:10;24:11,19
**almost (1)**
40:19
**along (3)**
53:21;57:7,13
**Although (1)**
6:13
**always (11)**
13:18;14:4,9;19:7;
37:21;41:20;42:2;
52:25;54:14,14;59:21
**ambiguous (1)**
7:3
**amendment (4)**
25:4,6,8,11
**answered (1)**
52:9
**apparel (2)**
10:14,15
**apparently (1)**
56:12
**appearing (3)**
52:24;53:4,7
**application (1)**
60:3
**applied (1)**
12:25
**apply (2)**

33:13;53:11
**appreciate (3)**
5:22;68:6,17
**apprehended (1)**
63:15
**approve (2)**
64:17;66:1
**approved (4)**
54:3;64:1,21,23
**April (2)**
32:3;48:1
**area (7)**
9:15;13:19,19,20;
55:12,12,14
**arguably (1)**
39:2
**Argument (1)**
54:8
**around (2)**
57:10;61:2
**arrest (4)**
23:11;24:12,20;34:4
**arrested (2)**
25:7,13
**assigned (2)**
34:8,10
**assume (2)**
6:24;40:10
**assumed (1)**
39:22
**Atlanta (2)**
29:20,21
**attached (11)**
11:3;20:2;25:23;
31:19;33:25;48:11;
50:3;51:18;55:2;58:25;
65:16
**attorney (4)**
7:2;25:1;41:8;56:13
**attorney's (1)**
41:23
**August (2)**
51:11;52:3
**aunt (1)**
33:3
**authored (1)**
63:5
**Autry (4)**
12:20;13:1,2,22
**available (2)**
22:14,23
**awaiting (1)**
30:17
**aware (4)**
41:10,21;42:8;52:9
**away (1)**
19:7

## B

**back (40)**
7:15;11:16;12:16;
14:20;17:4;21:16,23,

24;23:21,25;24:4,16;
26:11,20;27:17;28:13,
21;32:1;34:25;35:3,5,
12;42:4;43:7,18;45:3,
3;47:13,19;49:16;
50:19,21;53:23;55:19;
56:25;57:8;60:23;62:4;
63:22;67:16
**background (4)**
6:2;7:24;22:1;34:8
**Baker (3)**
9:23;46:15;55:5
**banished (5)**
30:8;32:10;38:12;
39:10;47:10
**Barnes (3)**
26:16;27:7;35:17;
44:20
**Barnes's (1)**
28:11
**based (5)**
36:12;38:16;40:15;
64:16,18
**basic (3)**
12:11;26:12;41:6
**beat (2)**
11:14
**became (1)**
13:5
**behavior (1)**
53:23
**behind (1)**
8:16
**bench (1)**
54:15
**Bentley (2)**
6:7;24:1
**beside (3)**
57:23,24;58:11
**Besides (3)**
66:8,13;67:14
**best (4)**
6:22;22:13;23:16;
40:17
**better (5)**
17:7;35:25;49:9,11;
65:7
**bit (7)**
38:19;54:7,22;61:2,
4;65:4,7
**both (4)**
15:20,23;16:2;39:4
**bottom (3)**
11:9;26:9;28:9
**bounce (1)**
61:2
**box (6)**
38:12;61:13,21,23,
24;62:3
**boxes (16)**
37:2,4,12;38:15;
39:8,13,22;40:2,14;
41:11,14;43:1;61:5,11,

17;62:5
**break (5)**
6:16;7:20,21;60:18;
67:25
**briefly (1)**
59:5
**broader (1)**
55:9
**brother (1)**
8:20
**building (2)**
57:18,22
**bunch (1)**
7:6;8:14,15
**bus (6)**
32:23;47:21;48:2,16;
49:3,14

## C

**Calhoun (1)**
46:14
**call (2)**
15:6;49:13
**called (2)**
32:20;48:24
**came (2)**
34:25;35:5
**Camilla (10)**
8:1,4,5;9:17;13:19,
25;14:4;34:18;46:18;
49:16
**Can (36)**
5:13;6:6,6,14;7:15;
19:10,24;23:15,20;
24:1;27:23,23;30:18;
33:19,22;38:20;40:10,
14,17;44:25;47:12;
49:4,13,13,25;50:7,16;
52:1;54:24;58:12;
62:23,25;63:10;65:7,
20;67:15
**career (2)**
10:2;13:8
**Carolina (2)**
33:10;62:7
**Case (47)**
5:8,21;6:1;8:12;15:2,
2;16:3,9,15,17,21;
17:12;19:16,22;21:13,
25;25:20;27:4,11;29:3,
8,10;31:7,8,9;32:1,3;
34:9,11;35:20;36:21;
37:6;40:24;44:1,19;
47:11;48:21;49:22;
53:17;54:4;58:20;62:2;
63:7,21;66:11,17;67:3
**cases (3)**
25:2;41:5;47:3
**Cato (3)**
36:11,16;54:14
**Cato's (1)**
54:16

**cause (1)**
    25:7
**cells (1)**
    65:20
**center (1)**
    67:10
**certificate (1)**
    10:4
**certified (1)**
    12:14
**certify (1)**
    12:6
**chain (2)**
    54:20,24
**chance (2)**
    7:8;49:8
**change (2)**
    37:11;61:19
**changed (2)**
    12:11;59:14
**changing (1)**
    12:15
**Charles (3)**
    56:5,8,11
**check (2)**
    38:12;40:13
**checked (17)**
    37:4,13;38:15;39:9,
    9,22;40:2,14;41:11,14;
    43:2;61:5,12,13,17,22;
    62:5
**checking (2)**
    37:1;40:12
**chief (2)**
    55:21;56:4
**children (1)**
    9:12
**chronological (1)**
    26:8
**circuit (21)**
    29:25;30:8;32:11;
    38:13;39:10;46:11,14;
    47:1,4,5,7,10,13,13,18,
    22;55:7,10;56:4;62:4;
    63:12
**circuits (2)**
    55:12,14
**Circuit's (1)**
    46:18
**clarification (1)**
    42:25
**clarity (1)**
    61:4
**clean (1)**
    6:16
**clear (2)**
    14:14;62:6
**Clearly (1)**
    60:13
**clerk's (1)**
    56:22
**click (2)**
    59:23;60:2

**close (2)**
    58:1;67:14
**closed (1)**
    57:10
**closing (1)**
    57:9
**clothes (1)**
    10:15
**college (1)**
    10:21
**coming (1)**
    45:14
**Community (3)**
    13:16;15:17;22:18
**compact (4)**
    30:5;62:9,13;63:1
**comparison (1)**
    38:18
**complete (1)**
    22:5
**completed (1)**
    12:10
**compliance (3)**
    23:12;24:13,21
**computation (4)**
    59:25;60:2,4,12
**computations (2)**
    20:9;59:12
**concede (1)**
    25:1
**concluded (1)**
    68:20
**Condition (4)**
    39:5,5;49:2;61:13
**conditions (16)**
    37:1,1,22;38:2;39:5;
    41:18;42:9,10;43:22,
    24;45:23;52:9;54:14,
    18;62:19,23
**confinement (1)**
    44:13
**confusing (2)**
    6:20,23
**connection (1)**
    66:14
**consideration (1)**
    25:6
**Constitution (3)**
    23:10;24:11,19
**conversation (2)**
    6:14;38:6
**conversations (1)**
    14:14
**coordinating (1)**
    56:4
**copy (4)**
    42:1;52:25;53:14;
    68:14
**correction (2)**
    12:24;14:9
**correctional (1)**
    13:4
**corrections (9)**

10:8;13:15;14:5,6;
    15:13,16;22:17;28:15;
    29:9
**counseling (2)**
    10:7;12:25
**counselor (2)**
    13:1,5
**counties (1)**
    46:12
**County (16)**
    10:19;11:13,16;12:3,
    17;44:4,13;45:17;
    46:13,14,15,15,15,16,
    19;57:18
**couple (8)**
    5:25;6:1;12:24;15:4;
    33:1;59:5;61:1;67:14
**course (4)**
    18:19;44:25;48:15;
    51:10
**court (28)**
    17:24,25,25;19:6;
    23:3;24:3,4,16;26:19;
    27:8;28:12,17;35:1,1;
    41:20;42:2,3,5;44:17;
    46:5;52:24;53:4,8,21,
    24;54:13;57:14;68:11
**courthouse (3)**
    58:2,3,7
**courts (3)**
    25:3;43:25;45:14
**cousins (3)**
    8:22;9:2,5
**create (1)**
    59:11
**creates (1)**
    26:20
**criminal (4)**
    10:7;16:25;17:12;
    32:7
**CSO (1)**
    20:8
**cut (2)**
    20:20;47:9

**D**

**Dashawn (2)**
    5:21;16:15
**data (1)**
    58:16
**date (8)**
    15:5;20:17;21:8,9;
    28:6,10;32:4;50:25
**dates (4)**
    20:13,18;21:2;60:14
**Daugherty (4)**
    11:13,16;12:3,17
**day (7)**
    15:5,25;16:6,9,14;
    40:5;41:2
**days (3)**
    17:19;37:17;63:8

**DCS (5)**
    19:24;20:7;22:19;
    56:2;60:8
**Decatur (1)**
    46:15
**definitely (2)**
    21:8;68:14
**degree (2)**
    10:4,8
**delinquency (2)**
    53:25;66:1
**Department (17)**
    11:13;12:4,18;13:15,
    16;14:5,5;15:12,16,17;
    18:10,14;22:17,18;
    28:13,15;29:9
**deposition (1)**
    68:19
**deposition (4)**
    5:7;6:3;14:12;63:3
**deputies (1)**
    48:17
**describing (1)**
    26:4
**determines (1)**
    60:8
**different (9)**
    13:21;21:17;27:16;
    28:5;29:6,24;47:14;
    52:15;55:13
**direct (2)**
    55:18,19
**director (2)**
    55:6,8
**disagree (1)**
    39:20
**discarded (1)**
    57:12
**discarding (1)**
    57:6
**discharged (1)**
    67:5
**discovery (1)**
    48:15
**dispatch (1)**
    12:14
**dispatcher (4)**
    11:17,21;12:4,7
**disposition (1)**
    17:24
**distance (1)**
    58:11
**District (4)**
    5:9;55:7,9,11
**Division (1)**
    5:10
**DOC (1)**
    22:19
**docket (2)**
    32:7;60:2
**dockets (1)**
    20:10
**document (18)**

19:21;25:19,19;26:1;
    28:3;30:24;33:19;
    35:21;36:3;48:6;49:21,
    23;51:8,21;58:23;59:3,
    4,6
**documentation (4)**
    14:22,22,25;15:1
**documented (1)**
    40:24
**documents (16)**
    14:16;15:4;16:3,21,
    25;17:8,12,17;27:19,
    24;28:5;30:17;41:8;
    54:20;56:22;58:19
**done (4)**
    14:18;16:9,14;63:6
**down (10)**
    13:23;26:19;27:24;
    28:1,12;43:24;45:13;
    46:5;54:7;59:16
**DR (3)**
    53:19,25;54:3
**drove (1)**
    48:17
**Dudley (2)**
    8:23;9:3
**due (2)**
    25:11;57:15
**duly (1)**
    5:15
**during (5)**
    10:21;32:11;42:3;
    43:21;57:2
**duties (1)**
    52:21

**E**

**earlier (4)**
    26:4;31:1;32:22;
    66:2
**education (2)**
    9:19;10:1
**effective (1)**
    21:14
**efforts (1)**
    33:1
**eight (1)**
    12:1
**Eighth (1)**
    25:8
**either (8)**
    16:17;19:7;22:17;
    25:16;30:9;34:15;
    47:12;58:9
**electronically (1)**
    18:2
**else (2)**
    10:16;30:10,13;67:9
**e-mail (5)**
    54:20,24;56:1,17;
    65:13
**employment (1)**

11:8
**end (18)**
11:3;20:2,13,17,18;
21:2,9;25:23;31:19;
33:25;48:11;50:3;
51:18;55:2;58:25;65:3,
16;67:16
**enforced (1)**
62:16
**enforcement (4)**
10:10,17,22;11:9
**enough (2)**
25:16;34:12
**entail (1)**
46:12
**enter (4)**
17:24;28:14;29:8;
63:12
**entered (3)**
27:9;28:24;29:2
**Entries (1)**
25:20;33:1;36:21
**entry (3)**
12:20;27:4;36:23
**escorted (1)**
36:9
**especially (1)**
59:25
**essentially (2)**
21:18,22
**et (1)**
5:8
**even (8)**
34:22;37:14,15;
38:12;58:12;61:5,12;
65:8
**eventually (1)**
33:12
**everybody (1)**
57:10
**everyone (1)**
37:21
**exactly (2)**
41:24;50:12
**EXAMINATION (1)**
5:17
**examined (1)**
5:16
**example (1)**
29:19
**Exhibit (15)**
11:1,2;19:25;20:1;
25:22;31:18;33:24;
48:9;10;50:2;51:15,17;
55:1;58:24;65:15
**exhibits (1)**
65:14
**expect (1)**
16:13
**expected (1)**
22:18
**eyes (1)**
34:22

### F

**fact (3)**
37:9;40:19,19
**facts (1)**
5:25
**failure (2)**
33:14,14
**fair (7)**
6:24;22:11;25:16;
34:12;40:3,22;64:25
**fairly (1)**
22:8
**fairness (1)**
40:18
**family (3)**
8:14,15;33:2
**far (8)**
17:25;36:22;38:25;
39:12;58:1,9,20;68:1
**father (1)**
33:6
**February (2)**
50:7,15
**Federal (1)**
5:12
**few (2)**
6:8;32:1
**fewer (1)**
11:24
**figure (1)**
32:19
**file (8)**
18:7;26:20;28:19,19,
20;30:17;57:8;65:9
**files (6)**
17:18,19;41:22,23;
57:7,12
**find (6)**
33:2,13;38:17;40:16;
59:15,19
**fine (2)**
28:5;56:16
**finish (1)**
6:14
**first (14)**
5:15;10:13;11:9;
13:14;26:8,12;27:4;
32:2;46:12;48:7;50:6,
14;54:21;55:5
**five (3)**
45:20,20;58:8
**five-minute (1)**
60:18
**Florence (8)**
5:7,8,14,19;8:20;
60:25;68:4,9
**follow (2)**
22:19;62:18
**follows (3)**
5:16;24:5,17
**Foot (1)**

10:15
**forgot (2)**
7:17;56:9
**forth (1)**
47:12
**found (1)**
40:13
**four (1)**
58:8
**four-page (1)**
59:4
**Fourteenth (1)**
25:11
**Fourth (1)**
25:6
**Frazier (1)**
9:9
**Fred (1)**
9:8
**free (1)**
68:16
**frequently (1)**
30:1
**front (1)**
50:22
**froze (3)**
8:24;27:10,13
**frozen (1)**
8:25
**full (5)**
23:11;24:13,21;
63:21;67:21
**further (3)**
7:24;59:16;68:6

### G

**gave (1)**
57:19
**general (7)**
18:9;37:1,21;39:5;
42:9;61:13;62:23
**General's (1)**
41:8
**Georgia (18)**
8:1,5,9:15,15,17;
10:19,19;13:24;30:8;
32:10;38:13;39:10;
46:11,14,17;47:1;55:6,
10
**Gervin (14)**
5:8,21;16:15;34:19;
44:21;46:23;61:6,14,
22;62:25;66:11,17,23;
67:2
**Gervin's (3)**
8:14;36:19;37:6
**gets (4)**
27:3;30:15;44:22;
65:3
**given (7)**
6:2;14:19;15:5,25;
16:6;47:25;53:20

**giving (2)**
28:20;39:1
**goes (7)**
17:23;19:6;26:7;
28:21;47:3;48:16;
53:21
**good (2)**
44:10;67:15
**governs (1)**
25:4
**graduated (3)**
9:20,22,24
**Grady (1)**
46:15
**grandmother (1)**
33:2
**greatly (1)**
68:5
**GREENAMYRE (24)**
5:6,18,20;11:5;20:4;
23:19;24:1,24;25:25;
31:16,21;33:22;34:2;
48:13;50:5;51:20;55:4;
59:2;60:17,24;65:12,
18;68:4,15
**grew (1)**
9:17
**Greyhound (2)**
48:8,18
**ground (1)**
6:8
**grow (2)**
9:14,16
**guess (17)**
8:18;13:14;19:13;
21:16;23:1;30:3;35:24,
25;39:2,4,15,16;41:6;
43:7;55:25;58:15;
59:23

### H

**half (1)**
32:22
**Hampton (4)**
63:4,24;66:13,15
**hand (2)**
37:19;40:6
**happen (1)**
63:16
**happened (7)**
12:1;21:16;26:10;
50:9;52:3;67:15,21
**happening (1)**
51:11
**happens (2)**
30:1;39:23
**Harriet (1)**
8:22
**hear (3)**
9:3;49:5,7
**heard (2)**
9:1,2

**hearing (12)**
35:12;42:20,23;
49:22;50:6,11,16;
51:11;52:2;58:5,6;67:6
**hearings (1)**
42:7
**held (1)**
58:6
**help (1)**
7:2
**helpful (1)**
27:20
**hesitate (3)**
6:11;7:15,22
**high (5)**
9:20,22,23,23;10:13
**highlight (1)**
20:6
**highlighted (3)**
20:23;47:23;65:21
**Highway (1)**
57:25
**history (1)**
11:9
**Hoke (1)**
63:4
**home (1)**
8:2,3
**honest (1)**
22:5
**husband (1)**
8:18

### I

**identification (11)**
11:3;20:2;25:23;
31:19;33:25;48:11;
50:3;51:18;55:2;58:25;
65:16
**important (1)**
7:9
**incarcerated (2)**
33:10;45:1
**incident (1)**
40:15
**include (2)**
16:24;19:15
**indicates (1)**
50:6
**individual (2)**
55:18;63:9
**inform (4)**
43:6,8,19;45:8
**information (22)**
7:11;18:10,15,19,21;
22:13,22;28:14,25;
29:2;32:7,15,17;38:5,
5;43:24;47:24;52:14;
58:20;59:10,12;67:20
**informed (1)**
43:21
**input (2)**

16:3,20
**instructions (2)**
45:25;59:15
**intake (6)**
37:17,20;38:10;
43:21,23;44:2
**interaction (1)**
67:2
**interactions (1)**
65:22
**interrupt (1)**
7:15
**interstate (5)**
30:4;62:2,9,12;63:1
**into (14)**
17:17;18:1;27:9;
28:14,25;29:1,8,21;
30:14,16;34:7;57:11;
58:7;61:25
**investigate (1)**
36:19
**investigation (1)**
22:22
**involve (1)**
21:4
**involved (1)**
65:22
**involvement (2)**
63:4,21
**issue (3)**
9:2;21:1,2
**issued (3)**
19:9,12;40:14
**issues (1)**
58:15
**issuing (6)**
18:11,17,18;19:3,4;
21:10

**J**

**jail (17)**
19:9;35:2;40:8,12;
44:4,13;45:17;47:4,6,
17;48:16;57:23,24;
58:7,10;63:12;67:5
**jailer (1)**
13:8
**January (1)**
27:8
**job (10)**
10:13,15;12:8;28:11,
16;38:4;45:7,13,13;
46:5
**jobs (1)**
10:9
**John (1)**
8:20
**joining (2)**
5:19;68:5
**judge (20)**
35:22;36:6,9,11,11,
15;38:11;41:17,24;

42:4,5,10,14;43:5,10,
15;52:10;53:21;54:14,
16
**judges (2)**
42:8;47:13
**judicial (7)**
29:25;32:11;46:11,
17;47:1,21;55:14
**July (1)**
65:23
**June (1)**
12:24
**jurisdiction (1)**
61:20
**jury (5)**
8:12,13,14,15;28:9
**justice (1)**
10:8

**K**

**keeping (1)**
15:21
**Key (1)**
10:18
**kind (5)**
14:15;25:2,10;30:9;
36:14
**kinds (1)**
29:23
**knew (3)**
40:24;48:1;53:16
**known (3)**
15:10,17;39:14
**knows (2)**
42:13;54:14

**L**

**lady (1)**
34:16
**laid (1)**
34:22
**Latch (1)**
10:18
**later (5)**
10:1;12:9;16:4;
54:22;63:23
**Laura (1)**
65:8
**law (4)**
10:10,17,22;11:9
**lawsuit (1)**
67:3
**lawyer (1)**
23:17
**learn (2)**
33:9;43:14
**least (5)**
19:24;21:4,20;49:4,
13
**leave (1)**
61:20

**left (1)**
62:6
**legal (2)**
23:14;56:7
**LEMMON (3)**
5:4;60:19,23
**likely (1)**
42:19
**litigation (1)**
51:10
**little (12)**
15:6;16:8;19:8;
38:19;54:7,21;59:16,
23;61:2,4;65:4,7
**local (1)**
10:14
**locate (1)**
19:11
**located (4)**
13:23;63:9,11;67:11
**Lones (5)**
14:15;23:13;65:11;
68:9,13
**long (6)**
5:24;12:21;13:3,4;
16:9;67:16
**look (14)**
11:8;21:2,19;26:13;
27:20;30:22;33:17;
36:24;40:1,7,10;52:2,
5;59:16
**looked (9)**
14:21;19:19;21:9;
28:25;40:20,23,25;
41:3;64:24
**looking (24)**
19:15;20:5,23;21:5,
6;26:4;27:24;28:1,2,4;
30:22,25;31:22;35:19;
37:3;44:19;46:10;
47:19;50:14;54:8;60:9;
61:10,16;65:19
**looks (21)**
8:24;11:12,22;12:19;
13:10;26:7;27:3,24;
32:2,20;35:8,20;48:16;
51:9;54:21;56:16,21;
63:23;65:2,19,21
**Loose (1)**
10:15
**Loretta (1)**
8:22
**lot (4)**
9:5;12:13;27:14;
58:13
**Louisiana (2)**
32:23;62:7

**M**

**makes (1)**
16:13
**making (1)**

20:12
**Management (1)**
20:7
**many (1)**
61:1
**March (1)**
27:4
**mark (12)**
11:1;19:24;25:20;
31:5,16;33:22;48:8;
49:25;51:14;54:24;
65:9,12
**marked (11)**
11:2;20:1;25:22;
31:18;33:24;48:10;
50:2;51:17;55:1;58:24;
65:15
**master's (1)**
10:8
**materials (1)**
26:5
**matter (3)**
5:8;43:17;46:9
**matters (1)**
66:21
**Mattie (4)**
26:16;27:7;35:17;
44:20
**may (7)**
13:3;16:10;27:10;
35:22,23;56:14,17
**maybe (10)**
11:24;13:24;26:11;
31:5;49:12;55:21;56:8;
58:7;62:8;67:3
**McCall (1)**
33:7
**mean (25)**
8:18;14:10;17:23;
18:18;19:6;20:22;25:1;
27:6;28:23;30:9;32:8,
16;36:22;38:19;40:4,
25;44:24;50:25;52:17;
55:23;57:2;64:22;
65:10;66:16;67:7
**means (2)**
27:20;63:10
**meantime (1)**
38:8
**meet (5)**
5:21;34:19;43:23;
57:19;58:12
**member (1)**
44:17
**merged (1)**
14:7
**merger (1)**
59:20
**met (1)**
34:22
**Middle (2)**
5:9;9:15
**might (2)**

25:9;33:3
**miles (3)**
8:7;14:3;58:8
**Milton (8)**
51:6;52:8,15;53:3,6;
54:3;66:5,9
**Milton's (1)**
52:18
**minute (4)**
17:4;28:22;31:7;
50:21
**minutes (1)**
13:24
**missed (1)**
27:14
**Missouri (4)**
33:4;49:3,15;62:7
**Mitchell (5)**
9:23;46:13,14,19;
57:18
**modify (1)**
68:1
**moment (1)**
31:23
**monitored (1)**
62:16
**months (7)**
11:23;12:1,25;13:6;
32:22;40:7,8
**more (10)**
26:12;32:1;34:7;
38:20;58:10;61:1,4,9;
65:4;67:21
**most (5)**
39:23;42:19;66:4;
67:13,17
**mostly (1)**
15:11
**mouth (1)**
39:19
**move (1)**
61:19
**much (12)**
14:4,21;16:5;19:3;
20:13,18;45:1;49:4;
53:22;59:17;63:8;
68:16
**must (6)**
22:4,21;23:7;24:7;
34:10;56:7

**N**

**name (9)**
5:20;8:10,17,18;9:6,
8;10:15;32:17;44:25
**narrative (2)**
15:6,24
**native (1)**
65:9
**nature (3)**
37:15;57:20;63:13
**need (1)**

45:6

**new (5)**
15:15;59:14,19,22;
62:13

**next (3)**
21:24;32:25;63:3

**nice (1)**
5:21

**none (2)**
39:8;43:1

**North (2)**
33:10;62:7

**notarized (2)**
36:5,9

**note (5)**
16:17;25:20;29:3;
32:2;36:21

**notes (12)**
15:24;26:13;27:11;
31:8,8,9;32:1;35:20;
40:24;47:19;48:21;
51:25

**notice (1)**
5:10

**notify (2)**
37:10;38:22

**number (7)**
37:17,18,18,19;
55:13;61:14,18

**numbers (1)**
32:18

## O

**object (1)**
23:14

**objection (1)**
23:17

**obligation (3)**
22:8;61:6,14

**obtaining (1)**
22:23

**Obviously (2)**
41:13;66:20

**occasion (1)**
53:2

**off (12)**
40:15;41:18;42:4,5,
9,10;47:9;49:15;60:19;
64:13,16,18

**offenders (1)**
38:10

**offered (1)**
36:15

**offering (1)**
53:17

**office (24)**
8:2;29:17,21;32:20;
35:2,16;37:10;41:9,22;
43:8,18;44:6;45:16;
46:18,25;47:5,20;
49:15,16;56:23;57:9,
10,15;67:4

**officer (21)**
11:14;12:11,24;13:4,
11,15;14:9,10;17:14;
18:13;22:2,3,12,13,25;
23:4;26:23;29:15;
30:18;35:3;44:16

**officers (9)**
12:7,14;22:7,16,21;
23:10;24:12,20;52:22

**offices (1)**
59:19

**once (9)**
14:2;17:23;19:9;
28:16;29:7;34:25;45:5,
6;49:14

**one (22)**
6:5,23;23:22;26:17,
18;27:11;31:2;37:18;
43:13;45:4,5,22;46:18;
47:3;50:24;52:7;54:21;
55:19;58:22;61:9;
64:24;65:5

**only (6)**
13:7;14:18,21;35:15;
42:6;67:1

**onto (1)**
35:12

**operate (1)**
59:22

**opinion (1)**
23:15

**opportunity (1)**
7:10

**order (6)**
26:8;41:23;64:1,13,
16,18

**original (11)**
11:4;20:3;25:24;
31:20;34:14;48:12;50:4;
51:19;55:3;59:1;65:17

**other's (1)**
6:14

**out (30)**
7:2;17:14;18:16;
19:9,15;20:20;21:18;
22:2;23:1;30:4;32:19;
33:2;34:4,20;36:20;
39:21;40:9,21;44:22;
45:7,18;47:4,5,17,21;
57:17;59:21;62:22;
63:22;64:6

**outline (3)**
52:23;53:3,7

**out-of-state (1)**
62:10

**outside (1)**
61:19

**over (3)**
45:23;61:16;67:10

**overview (1)**
9:18

**own (1)**
41:7

## P

**page (8)**
11:10;20:5;26:9;
50:14,21,22;52:7;54:8

**pages (1)**
25:19

**Pamela (2)**
5:7,14

**pandemic (1)**
57:10

**paper (7)**
17:18,19;18:7;28:19,
20;30:16;57:8

**papers (1)**
40:5

**paperwork (8)**
14:19;17:16;18:1;
19:7;37:20;40:11;
53:22;57:11

**parking (1)**
58:13

**parole (1)**
14:7

**parolees (1)**
53:9

**part (6)**
15:12;20:22;28:15;
44:23;52:21;67:17

**particular (1)**
16:9

**partisan (1)**
14:7

**parts (1)**
13:21

**past (2)**
38:1;41:25

**peace (1)**
12:7,11,14

**Pelham (1)**
13:24

**pending (1)**
5:9

**people (11)**
9:1;23:11;24:12,20;
25:9;41:13,25;45:25;
47:7,10,14

**percent (1)**
24:2

**perfect (2)**
31:5,25

**period (5)**
11:22;13:7;15:11;
44:4,12

**permissible (1)**
5:11

**permission (1)**
61:20

**person (18)**
15:7;17:23;19:6;
26:23;35:15;36:2;
37:16,24;38:1,22;

41:17;43:4;44:3,7,12,
14;60:5;66:4

**perspective (1)**
5:25

**phone (2)**
32:18;48:24

**physically (3)**
46:24;49:1,16

**pick (1)**
56:21

**picture (1)**
67:21

**place (4)**
50:7,17,18;61:19

**placed (1)**
52:8

**places (1)**
62:8

**Plaintiff's (15)**
11:2;20:1;25:21,22;
31:18;33:23,24;48:10;
50:1,2;51:17;54:25;
55:1;58:24;65:15

**plea (1)**
28:12

**pleadings (1)**
26:19

**pleas (1)**
45:3

**plenty (1)**
7:10

**point (6)**
33:4;40:17;45:4;
52:7;18;68:16

**Police (4)**
11:13,16;12:4,17

**policy (10)**
18:10,12,14;19:23,
23,23,24;21:12,17;60:8

**Portal (15)**
15:18;16:18,20;17:9;
20:7;56:18;57:4,6,8,
12;58:16,21;59:11,18;
65:5

**position (3)**
12:25;14:2;56:2

**possible (1)**
29:23

**POST (1)**
11:6

**POST-certified (1)**
26:23

**potentially (1)**
39:19

**practical (1)**
46:9

**practice (3)**
43:18;44:11;54:17

**preference (1)**
65:9

**preparation (1)**
14:17

**prepare (6)**

14:12,20;52:22;53:3,
6,13

**prepared (6)**
35:21;36:2,4;51:9,
23;54:4

**present (2)**
13:11;61:19

**presumably (1)**
32:12

**pretty (9)**
14:4,21;16:5;19:3;
20:13,18;53:22;59:17;
63:8

**previous (1)**
68:1

**prior (11)**
21:10;23:22;36:5,20;
53:4,7,21;57:9;64:5,
12;67:3

**Prison (5)**
12:21;13:22;45:19,
20,22

**probable (1)**
25:7

**probably (8)**
28:24;32:8,9,9;38:6;
45:3;64:9;67:9

**probation (126)**
13:11,15;14:3,7,10;
17:2,13,14;18:11,13;
20:16;21:1,7,8,10,19,
21;22:2,3,7,9,12,13,16,
21,25;23:3,4,4,7,10,11,
12;24:7,11,12,14,19,
20,22;25:14;26:23;
28:13;29:15,17,25;
30:18,19;32:11;34:5;
35:12,16;36:19;37:2,
16,22,24;38:9,13,14,
25;39:7,24;40:16;
41:18;42:9,11,14;43:5,
6,8,9,9,13,18,20,22,25;
44:5,5,14,15,15,16;
45:6,15,16,21,23;46:1,
1,2,3,6,7,18,24;47:1,
11;49:16,21;50:8;51:5,
10;52:2,8,22;54:15;
60:5,6,9,9,13,14,15;
61:6,15,25;62:1,13,14,
15;63:10,11,14,17;67:5

**probationer (7)**
18:6;21:20;41:19;
42:13;43:12,19;45:9

**probationers (6)**
15:21;43:21,23;
53:11;57:20;62:10

**probationer's (1)**
16:16;45:9

**probative (1)**
38:2

**problem (4)**
7:17;27:25;28:4,5

**procedures (1)**

22:19
**proceedings (2)**
57:3;68:20
**process (3)**
25:11;35:24;57:6
**procured (1)**
42:18
**profile (1)**
11:6
**Program (2)**
10:18,20
**protocol (1)**
38:9
**provide (2)**
33:14;52:25
**provided (2)**
21:13;48:15
**pull (1)**
58:22
**pulled (1)**
31:9
**purchased (1)**
47:20
**purpose (1)**
43:22
**purposes (1)**
5:11
**pursuant (1)**
5:10
**Purvis (3)**
56:5,8,9
**put (11)**
27:12,23;28:6;29:3;
39:18;48:2;49:3,14;
57:5;62:11,12

**Q**

**quick (3)**
6:8;9:18;15:6

**R**

**reach (1)**
33:2
**read (14)**
24:4,15,16;37:21;
41:18;42:4,5,9,10;
43:24;54:14,18;68:13,
18
**reading (2)**
50:24;68:11
**realize (2)**
37:12,13
**reasonable (1)**
22:22
**reasonably (1)**
22:14
**reasons (1)**
8:11
**recall (4)**
53:13,14;64:14;65:1
**receive (1)**

28:17
**received (2)**
14:2;32:3
**receiving (1)**
62:16
**recess (1)**
60:21
**recognize (5)**
26:1;34:3;49:23;
51:21;59:6
**recollection (1)**
48:20
**recommendation (1)**
53:24
**record (8)**
5:4;6:15;7:12;23:18;
24:4,16;60:19,23
**referring (1)**
30:25
**refresh (1)**
48:20
**regard (1)**
66:23
**region (1)**
13:20
**regular (1)**
6:14
**rehabilitation (1)**
10:6
**rehired (1)**
12:9
**related (1)**
66:10
**relation (1)**
66:16
**relatively (1)**
30:1
**relatives (2)**
8:7,10
**release (1)**
45:22
**released (3)**
32:21;35:12;46:8
**relocated (1)**
57:15
**rely (1)**
43:10
**remember (12)**
7:14;19:17;32:8;
34:24,25;35:1,9;41:2;
57:14;67:8,8,10
**renovations (1)**
57:15
**repeat (4)**
24:2;43:11;44:7,8
**report (32)**
19:10;33:14;37:10,
19;38:1,22;39:7,12,12,
24;40:6,15;44:5,14,15,
22;45:6,15,17,20,21,
25;46:2,7;47:12;48:23;
49:13,15;54:1;61:6,15;
66:2

**reported (5)**
39:14;46:24;49:1;
62:11;67:4
**REPORTER (4)**
24:3,5,17;68:11
**reporting (3)**
35:2;38:16;67:10
**reports (1)**
59:21
**represent (2)**
5:20;48:14
**request (1)**
42:1
**requested (7)**
20:10;27:5;28:22;
29:12;30:7;41:25;51:4
**requests (1)**
41:7
**require (2)**
20:7;62:24
**required (1)**
37:10
**requirement (1)**
12:12
**requirements (3)**
12:16;62:14,15
**requires (1)**
22:12
**reserved (1)**
68:19
**responsible (1)**
28:20
**rest (1)**
38:7
**retrieval (1)**
16:3
**return (5)**
46:11,25;47:15;49:2,
18
**reverse (1)**
26:8
**review (1)**
64:12
**reviewed (4)**
14:17,20;26:3;64:5
**reviewing (1)**
64:8
**revocation (14)**
18:11;35:6,11;42:7;
49:21;50:8,10;51:6,11;
52:2;57:3;58:5,6;67:5
**Richardson (2)**
54:9,11
**right (82)**
5:6;6:6;8:6;9:14;
10:24;13:12,16,18;
15:13,21;16:10,10,18,
22,25;17:3;18:2,3,5;
19:7;21:14;25:13,18;
26:3,16;27:1,20,25;
28:1;30:5,12;31:8,11,
23,25;32:13,23;33:17,
21;35:19;36:1,7;37:4,

11;39:3,17,21;41:14;
42:15;44:24;48:1,2,3,
5;49:20;50:8,16,20;
51:2;52:5;55:17;56:13,
25;57:4,23,24;58:10,
11;60:7,12;62:6,8;
63:2;64:10;65:12;66:2,
8,19,22;67:12;68:15,18
**road (1)**
58:12
**role (1)**
11:15
**roundabout (1)**
40:19
**rules (5)**
5:12;6:9;22:1,19;
62:2
**running (1)**
63:11

**S**

**sake (1)**
6:15
**same (10)**
9:2;13:19;14:4;
21:18,22;28:3;61:18;
62:14;64:4;66:13
**Sarah (2)**
65:8,14
**saw (2)**
67:3,9
**Saying (5)**
20:16,25;39:19;
49:11;59:10
**school (6)**
9:20,22,23,23;10:13,
19
**scope (1)**
63:21
**screen (5)**
27:23;28:2;31:12;
47:23;59:24
**Scribe (16)**
14:22,24;15:9;16:17,
20;17:8,15,16,20;18:4;
26:5,13;28:14;29:8;
31:9;65:3
**scroll (3)**
54:7;59:4,16
**second (8)**
6:5;20:20;30:22;
42:17;43:5,14;58:22;
65:5
**secretaries (1)**
26:18
**secretary (4)**
17:24;26:22;36:8,8
**seeing (1)**
61:11
**seem (1)**
6:13
**seems (1)**

59:24
**sell (1)**
10:14
**send (1)**
59:21
**sending (1)**
62:15
**sense (1)**
16:13
**sent (2)**
49:15;56:21
**sentence (61)**
16:25;18:10,15,22;
19:1,5,15,19;21:5,6,19;
23:7;24:8;25:10;28:7,
12;30:17,24;31:6,13;
32:12;36:24;37:3,6,14,
18,20,23,25;38:2,21;
39:9,12;40:1,21,24,25;
41:3,9,11,12;42:4;
43:2;44:23;45:14;
46:10,23;47:14;49:17;
56:17,22;57:3;59:25;
60:1,11;61:3,11;64:5,8,
12,24
**sentenced (14)**
29:20;37:16;38:8,25;
40:8,16;41:17;43:4,16;
44:3,12;45:5;46:6,13
**sentences (5)**
6:15;28:17;37:25;
39:23;46:5
**sentencing (5)**
35:17;41:21;42:20,
23;52:10
**SEP (1)**
44:20
**series (2)**
21:24;54:19
**server (1)**
29:14
**service (1)**
29:6
**serving (1)**
25:10
**sets (1)**
23:3
**seven (1)**
38:9
**share (1)**
10:25
**sheet (1)**
61:16
**Shepard (2)**
8:22;9:3
**Sheriff's (3)**
32:20;47:20;49:14
**short (1)**
67:25
**show (13)**
19:20,23;25:18;
27:22;49:20;51:8;
54:19,21;59:3,17,18,

21;65:6
**showing (1)**
  60:4
**shows (1)**
  51:10
**sign (3)**
  35:22;68:13,19
**signature (2)**
  36:10;54:5
**signed (4)**
  28:9;35:22;36:11;
  64:2
**signing (2)**
  64:13;68:11
**single (1)**
  16:14
**sister (1)**
  33:3
**situation (2)**
  25:9;43:1
**Six (2)**
  12:1;13:6
**somebody (1)**
  30:10
**someone (9)**
  17:13;23:16;34:10;
  39:24;46:10;56:7;60:8;
  63:17;67:9
**sometimes (1)**
  6:13
**somewhere (1)**
  62:22
**Sorry (7)**
  10:12;20:20;27:13;
  31:11;49:7;59:13;
  60:11
**sort (7)**
  15:3;16:16;19:21;
  22:1;25:8;26:7;65:3
**source (1)**
  25:13
**South (13)**
  9:15;13:23;30:8;
  32:10;38:12;39:10;
  46:11,14,17,25;55:6,
  10,12
**southwest (1)**
  13:20
**space (1)**
  57:19
**speak (2)**
  6:16,16
**special (1)**
  42:10
**specific (1)**
  64:22
**specifically (1)**
  21:25
**spend (1)**
  45:16
**spent (1)**
  19:8
**spouse (1)**

9:10
**spreadsheet (3)**
  65:6,10,13
**staff (4)**
  26:18;29:7;44:17,24
**stand (1)**
  53:25
**start (3)**
  27:16;30:18;53:9
**started (6)**
  10:2,17;12:3;14:6;
  34:14,17
**state (14)**
  5:15;9:24;10:7;
  12:21;13:21,22;30:4;
  61:20;62:1,16,16,21,
  22;63:13
**statements (1)**
  17:2
**States (4)**
  23:9;24:11,19;62:18
**station (2)**
  48:17,18
**stayed (1)**
  13:1
**step (2)**
  21:23,24
**steps (5)**
  18:15;19:11,14;29:7;
  36:19
**still (7)**
  8:25;21:20;25:9;
  38:13;47:17;56:3;
  61:14
**stop (4)**
  47:5;63:10,14,14
**store (2)**
  10:14,14
**straight (2)**
  47:12;48:16
**street (1)**
  58:9
**subject (1)**
  32:16
**submit (1)**
  60:3
**submitting (1)**
  36:5
**summary (1)**
  53:22
**summery (1)**
  53:20
**supervise (2)**
  22:8;44:1
**supervised (2)**
  38:10;66:24
**supervising (6)**
  20:8;53:9;63:23;
  66:8,14,20
**Supervision (9)**
  13:16;15:17;22:12,
  18;30:11;55:14;62:9;
  66:10,15

**supervisor (9)**
  34:10,12,17;52:19;
  55:19,22,23;56:3;66:5
**Supervisors (2)**
  34:14;55:19
**supervisory (1)**
  52:21
**supposed (6)**
  40:7,9,11,13;62:3;
  64:9
**sure (25)**
  7:8;8:12;19:5;20:8,
  12,17;21:7,10;25:3;
  32:9;34:11,16;38:24;
  41:3;44:9;45:3;48:25;
  50:19;51:3;52:10;
  55:22;56:11;63:20;
  64:24;67:9
**suspended (1)**
  38:3
**swap (1)**
  31:12
**swear (1)**
  5:13
**swearing (1)**
  23:1
**switched (1)**
  15:16
**swore (3)**
  19:15;34:4;39:21
**sworn (2)**
  5:15;36:15
**system (25)**
  15:9,15;16:22;17:15,
  16,18;18:1;20:17;
  26:14,20;27:9;28:14,
  25;29:1,9,9;30:14,16;
  31:10;58:17;59:12,20;
  60:14;65:4,5
**Systems (5)**
  10:19;15:20,23;16:2;
  17:9
**systemwide (2)**
  58:15,18

**T**

**talk (4)**
  26:9;33:6;38:19;
  68:12
**talked (2)**
  66:2,9
**talking (4)**
  15:11;19:21;20:12;
  21:15
**ten (4)**
  11:23;13:24;40:18,
  19
**term (3)**
  43:4;47:1;49:17
**terms (15)**
  18:9;23:4,6,12;24:7,
  13,21;34:5;42:13;43:6,

9,13,19;45:9;63:17
**terribly (1)**
  5:24
**testified (4)**
  5:16;43:14;51:6;
  52:15
**testimony (8)**
  36:15;52:23;53:1,3,
  7,14,17;64:7
**Thanks (1)**
  68:15
**Thomas (3)**
  10:2,5,6
**though (2)**
  61:5,12
**thoughts (3)**
  25:5,12;39:17
**three (3)**
  25:19;32:21;37:19
**ticket (2)**
  47:21;48:8
**timeframe (1)**
  21:8
**timeline (2)**
  51:9,14
**tiny (1)**
  28:2
**title (3)**
  8:16;56:9,15
**today (9)**
  5:20;7:12,25;14:12,
  17,20;15:12;38:21;
  68:5
**together (1)**
  14:7
**told (10)**
  32:21;43:10;44:21;
  46:4,10
**toll (1)**
  63:10
**tolling (10)**
  63:5,6,16;64:1,7,13,
  16,18;66:14,24
**took (9)**
  15:2;17:14;19:11;
  26:19;40:21;50:7,17;
  63:22;67:25
**top (1)**
  26:8
**town (1)**
  58:7
**track (1)**
  15:21
**training (2)**
  12:11;59:17
**transcript (16)**
  11:4;20:3;25:24;
  31:20;34:1;42:1,19,23;
  48:12;49:21;50:4;
  51:19;55:3;59:1;65:17;
  68:19
**Transfer (7)**
  27:5;28:22;29:5,12,

20;30:7;47:11
**transferred (8)**
  29:1,24;30:4,10,13,
  13,16;62:22
**transferring (3)**
  29:6,10,12
**transfers (2)**
  29:23;30:9
**trial (4)**
  8:12;42:3,6;45:2
**trials (1)**
  42:6
**tried (2)**
  15:6;67:14
**truth (1)**
  5:15
**try (4)**
  6:15;19:11;32:19;
  33:1
**trying (2)**
  6:5;17:7
**two (2)**
  7:20;37:18
**two-part (1)**
  39:3

**U**

**Uhm-uhm (1)**
  14:1
**uncle (1)**
  9:8
**under (2)**
  5:11;55:14
**understood (7)**
  6:25;14:11,11;21:12;
  27:3;60:16;64:7
**United (3)**
  23:9;24:10,18
**University (5)**
  9:24;10:2,5,6,7
**unless (2)**
  49:2;52:10
**unusual (3)**
  37:14,23;38:11
**up (9)**
  9:14,16,17;17:4;
  26:11;31:2,9;50:21;
  54:21;56:21
**updated (1)**
  59:20
**uploaded (5)**
  17:17;18:1,2;56:18;
  58:20
**uploading (1)**
  57:11
**upon (2)**
  45:22;46:7
**use (1)**
  22:13
**used (1)**
  29:10
**users (1)**

59:11
**using (1)**
22:22
**Usually (2)**
18:17;37:24

## V

**vaguely (3)**
34:25;35:9;67:8
**Vaughn (1)**
55:24
**verify (3)**
18:15;59:11;60:1
**verifying (1)**
18:10
**version (2)**
41:9,10
**video (3)**
5:4;14:16;60:19
**view (1)**
6:6
**violating (5)**
34:4;46:25;49:1,17;
63:17
**violation (4)**
17:2;19:5;53:23;
56:15
**visit (1)**
42:3
**vs (1)**
5:8

## W

**Wait (4)**
17:4;28:16;31:7;
50:21
**walk (3)**
35:24;37:8;58:12
**walking (1)**
58:10
**warrant (44)**
17:14;18:11,16,17,
18;19:3,4,9,12,16;
20:10;21:2,3,11,19;
22:4,23;23:1;33:13,18;
34:3,20;35:19;36:4,5,9,
12,14,20;38:16;39:13,
21;40:15,20,21,23;
42:18;60:3,10;63:22;
64:6,8,17,19
**Warrants (2)**
20:6;22:3
**way (9)**
6:2;7:4,24;35:3;
43:13;47:5;59:11;60:7;
64:25
**ways (4)**
47:14;48:23;49:13;
66:9
**week (3)**
10:21;42:3;45:2

**weird (1)**
31:12
**weren't (3)**
11:23;40:2;46:1
**west (1)**
13:20
**what's (2)**
36:22;59:8
**whereabouts (1)**
39:14
**wherever (1)**
35:3;62:8
**whole (2)**
55:7,11
**who's (2)**
23:16;44:17
**wish (1)**
67:19
**within (1)**
8:7
**without (5)**
25:7;46:25;49:1,17;
61:20
**witness (5)**
5:13;24:15,23;68:8,
18
**wording (1)**
64:17
**words (1)**
39:18
**work (3)**
6:17;57:19;66:5
**worked (4)**
10:18;12:20,21,23
**working (6)**
11:23;12:17,20;
22:17;34:17;57:17
**works (2)**
6:10;65:11
**Worsley (3)**
34:15;55:17,24
**written (2)**
23:7;24:7
**wrong (1)**
25:14
**wrote (1)**
36:12

## Y

**y'all (4)**
15:15;30:16;57:17;
65:8
**Years (6)**
10:1;38:9;40:18,19;
45:20,21

## Z

**Zack (1)**
5:20
**zoom (1)**
65:7

**zoomed (1)**
65:20

## 1

**1 (2)**
11:1,2
**1:21-67-LAG (1)**
5:9
**10 (2)**
54:25;55:1
**10:03 (1)**
5:5
**100 (1)**
24:2
**11 (1)**
58:24
**11:31 (2)**
60:20,21
**11:40 (2)**
60:22,23
**11:52 (1)**
68:20
**12 (3)**
40:8;65:13,15
**150 (1)**
8:7
**18th (2)**
32:3;48:1
**1991 (1)**
9:22
**1999 (2)**
12:24;13:2

## 2

**2 (2)**
19:25;20:1
**2003 (2)**
13:2,10
**2012 (12)**
15:12;16:15;21:16,
17;26:10;27:5;34:4;
43:7,18;55:20;63:22;
67:16
**2014 (4)**
26:9;63:23;65:2,22
**2016 (2)**
14:6;21:14
**2017 (1)**
58:15
**2018 (1)**
58:15
**2019 (9)**
16:15;50:9,18;51:11;
52:3;57:2,9;58:15;
65:23
**2021 (8)**
50:7,15,17,20;56:1,1,
17,25
**2022 (2)**
38:21;40:18
**29th (1)**

35:22
**2nd (2)**
50:7,15

## 3

**3 (2)**
25:21,22
**3.113 (1)**
19:24
**30 (2)**
14:3;63:8
**31st (1)**
35:23
**37 (1)**
57:25

## 4

**4 (6)**
31:17,18;39:5,22;
52:7;61:14

## 5

**5 (3)**
20:5;33:23,24
**5th (1)**
56:17

## 6

**6 (4)**
39:5,22;54:4;8;61:18

## 7

**7 (2)**
48:9,10

## 8

**8 (3)**
49:25;50:1,2

## 9

**9 (2)**
51:15,17
**911 (3)**
57:18,21;67:10