# In The Matter Of:

*Dashawn Gervin vs.*
*Pamela Florence, et al.*

---

*Hoke Hampton*
*April 5, 2022*

---

*LYON REPORTING, INC.*
*Certified Court Reporters*
*P.O. Box 81124*
*Atlanta, Georgia 30366*
*770/458-5500    800/767-2030*

Original File Hoke Hampton - 4-5-22.txt
**Min-U-Script® with Word Index**

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF GEORGIA
 2                   ALBANY DIVISION

 3

 4  DASHAWN GERVIN,            )
                               )
 5            Plaintiff,       )  CIVIL ACTION FILE
                               )
 6       vs.                   )  NO. 1:21-CV-00067-LAG
                               )
 7  PAMELA FLORENCE, HOKE      )
    HAMPTON, and TANDRIA       )
 8  MILTON, in their           )
    individual capacities,     )
 9                             )
              Defendants.)
10  - - - - - - - - - - - - - )

11

12          DEPOSITION OF HOKE HAMPTON

13          (conducted remotely via Zoom)

14               April 5, 2022

15                 12:31 p.m.

16

17

18

19     Sarah M. Bentley, RPR, CCR-B-1745  (via Zoom)

20

21

22

23             LYON REPORTING, INC.
                Certified Court Reporters
24      P.O. Box 81124, Atlanta, Georgia 30366
             770/458-5500  800/767-2030
25               www.lyonreporting.com
```

## Page 2

```
 1           A P P E A R A N C E S

 2

 3  For the Plaintiff:

 4       ZACK W. GREENAMYER, ESQ.  (via Zoom)
         SAMANTHA J. FUNT, ESQ.  (via Zoom)
 5       Mitchell & Shapiro, LLP
         Suite 650
 6       3490 Piedmont Road
         Atlanta, Georgia  30305
 7       (404) 997-8972
         zack@mitchellshapiro.com
 8       sam@mitchellshapiro.com

 9

10

11  For the Defendants:

12       LAURA L. LONES, ESQ.  (via Zoom)
         Assistant Attorney General
13       Georgia Office of the Attorney General
         40 Capitol Square, S.W.
14       Atlanta, Georgia  30334-9057
         (404) 656-6710
15       llones@law.ga.gov

16

17

18

19  Also Present:

20       Frank Lemmon, Videographer
         (Mitchell & Shapiro, LLP)

21

22

23

24

25
```

## Page 3

```
 1                    I N D E X

 2

 3  EXAMINATION OF HOKE HAMPTON                    PAGE

 4    By Ms. Funt                                     5

 5

 6

 7

 8
                    PLAINTIFF'S EXHIBITS
 9  NUMBER           DESCRIPTION               PAGE

10   3  *   Case Notes Entries for Dashawn       23
             Gervin, 3 pages;
11           Bates SUB-27 through 29

12  13      10/31/14 Affidavit Requesting        29
             Tolling of Sentence, 1 page;
13

14

15

16

17     * (Exhibit marked in previous deposition.)

18

19

20             *      *      *

21

22

23

24

25
```

## Page 4

```
 1              P R O C E E D I N G S

 2

 3       MR. LEMMON: On the record at 12:31.
```

Q. Good morning, or good afternoon.

A. **Good afternoon.**

Q. Good afternoon. My name is Samantha Funt, and along with Zack Greenamyre here we represent Dashawn Gervin in this case.

Have you ever given a deposition before?

A. **This is my first time. No.**

Q. Oh, wow, okay. So I'm sure you've talked

MR. LEMMON: On the record at 12:31.

MS. FUNT: Okay, so we are on the record here in the case of Dashawn Gervin versus Pamela Florence, Hoke Hampton, and Tandria Milton, pending in the Albany Division in the Middle District of Georgia, Case No. 1:21-CV-00067-LAG, taken pursuant to notice and agreement for all purposes permissible under the federal rules.

Can we have the witness sworn, please, Sarah.

HOKE HAMPTON,
having been first duly sworn to state the truth, was examined and testified as follows:

**EXAMINATION**

BY MS. FUNT:

Page 5

1  with your lawyer about it a little bit, but just a
2  couple of ground rules so we will be on the same page.
3  Okay?
4      A.    Okay.
5      Q.    Just as you're doing, if you can make all
6  responses to my questions out loud because Sarah is
7  making a written transcript for the record, and we
8  want to have everything written down.  So head nods
9  and non-verbal stuff, that's not going to be on the
10  record.  Do you understand?
11      A.    I understand.
12      Q.    And then it's going to feel hopefully a
13  little bit like a regular conversation but it's not,
14  and so I would ask for you to just wait until my
15  question is fully completed and then you respond so
16  that we're not talking over each other and Sarah gets
17  mad and has a really hard time.
18          Does that make sense?
19      A.    Yes.
20      Q.    Thank you.  And let me know if I ask you
21  a confusing question, and I will try my best to
22  clarify for you.  That is not my intent.
23          Is that fair?
24      A.    Yes, that's fair.
25      Q.    Okay.  And I do want to give you an

Page 6

1  opportunity to fully answer each of my questions.  If
2  you feel like we're going on and you have more to say,
3  just stop and let me know and I will let you respond.
4  Is that okay?
5      A.    That's okay.
6      Q.    Okay.  And we're going to take a break
7  because I have a quick meeting I have to attend at
8  12:50 and then we'll get back on the record, but
9  hopefully we can get this done pretty quickly.
10          All right?
11      A.    Okay.
12      Q.    Okay.  So without telling me anything
13  that you've discussed with your lawyer, can you just
14  tell me whether you've reviewed any documents or done
15  anything else besides talk to your lawyer in
16  preparation for this deposition?
17      A.    I read -- I read the file, the case file,
18  you know, everything that transpired, you know, during
19  that time, but I have had an opportunity to read the
20  case file.
21      Q.    You said you did have the opportunity to
22  read the case file?
23      A.    I did have an opportunity, yes.
24      Q.    And by "case file" what do you mean
25  exactly?

Page 7

1      A.    I mean the whole plaintiff/defendant
2  issue that was transpired.
3      Q.    Oh, so you've read the pleadings in our
4  lawsuit, is that what you mean?
5      A.    That's correct.
6      Q.    Okay.  And did you meet -- have you gone
7  back to review any of the probation file for when
8  Dashawn Gervin was on probation?
9      A.    Yes, I did.
10      Q.    Okay.  And what did that include?
11      A.    It's, to my understanding, that he was on
12  probation.  The judge actually told him that he was
13  banned from the Mitchell County Probation District and
14  the South Georgia Circuit.  He was banned from that
15  circuit.  Some kind of way he did not show up for his
16  intake to get paperwork signed, and Ms. Florence done
17  the -- performed the warrant on him.
18          A short time later -- I'm not going to
19  say a short time later, but then when I came on scene
20  and start supervising the case -- like I said, I
21  never -- I didn't know him.  The warrant was already
22  in process by the time I got on there.  I was just
23  starting with the agency.  And at that particular time
24  I tolled the warrant, which is protocol for DCS.
25          And after the warrant was tolled, to my

Page 8

1  understanding that he got arrested at Mitchell County
2  Jail, and Ms. Tandria Milton was -- held him in, you
3  know, in jail for a long period of time.  And, I mean,
4  just going through that.  That's what I've read.
5      Q.    Okay.  So you gleaned this information
6  from reading the pleadings, is that what you're
7  saying?
8      A.    That's correct.
9      Q.    Okay.  And then in preparation for the
10  deposition you also reviewed his actual probation file
11  that they had in the probation office at the time of
12  this incident; is that right?
13      A.    I looked over it, but I can't tell you in
14  detail.  I did look over it, yes.
15      Q.    Okay.  And did that include -- well,
16  we'll get back to that.
17          So I was trying to ask you what documents
18  you reviewed, and I think I understand you're saying
19  the pleadings and the physical probation file, you
20  went through some of it; is that right?
21      A.    I went through some of it.  I looked at
22  his sentencing and things of that nature, so that's
23  what I viewed.
24      Q.    Okay.  And are you in your home at this
25  point right now physically?

Dashawn Gervin vs.
Pamela Florence, et al.

Hoke Hampton
April 5, 2022

Page 9

1    A.    Yes, I'm in my home.  I'm the only one.
2    Q.    You're the only one home, is that what
3 you said?
4    A.    Yes, that's correct.
5    Q.    I would just ask that you not -- that you
6 agree not to use your phone or any other electronic
7 devices during the deposition.  Is that okay?
8    A.    That's fine.  That's fine, yes.
9    Q.    And just for purposes of trial, do you
10 have any adult relatives within 150 miles of Albany,
11 Georgia?
12    A.    No.
13    Q.    No, okay.  And, sorry, in what county is
14 your home located in?
15    A.    It's in Moultrie.  Colquitt County.
16 Moultrie, Georgia.
17    Q.    And can you just briefly tell me, where
18 did you work before becoming a probation officer?
19    A.    I worked at Job Corps.  It's been so
20 long.  I worked at Job Corps where I was a recruiter
21 for underage individuals.  Well, I won't say
22 "underage"; between the age of 16 and 24, at-risk
23 youth.  I did that for about five years.
24    Q.    Okay.  And after that you started with
25 probation?

Page 10

1    A.    Yes.  I started with misdemeanor
2 probation.  I was there for two years, and after I
3 left misdemeanor probation, that's when I came with
4 the State of Georgia, back in 2014.
5    Q.    Okay.  Any gap between that first job and
6 the Moultrie office?
7    A.    No.
8    Q.    Okay.  And then now you work, and you are
9 a sex offender officer; is that right?
10    A.    That's correct, yes.
11    Q.    Okay.  And in your other roles currently,
12 it includes Job Corps, after care, community service
13 coordinator?
14    A.    Yes.
15    Q.    Is that the extent of your current
16 position?
17    A.    Yes, I started off, I did after care, I
18 did Job Corps, and it just kind of progressed from
19 there, doing community service.  I'm doing community
20 service now and also dealing with the sex offenders,
21 so --
22    Q.    Okay.  Have you ever had -- well, tell me
23 about your education, briefly.
24    A.    Education.  I got a bachelor's -- well, I
25 started off at Valdosta State.  Well, Valdosta High

Page 11

1 School.  Of course Valdosta High School.  Got a
2 bachelor's at Valdosta State University.  I got a few
3 graduate courses at Albany State, but I did not finish
4 my graduate course at Albany State.  I got enrolled
5 Ogeechee Tech for online, so I've been doing that as
6 well.
7    Q.    Ogeechee Tech?
8    A.    Ogeechee Tech.  That's in Statesboro,
9 Georgia.
10    Q.    Okay, and so -- but no other graduate
11 degrees from those programs?
12    A.    No.
13    Q.    Okay.  And any periods of unemployment
14 since your education was completed?
15    A.    Since my education was completed?
16          There was a gap in unemployment.  I think
17 it was 2006, I think somewhere in that neighborhood.
18 Because I started with the City of Albany, that was
19 back in 1987, and I started with the Proctor & Gamble
20 in 2000.  And from 2000 to 2006 I think was that --
21 that was that gap between Proctor & Gamble and Job
22 Corps.  There was unemployment during that time.
23    Q.    And that was a six-year period?
24    A.    No, no, no, no.  From 2006 until maybe a
25 year and a half, maybe almost two years.  I don't

Page 12

1 think it was two years.  Maybe a year and a half there
2 was an unemployment gap there because I left Proctor &
3 Gamble, I was unemployment, and then I think I was
4 unemployment for like a year or so, a year and a half,
5 I'm not really sure, and then I started with Job
6 Corps.
7    Q.    Okay, so what was the reason you left
8 Proctor & Gamble?
9    A.    I left Proctor & Gamble because I was
10 unfairly terminated.  I was terminated in the program.
11    Q.    Where were you terminated?
12    A.    It was a wrongfully terminated lawsuit.
13    Q.    But you had a lawsuit as a result of
14 that?
15    A.    I went through the EEOC.
16    Q.    Okay.  Did you actually go through a
17 court proceedings or just the EEOC?
18    A.    Just the EEOC.
19    Q.    Okay, and what was the result of the
20 EEOC?
21    A.    I filed a claim against them because they
22 wrongfully terminated me.  So I filed a claim with the
23 EEOC, and that was what that was about.
24    Q.    And what was the result of that complaint
25 with the EEOC?

Page 13

1    A.    Nothing.  They didn't do anything.
2    Q.    Okay, so they didn't -- the EEOC didn't
3  find that you were wrongfully terminated?
4    A.    Yeah, that's right.
5    Q.    Okay.  What was Proctor & Gamble's
6  reason, do you know?
7    A.    I can't remember what they put in there.
8  I don't remember.  I think it was like -- oh, my gosh.
9  Because this happened back in 2006, so it was like a
10  long time ago.  Maybe, I don't know, 18 years ago,
11  14 years ago.  I can't really remember.
12        I think it was -- I don't know what the
13  real reason why they put unemployment -- I mean
14  termination on there.  I don't know.  I can't
15  remember.  I got to go back and look what they
16  actually put on there, but in my opinion I got
17  wrongfully terminated so that's why I went to the
18  EEOC.
19    Q.    Okay.  And then -- well, did it have
20  anything to do with drugs or any other allegations of
21  wrongdoing?
22    A.    No, no drugs, and I don't know about
23  wrongdoing.  I don't know what that -- what you mean
24  by wrongdoing.
25    Q.    I'm just wondering why they fired you,

Page 14

1  and you said you don't remember at all?
2    A.    Oh, well, I don't remember.
3    Q.    Okay.
4    A.    I mean, they wrongly terminated me
5  because I think me and my manager was not seeing eye
6  to eye or something like that, and I don't know if it
7  was insubordination or something like that.  I really
8  don't know.  I think me and what -- it ain't no
9  "think".  I know that me and my manager got into it,
10  and I think he -- I mean, some kind of way they took
11  his side and they didn't take my side.  They just took
12  whatever he said at face value.  They terminated me.
13        And I think it was me and the manager had
14  a disagreement, they terminated me, and I felt that at
15  that particular time that I was wrongly terminated, so
16  I went to the EEOC and filed a lawsuit.
17    Q.    Have you ever been terminated from any
18  other positions you've held prior to this one?
19    A.    No.
20    Q.    Okay.  And any discipline taken against
21  you while you've been serving as a probation officer?
22    A.    No.
23    Q.    Any complaints filed against you as a
24  probation officer?
25    A.    No, not that I'm aware of.  Not me, no.

Page 15

1    Q.    Okay.
2    A.    I mean, of course, you're going to
3  always -- in this position you're going to always have
4  complaints that -- okay, let's say, for example, case
5  in point, Mr. Hampton is not answering his phone.
6  Mr. Hampton probably -- just, for example, like he's
7  not answering his phone or he got my -- he put my
8  person in jail, or it's always going to be some kind
9  of issue where any time a person goes to jail it's
10  always the probation officer's fault, okay, so let's
11  just make that known.
12        Few and far between, no one is going to
13  say, Oh, yeah, I really messed up, it's my fault.  So
14  in this business it's going to always be a probation
15  officer is wrong, in my opinion.  That's just my
16  opinion.
17        So with that said, I don't know if they
18  called my supervisor and whatever have you and say,
19  well -- and she probably squashed it at that level.  I
20  don't know, but it's always -- let's say, for example,
21  Mr. Hampton don't answer his phone.
22    Q.    I don't mean to cut you off, but I can
23  kind of tailor the question a little bit more, if it's
24  helpful.
25    A.    Oh, that's fine.  That's fine.

Page 16

1    Q.    I hear you.  I understand that people
2  make complaints pretty generally as far as the
3  probation process.
4        Have you ever been named as a defendant
5  in a lawsuit before?
6    A.    No, never.
7    Q.    Okay.  And have you ever known a court or
8  the State to determine that you were responsible for
9  wrongfully violating someone's probation?
10    A.    No, never.
11    Q.    I just want to ask you some background
12  questions about probation supervision work, basically
13  just background rules, and I'm not asking you to apply
14  them yet to this case and this is just to get an
15  understanding for what they are.
16        And so do you agree that warrant
17  affidavits, it's important that when writing them for
18  a probation officer to be accurate, complete, and
19  honest?
20    A.    Yes.
21    Q.    Okay.  Would you agree that warrant
22  affidavits must be -- well, that an affidavit to toll
23  a sentence like you did in this case must be accurate,
24  complete, and honest?
25    A.    Yes.

Page 17

1    Q.    And do you agree that the Fourth
2  Amendment protects citizens from arrest without
3  probable cause?
4    A.    Yes.
5    Q.    And do you agree that probation officers
6  have an obligation to fairly and accurately supervise
7  and administer probation?
8    A.    Yes.
9    Q.    Do probation officers -- well, are
10 probation officers required to use the best
11 information reasonably available to them in making
12 decisions and reports?
13   A.    Yes.
14   Q.    Do you agree that as a probation officer
15 you have to follow the Department of Community
16 Supervision rules and procedures?
17   A.    Yes.
18   Q.    And do you have a copy of those rules and
19 procedures?
20   A.    I do.
21   Q.    Okay.  Do you agree that probation
22 officers must make a reasonable investigation using
23 the information available to them before taking out a
24 warrant for a probation violation?
25   A.    Yes.

Page 18

1    Q.    Okay.  And maybe a reasonable
2  investigation in some instances would include looking
3  at the court documents like the sentence; is that
4  right?
5    A.    That's correct.
6    Q.    Okay.  Would you agree that a probation
7  officer cannot submit an affidavit or warrant with
8  information that's knowingly or recklessly false?
9    A.    Yes, I do agree.
10   Q.    And would you agree that probation
11 officers cannot knowingly or recklessly leave out or
12 omit important exculpatory information about a
13 probationer from an affidavit or a warrant?
14   A.    Yes.
15   Q.    Do you agree that the Court sets the
16 terms of a person's sentence, not the probation
17 officer?
18   A.    Yes.
19   Q.    So would you also agree that a probation
20 officer can't independently modify the terms of a
21 sentence?
22   A.    That's correct.
23   Q.    Okay.  Would you agree that the terms of
24 a person's sentence must be written on their sentence
25 sheet?

Page 19

1    A.    Can you repeat that one more time?
2    Q.    Sure.  So would you agree that the terms
3  of a person's sentence, they must be written down by
4  the Court on their sentence document?
5    A.    Yes, I do agree.
6    Q.    Do you agree that the Constitution of the
7  United States doesn't allow a probation officer to
8  arrest a probationer when they're in full compliance
9  with their probation?
10   A.    I don't know about that one.
11   Q.    Okay.  So just basically, you know, are
12 you allowed to arrest a probationer under the law when
13 they're fully compliant with their probationary terms?
14   A.    No, you can't do that, that's correct.
15        MS. FUNT: I do have to take my break
16 now, and I'm sorry for the inconvenience but it
17 will be 20 minutes and we can be right back on.
18        THE WITNESS: Yes, ma'am.
19        MS. FUNT: Thank you so much.  I
20 appreciate it.
21        THE WITNESS: Okay.
22        MR. LEMMON: Going off the record at
23 12:49.
24        (A recess was taken from 12:49 p.m. to
25   1:13 p.m.)

Page 20

1        MR. LEMMON: Back on video record at
2   1:13.
3  BY MS. FUNT:
4    Q.    Okay, great.  So we were just going
5  through some of these baseline rules about probation
6  generally.  Do you agree that probation officers
7  cannot arrest individuals for no good reason at all?
8    A.    That's correct.
9    Q.    And that if they do, they should be held
10 accountable for their actions?
11   A.    That's correct.
12   Q.    Do you agree that being held accountable
13 for wrongful conduct includes paying for all damages
14 caused by the wrongful conduct and everything that
15 happens as a result?
16   A.    Yes.
17   Q.    And can you confirm there's been no
18 discipline or adverse action against you for
19 Mr. Gervin's probation?
20   A.    That's correct.
21   Q.    Okay.
22   A.    Can I make a statement?
23   Q.    Sure.
24   A.    And I'll be honest with you, I had no
25 involvement in this at all.  Like I say, when I first

Page 21

1  got there the warrant was already in place, and by
2  policy it was my -- by policy I was supposed to toll
3  the warrant, but --
4      Q.   Yeah, we're going to get there.  Sorry,
5  what did you say?
6      A.   As far as -- as far as doing the warrant
7  and going through all that stuff, I mean, I was fresh
8  off the boat at that particular time, and eight years
9  later here we are but --
10     Q.   I know, I know, and we're going to get to
11 that, and I understand that you did not write the
12 affidavit; that that was Pamela Florence, right?
13     A.   Yes, ma'am.
14     Q.   Okay.  And what you're saying is that the
15 extent of your involvement was to write out the
16 tolling affidavit; is that right?
17     A.   Yeah, that's right.  Because I -- I have
18 to admit I don't know him.  If he come in front of me
19 right there, the only thing I did, like I say, once I
20 come to this agency, 2013, whatever happened, 2014, by
21 policy we're supposed to toll the warrant within
22 30 days.  She instructed me to do so, that's what I
23 done, and that's the only involvement that I have with
24 this case, so I don't even understand why I'm --
25     Q.   Right, right, and we're going to get

Page 22

1  there, but -- so just to clarify one thing you said,
2  you said that Pamela Florence instructed you to fill
3  out the tolling affidavit; is that right?
4      A.   That's correct.
5      Q.   Okay.  Just one second.  So I'm going to
6  refer to what's been previously marked as Exhibit 3.
7  I'm not trying to confuse you.  These are just the
8  numbers from the last deposition so that we can have
9  just one list of the same document.  I haven't done 1
10 or 2.  This is just 3 and so, let's see.
11         (Plaintiff's Exhibit 3 was previously
12         marked for identification, attached at the end
13         of the original transcript.)
14 BY MS. FUNT:
15     Q.   And can you see this document, the case
16 notes entries now?
17     A.   Yes.
18     Q.   Hold on one second.
19         Okay, so it shows, I see that the first
20 time that you became involved in this case looks to be
21 May 19th, 2014.  Is that your understanding?
22     A.   Yes.
23     Q.   Okay.  And so before that --
24     A.   I'm sorry, hold on.  May 19th, 2014, yup,
25 because I think I started in May.  It was just like I

Page 23

1  just started, so maybe it was like May the 13th I got
2  started with the department.
3      Q.   Okay, so because you sit here in this
4  summary entry that -- it says, Received case for
5  supervision on -- sorry, Received case for supervision
6  on May 13th, 2014?
7      A.   That's correct.
8      Q.   Case is currently on warrant status?
9      A.   Yup.
10     Q.   And so does that mean you, Hoke Hampton,
11 received the case for supervision May 13th, 2014?
12     A.   That's correct.  So what happens is, is
13 that once -- once we receive a case we have to just
14 document that we -- okay, this person is not under my
15 supervision, so I think I went through maybe 100 cases
16 that particular day saying, okay, now this person is
17 under my supervision and now I can start doing
18 whatever I need to do with the case.
19     Q.   So was --
20     A.   But on the 13th, if I started on May the
21 13th, I think it says six days later, yeah, because
22 that's when I started with this department, May 13th.
23 So six days later, that's when -- I guess when I made
24 that case note.
25     Q.   Oh, okay.  So you actually started with

Page 24

1  the department on May 13th, 2014?
2      A.   Right, yeah.
3      Q.   Okay.
4      A.   That's when I --
5      Q.   And so then -- but you weren't assigned
6  as the new probation officer for Dashawn Gervin.  It
7  was still -- it was still --
8      A.   Pamela Florence.
9      Q.   -- Pamela Florence then; is that right?
10     A.   That's correct.
11     Q.   Okay, so you just were instructed by
12 Florence fill out this affidavit and that's it.  You
13 don't have any other tasks for that probationer; is
14 that right?
15     A.   That's right.
16     Q.   You weren't the primary probation
17 officer; is that right?
18     A.   That's right.
19     Q.   Okay.  Why didn't Florence just enter the
20 tolling affidavit herself?
21     A.   I don't know, but the only thing I know
22 is that, I mean, when I just started with the
23 department I'm just following my rules and what my
24 supervisor told me to do so.
25     Q.   Right.  How long was Florence your

Page 25

1 supervisor?

2    A.   Roughly around two years. Because if I
3 started in 2014, I think I came in -- I need to go
4 look. It should be on my resume because when I
5 left -- and I don't have that in front of me, of
6 course. But I was -- I know it was two years, maybe a
7 little bit shy of, a little bit over two years, two
8 years and maybe five months, give or take, and then I
9 transferred back to Moultrie in 2016.

10    Q.   Yeah, and what was your impression of her
11 as a supervisor?

12    A.   I like her. I mean, I think she's a good
13 person. I think she's a good person. I don't know if
14 she -- now that I know, looking back, hindsight is
15 20/20, I don't know if she's the best as far as
16 protocol and as far as policy concerns.

17    You know, I think per policy, I think
18 that she really didn't know exactly what -- a whole
19 lot of policy, but I like her as a person. I don't
20 think she did -- she would do anything ill willed, so
21 to speak, or something in spite. I think that she
22 just don't know a lot of the policy.

23    But thinking back now I could say that,
24 looking back now she -- I mean, my supervisor now
25 compared to the supervisor that I had that -- you

Page 26

1 know, everything is spot-on. You know, it's policy.
2 So it's more policy driven in the Moultrie office, but
3 there I just didn't think that she knew a whole lot of
4 stuff, in my opinion, so --

5    Q.   Right. Would you agree that she violated
6 policy in filling out an affidavit for Dashawn
7 Gervin's probation violation when he hadn't actually
8 violated any conditions?

9    A.   If that holds true, I would say "Yes".

10    Q.   Okay. Well, do you -- I mean, looking
11 back now, knowing what you know about the case, would
12 you agree that Dashawn Gervin never violated any
13 conditions that were imposed during his sentence?

14    A.   I look at it two ways. I think that
15 ultimately it was the judge because I think the judge
16 really confused a lot of stuff. If you look at that
17 one little check, so to speak, yes, she did violate,
18 but per policy, I mean, I think she violated -- I
19 don't -- I could see both sides.

20    I don't think that Dashawn Gervin, I
21 don't think -- in his mind he wasn't on probation. He
22 just didn't have to report to the sentencing circuit.
23 From a DCS standpoint she was like, well, he need to
24 report in, fill out the paperwork, sign it and then he
25 going by his merry way, so I can kind of seeing it

Page 27

1 going both ways.

2    Q.   Well, let's talk about a couple specific
3 things then.

4    A.   Okay.

5    Q.   So one second.

6    A.   Can I pick it back up?

7    Q.   Sure.

8    A.   I would say it's all about communication.
9 If she -- she should have told him -- she told him --
10 to my understanding she told him to come into the
11 office to sign the paperwork.

12    He, on the other hand, he should have
13 said, Well, Ms. Florence, I'm not on probation, I
14 don't think I need to come in there. And then that
15 would have raised the flag whether or not is this guy
16 really on probation.

17    I would have done a little bit more
18 investigation, but that didn't happen so I kind of
19 understand both sides.

20    Q.   Well, I want to show you a copy of the
21 sentence.

22    A.   Okay.

23    Q.   And I'm trying to pull up your affidavit
24 of probation, so give me one moment.

25    A.   Okay.

Page 28

1    Q.   Let's see. This is not working for me,
2 so hold on one second. I'm so sorry.

3    A.   Oh, you're good.

4    Q.   Some days things don't work the way you
5 want them to. Sorry, just one second.

6    (Brief pause.)

7 BY MS. FUNT:

8    Q.   Somehow we are trying to locate a
9 document. Oh, I found it.

10    (Plaintiff's Exhibit 13 was marked for
11    identification, attached at the end of the
12    original transcript.)

13 BY MS. FUNT:

14    Q.   Okay, so I don't think this was marked
15 yet but we'll mark it as Exhibit 13, and I'm going to
16 show you the affidavit of tolling that you completed.

17    So this is the affidavit that you
18 completed in this case; is that right?

19    A.   That's right.

20    Q.   And then going back to the sentence
21 itself, did you review a copy of this sentence before
22 you completed the affidavit of tolling?

23    A.   Yes.

24    Q.   Where did you go to find the copy of the
25 sentence to review it before you completed the

Page 29

1    affidavit of tolling?
2        A.    It was already -- it was in our DCS
3    system, but we also had a copy of the other warrant,
4    like the hard copy in the file that was in the office.
5        Q.    Okay.  So did you reference both a hard
6    copy and the copy in the software system?
7        A.    Yes.
8        Q.    Okay.  And is that typically what you do
9    before doing the affidavits for tolling?
10       A.    That's correct.
11       Q.    All right.  And so when you reviewed
12   this --
13       A.    Thank you, because I was straining to see
14   it.
15       Q.    Yeah, I know.  It's very small.
16            When you reviewed the sentence prior to
17   doing the affidavit for tolling, you saw that none of
18   the general conditions of probation were checked; is
19   that right?
20       A.    I'm going to be honest with you, I really
21   didn't notice it.
22       Q.    But you looked at this document, right,
23   twice?
24       A.    Yeah, that's correct, and what I saw was,
25   now -- even now looking at it, it says ten years,

Page 30

1    sentenced to nine years, received 12 months.  Do not
2    return to the judicial circuit.
3            Now, a lot of times -- now, I will say
4    this.  Now, I guess back in the day a lot of that
5    stuff wasn't even checked, so I really wouldn't think
6    to look at the general conditions and all that stuff.
7    But the way the judge -- that's why I was saying
8    earlier, the way the judge had everything written,
9    it's like he's on probation but he's banned from the
10   judicial circuit of probation, South Georgia Circuit.
11       Q.    Okay, so you're saying that when you
12   looked at this document twice before filling out the
13   affidavit of tolling, you didn't really worry about
14   the general conditions; is that right?
15       A.    That's correct.  Now, that's just me now.
16       Q.    Okay.  So when -- when Florence gave you
17   the instruction to go fill out the affidavit of
18   tolling, that was verbally?
19       A.    Yes.
20       Q.    Okay.  And --
21       A.    Because I was -- at that particular time
22   I was still learning.  I think, like I say, I was just
23   maybe there a week, maybe.
24       Q.    Okay.
25       A.    And so she was training me on how to do

Page 31

1    stuff.
2        Q.    Okay.
3        A.    So it was like --
4        Q.    Was there -- sorry, I didn't hear what I
5    you said.
6        A.    So it was mainly like a verbal deal
7    because, like I say, when I -- I took over that case
8    in 2013 -- I mean 2014; May the 13th, 2014, and I
9    tolled it May the 19th, 2019.  I was only there for
10   like six days, maybe a week, so I was learning, and I
11   was just going by what she told me to do in so many
12   words.
13       Q.    Okay.  And so this being your first week
14   of work, you really relied on her rather than, you
15   know, anything else; is that right?
16       A.    That's right.
17       Q.    And so you didn't -- so but you did look
18   at the sentence twice before you filled out your
19   affidavit, right?
20       A.    Right.
21       Q.    Did you rely on anything else before
22   filling out the affidavit?
23       A.    No, because I didn't know what to rely
24   on, to be honest with you.
25       Q.    Okay.

Page 32

1        A.    I didn't know what I was doing.
2        Q.    Okay.  Going back to Exhibit 13, your
3    affidavit, you wrote that, It now appears that the
4    defendant's whereabouts are unknown and that a
5    thorough and diligent search has been made by law
6    enforcement officers; is that right?
7        A.    I'm trying to see here.
8        Q.    It's in the middle here.
9        A.    Oh, okay, yeah, yeah, yeah.  I don't
10   think I wrote that.  This is just like a general --
11   this is like a general format that we use.
12            What I actually go in and fill out is
13   like there's ten years.  The things that's
14   highlighted, if you can see the criminal attempt to
15   commit burglary, he was sentenced to ten years, served
16   two to 12 months, Do not return to South Georgia
17   Circuit.  And then I went in and failed to report to
18   probation officers.  All of that, I pretty much typed
19   it in because that's a general format that we use and,
20   yeah, so that's what I actually put in there.
21       Q.    Okay.  So you're saying that you used a
22   basic form, and then you inserted the parts that are
23   underlined; is that right?
24       A.    That's correct.
25       Q.    Okay.

Page 33

1    A.    And I was off -- like the fourth day, I
2  ain't trying to talk over you, but it says, the top
3  line up there, it says, above-named defendant,
4  Mitchell County, I go and change that to the date that
5  he actually got sentenced in Mitchell County, and then
6  I go in and fill in the blanks.  It's almost like you
7  just type in everything, and it spit out this little
8  form.
9    Q.    Right, and so you had to reference the
10  sentence to get that date, right?
11    A.    That's correct.
12    Q.    And you also swore to this, right?
13        This was your signature and it was
14  notarized, and you swore to the truth of this, right?
15    A.    That's correct.
16    Q.    Okay.  But you're saying that this part
17  was a form, and so did you actually know whether law
18  enforcement officers made a diligent search?
19    A.    I did not.  I just automatically -- if
20  you look in the back of the warrant itself, it will
21  tell you whether or not it was non -- like non est
22  inventus.
23        If I could see on the warrant, on the
24  back of the warrant, if it's on there, it should have
25  been done.  The back of the warrant should say that it

Page 34

1  was a diligent search.
2        Yeah, right there.  So the "non est
3  inventus", yeah, I could see where they did a diligent
4  search right there.  I don't go out per se -- well, at
5  that time I didn't because I was just like a standard
6  officer.  So I didn't go in the field, so I relied on
7  the deputy to go in there and do that.
8        So that's what I looked at, that 23rd of
9  October or whatever have you.  That's what I -- that's
10  what I did there.
11    Q.    Okay.  So you didn't reference anything
12  else other than the sentence and this warrant; is that
13  right?
14    A.    Right, and so, exactly, that's saying
15  that the deputy went out there to do a diligent
16  search.  So if I put it in there, that means it's been
17  done by the deputy.
18    Q.    Okay.  Do you know whether or not Dashawn
19  Gervin's sentence was actually tolled as a result of
20  your affidavit of tolling that was signed by the
21  judge?
22        Like was his sentence extended based on
23  your affidavit?
24    A.    I don't know if it was tolled -- I know
25  it was tolled, I tolled the warrant, but I'm not sure

Page 35

1  what you're asking.
2    Q.    Right, so what's your understanding of
3  the effect of the affidavit for tolling that you
4  filled out and that the judge signed?
5    A.    Okay, any time that a warrant get tolled
6  it stops in the mid air.  It just stops it at that
7  particular time.  So that time, that time gets
8  stopped.  So when he actually get captured or whatever
9  have you, incarcerated, that time that gets tolled
10  gets tacked onto the end of his sentence.
11    Q.    So is that your understanding of what
12  actually happened to Dashawn Gervin's sentence?
13        Did the judge tack on additional time
14  based on your tolling affidavit?
15    A.    Yes.
16    Q.    Okay.  Do you know how much time was
17  tacked onto his sentence?
18    A.    I don't know because I really don't know
19  what happens after that.  I don't know what happened.
20  I don't know when he got captured or when he got
21  incarcerated.  I don't know.
22    Q.    Okay.  I'm just going to show you a
23  timeline that was produced in discovery to us that
24  shows that he was sentenced January 4th, 2012, and
25  that was to serve -- for ten years to serve -- to

Page 36

1  serve a nine-year probation sentence.  Is that your
2  understanding of that?
3    A.    Yes.  Can you blow it up just a little
4  bit more, please?
5    Q.    Okay.
6    A.    Perfect.  All right.  Yes, gotch you.
7    Q.    To serve nine years and 12 months --
8    A.    Right.
9    Q.    -- on probation; is that right?
10    A.    Yeah, ten years to serve.  12 months, I
11  guess that has already been served, and then nine
12  years on probation.
13    Q.    Okay.
14    A.    Because I guess that's the time that he
15  stayed in jail.  Served 12 months, and now he's on
16  probation.
17    Q.    Right.  And then your tolling order was
18  entered October 31st, 2014, and then he had a
19  probation revocation hearing August 7th, 2019, and was
20  released after the hearing.
21        Is it your understanding that his
22  probation was extended beyond the nine years based on
23  your tolling affidavit?
24    A.    I don't think so.  Because I -- I mean,
25  because my thing is if he -- if his -- go up just a

Dashawn Gervin vs.
Pamela Florence, et al.

Page 37

1  little bit more.
2          If he was sentenced back in 2012 and
3  that's ten years, that's 2022, so that's still within
4  that timeframe would be my -- would be my guess.
5      Q.    Okay, so it sounds like you thought that
6  it was extended based on your tolling agreement, but
7  you don't really know whether that's true?
8      A.    That's correct.
9      Q.    Okay.  What -- when you entered the
10 tolling affidavit is the probation automatically
11 extended, or does that have to happen later after a
12 probation hearing?
13     A.    That happens later after the probation
14 hearing.
15     Q.    Okay.
16     A.    Just like -- it don't have to be after
17 the probation hearing, but what happens is after they
18 are captured then I have to do another -- another
19 affidavit that tolled the time, to add in time back
20 onto that sentence.
21     Q.    Did you do a second affidavit?
22     A.    No, because I wasn't even there.
23     Q.    Okay.  Do you know if anyone did?
24     A.    I don't know.  Yeah, because I left in
25 2000 -- I guess '16 it would have happened.  So I

Page 38

1  don't know what happened.  And at that particular time
2  when I left the Camilla office he no longer was under
3  my caseload or supervision.
4      Q.    Well, after learning that Mr. Gervin --
5  well, hold on just a second.
6          So at some point you figured out that
7  Mr. Gervin wasn't required to report; is that right?
8      A.    Yeah, like probably when I got this
9  lawsuit, I guess.  I mean, other than that I have
10 no -- because I don't even know Gervin.  When I got
11 named in a lawsuit, that's what I find out that, you
12 know, he said he was terminated, wrongfully
13 terminated.
14     Q.    Okay, so you never did anything to
15 withdraw the tolling affidavit that you placed into
16 his file; is that right?
17     A.    Right.
18     Q.    And you never did anything to ensure that
19 he wasn't on probation for an extra five years?
20     A.    Right.
21     Q.    And you're saying that you actually
22 didn't know that his violation -- well, you didn't
23 know that he wasn't in compliance with his
24 probationary terms until this lawsuit, is that what
25 you're saying?

Page 39

1      A.    That's correct.
2      Q.    Okay.  But now, looking at the sentence,
3  you can see that he was in compliance with his
4  probationary terms because he wasn't sentenced to any
5  reporting requirements; is that right?
6      A.    That's incorrect.  In my opinion he was
7  sentenced to probation because why would the judge put
8  it in there if he haven't been sentenced?
9          So my theory is, in looking at that
10 sentence, is that the judge sentenced him to ten
11 years, serve nine years -- serve 12 months and then
12 the rest of the nine years on probation, and looking
13 at this sentence that's what I see.
14     Q.    Okay, but we agree --
15     A.    It might be -- now it's just me.  In my
16 opinion the general conditions of probation, that
17 little check don't mean anything, I mean in my
18 opinion, I mean.
19     Q.    Why is that?
20     A.    Because the judge sentenced him.  Because
21 if that be the case why would the judge sentence him
22 to ten years?
23          In that case he should have just said,
24 well, no probation at all.  So that was -- I mean, if
25 I was -- if I was looking at this and the judge said

Page 40

1  no probation -- in other words, why even put it on
2  there?  Okay, this is a probated document.  Ten years,
3  serve 12 months, nine years on probation, do not enter
4  the judicial circuit.  If that be the case, it just
5  should have been be do not enter the judicial circuit, no
6  probation.
7          And, also, it says, if you look at it --
8  hold on.  It says, Do not return.  Yeah, thank you.
9          It said, Do not return to the South
10 Georgia Circuit during probation.  So the judge says
11 on probation, I mean, so it doesn't really matter.  So
12 that checkmark really don't even matter anyway, in my
13 opinion, because you do -- it says, Do not return, and
14 it's clear as day.  Do not return to the South Georgia
15 Circuit during probation.  The judge means that he's
16 on probation.  That was a judge-ordered probation.
17     Q.    But would you agree with me --
18     A.    It don't really matter about the
19 checkmarks.  That's just me.
20     Q.    Okay, so you ignore the checkmarks?
21     A.    No, I'm not ignoring the checkmarks.  I'm
22 just telling you what I see.
23          Because if that had been the case, this
24 is a probated sentence.  I mean, it's common sense,
25 and then dress it up anyway they want to, but at the

Dashawn Gervin vs.
Pamela Florence, et al.

Hoke Hampton
April 5, 2022

Page 41

1  end of the day this is a probated sentence. That
2  means that you are on probation.
3      Q.    Okay, so let me just ask you a question,
4  because you're not really responding to anything right
5  now at this point.
6      A.    Yeah, I'm just telling you.
7      Q.    Yeah.
8      A.    This is an official document that the
9  judge signed, but with his own writing it says, Do not
10 return to the South Georgia Circuit during probation.
11     Q.    Sure.
12     A.    I'm telling you that he wouldn't even put
13 that on there.
14     Q.    Okay. So --
15     A.    That's what I see.
16     Q.    Right. So looking at this now, if Gervin
17 did not report to the Camilla office, you see that as
18 a violation of this sentencing order; is that right?
19     A.    I do, because see what you have to do,
20 you have to -- you have to serve him with this
21 sentence. And if he had any good intentions he would
22 have said, Well, Ms. Florence, I'm not on probation.
23 He had ten years to say this. I'm not on probation.
24 But he didn't say that. So all --
25     Q.    But where -- let me just ask you a

Page 42

1  question. Where on this document does it say that he
2  has to report to the probation office?
3      A.    Hold on. Let me see. Because this is an
4  old sentence.
5      Q.    Yeah, sure, take your time, and you can
6  look at this for as long as you want.
7      A.    Okay.
8      Q.    I just want to know where on here it says
9  that he has to report to the probation office at any
10 point.
11     A.    Can you scroll it up a little bit more
12 for me?
13     Q.    Yes. If you need me to move it like to a
14 particular spot because it cuts off the page but,
15 yeah.
16     A.    Right there, Number 4. It says, Report
17 to the probation/parole supervisor as directed and
18 permit the supervisor to visit him -- sorry, and as
19 directed and permit such supervisor to visit him or
20 her at home or elsewhere.
21     Q.    Okay. Does that have a box in front of
22 it?
23     A.    It does.
24     Q.    Okay, and is that box checked?
25     A.    It's not, but that's what I'm saying.

Page 43

1  The whole thing -- I mean, the judge probably flew
2  through it and didn't do it. That doesn't mean he's
3  not on probation.
4      Q.    Okay, so if it's your position that the
5  judge should have checked that box and didn't, is that
6  basically --
7      A.    That's what -- that's what happened.
8  People make mistakes and --
9      Q.    But we can all agree that this
10 sentence -- but we can agree that this sentence as
11 written doesn't require him to report because the box
12 isn't checked; is that right?
13     A.    I can't agree to that one.
14     Q.    Why not?
15     A.    Because I've been doing it long enough,
16 and I know better. Because now I know better.
17 Probably at the time I didn't, but I know better now
18 because it's automatic.
19           I mean, why put him on probation? Why
20 even do all of this if he's not going to be on
21 probation?
22     Q.    Okay, but you agree with me that the
23 terms of someone's sentence has to be written down,
24 right?
25     A.    And it is. I mean, this is a document.

Page 44

1      Q.    Yeah, but it's not written on here that
2  he has to report, right?
3      A.    I see where it says he has to report.
4  It's just that I don't see a checkmark, but that don't
5  mean that he's not supposed to report.
6      Q.    Do you have it in a policy somewhere
7  that --
8      A.    I guess a good way to look at this, if
9  you could --
10     Q.    I'm sorry, if you could just let me
11 finish the question, because you're talking over me at
12 this point.
13     A.    Oh, I apologize. Go ahead.
14     Q.    That's okay. Is there a policy that says
15 an unchecked box on the general conditions actually
16 means that someone has to report?
17     A.    I don't know.
18     Q.    You don't know?
19     A.    I don't know. I'd have to look it up and
20 see.
21     Q.    Are you familiar with the Department of
22 Supervision policies?
23     A.    I am.
24     Q.    Okay. Okay, and you were saying you
25 weren't there for Mr. Gervin's sentencing, right?

Dashawn Gervin vs.
Pamela Florence, et al.

Hoke Hampton
April 5, 2022

Page 45

1    A.    That's correct.  It's to my
2  understanding, if he got a warrant back in 2012, if
3  that's what that was, I wasn't with the department
4  then.
5    Q.    Okay, and I just want to verify, which
6  system -- was it the Portal system or the Scribe
7  system that you specifically looked in to look at the
8  sentence?
9    A.    You know what?  It wasn't the Portal
10  because I don't think the Portal was identified until
11  later on, maybe several years later, a couple years
12  later.  I don't really know, but it was Scribe.
13    Q.    Okay.  So you went into the Scribe system
14  and you were able to see a copy of the sentence, and
15  then you also reviewed a physical copy before you did
16  your affidavit; is that right?
17    A.    I'm sorry to take over you.
18          I know that I did a hard copy.  I know
19  that part.
20    Q.    Okay.
21    A.    I'm thinking that I looked at -- if I'm
22  not mistaken, I think that I looked at Scribe.  I know
23  it was Scribe, I know that part, but -- I think it was
24  Scribe.  I'm not really sure right now at this point,
25  but --

Page 46

1    Q.    Okay.
2    A.    I know Scribe was our software system at
3  the time.  The Portal didn't get introduced to like
4  when probation and parole merged together, which is
5  maybe about four or five years ago, give or take.
6    Q.    Okay.  Just give me a minute, and I think
7  we can wrap this up shortly.
8    A.    Okay.
9    Q.    Well, just to confirm, the Camilla
10  probation office, that's inside the South Georgia
11  Circuit, right?
12    A.    That's correct.
13    Q.    Okay.  And you agree that he couldn't
14  physically have travelled to the Camilla probation
15  office without violating his sentence, Do not return
16  to the South Georgia Circuit; is that right?
17    A.    Yeah, that's correct.  Can I -- can I
18  touch on that?
19    Q.    Sure.
20    A.    Okay.  So, for example, over here in --
21  I'm in the Southern Circuit now, so -- and we very
22  seldom have banishments.  But if we have banishments,
23  the judge would allow you to come to the office, sign
24  your paperwork and immediately leave.  I mean, that's
25  just how it is, I mean.

Page 47

1          And we'll tell them, hey, report into
2  this office immediately upon your release.  You sign
3  your paperwork, you do everything you need to do, and
4  you go on, on your merry way.  Just don't come back to
5  this county.  That's -- that's normally the protocol
6  that we follow.
7          That's not telling just because he's
8  banished, that's not saying, hey, don't come in and do
9  your paperwork.  That's saying that, hey, come in to
10  your paperwork and then leave.
11    Q.    Are you aware that Mr. Gervin was
12  actually given this Greyhound bus ticket and sent on
13  his way after he was released from jail?
14    A.    No.  No, I wasn't aware of that.
15    Q.    Okay.
16    A.    When?  When was this?  2000 -- 2018?  I'm
17  not sure.  I can't see.
18          Either way, I'm not -- I'm not -- I'm not
19  familiar with it, but I'm trying to figure out the
20  dates that he actually left.
21    Q.    This is January 18th, 2012, was the date
22  that he was released from jail and driven to the
23  Greyhound bus station and sent on his way to
24  St. Louis; is that right?
25    A.    I guess, looking at that.  I wasn't with

Page 48

1  the department, so I really don't know.
2    Q.    You don't know.
3          How often is banishment a part of
4  sentences as far as you know?
5    A.    It normally means for life,
6  unfortunately, or I guess --
7    Q.    But how often do you see it as part of a
8  sentence?
9    A.    I see banishments all the time from other
10  circuits, from the South Georgia Circuit.  Different
11  circuits, but in the Southern Circuit where I work at
12  it's very rare that you have a banishment, but it
13  happens all the time in the South Georgia Circuit.
14          And that's because they don't want to
15  have to deal with them.  That's -- that's a lot of it,
16  so that's why they do banishment.  Just get them away
17  so they don't have to deal with them no more.  But, I
18  mean, maybe twice here in the Southern Circuit in
19  eight years, maybe twice.
20    Q.    I think I'm almost done.  I'm just
21  checking over everything.  Just one second.
22    A.    Okay.
23    Q.    Okay, and just going back, a couple more
24  questions about this sentence.
25          So in your understanding, it says don't

Page 49

1  return to South Georgia Circuit, but you thought he
2  had to report there, right?
3      A.    Yes.
4      Q.    And so did you ever --
5      A.    Hold on.  Well, like I said, when he --
6  when this warrant took place or when the sentence took
7  place I wasn't there.  That was in 2012.
8      Q.    Right, but did you go back and check the
9  transcript of the sentencing hearing to understand the
10  judge's intent behind this sentence?
11      A.    I did not, but that would be a great tool
12  to do.  I mean, I'm pretty sure if we pulled the
13  transcript, we'll see that the judge really meant for
14  him to be on probation.
15      Q.    Okay, so that would have been a great
16  thing for you to have done before filling out your
17  affidavit; is that right?
18      A.    Yeah, yeah.
19      Q.    Okay.  And you agree that probably would
20  have been a great thing for Florence to have done
21  before filling out her affidavit?
22      A.    That's not typical protocol but, sure,
23  that would have been great.
24      Q.    Do you know whether anyone went to look
25  at it or to try to understand the judge's intent?

Page 50

1      A.    I don't know.  I really can't answer that
2  question.
3      Q.    Okay.
4      A.    I mean, typically we don't -- we don't go
5  read transcripts.  We just go ahead and toll the
6  warrant, but at that point we haven't made a
7  good-faith effort to look for the individual so --
8      Q.    I didn't hear what you said.  I'm sorry.
9      A.    Okay, so when we toll warrants, when we
10  toll warrants we have made a diligent -- the whole
11  point of tolling a warrant is because we want to make
12  sure that we have did a diligent search for that
13  individual.  That's the whole point of tolling the
14  warrant, is because we want to -- number one, we want
15  to stop the time and keep it from running.  Stop the
16  time and keep it from running, and we want to toll the
17  warrant because we have did a diligent search for this
18  individual.  That's the whole point of tolling the
19  warrant.  Not any kind of smoke and mirrors.
20          We toll the warrant because we have made
21  a diligent effort to see the person, to find the
22  person.  That's the whole point of tolling a warrant.
23  Not saying whether they're on probation or not.  We
24  passed that at that point.
25          Now, when you're doing the warrant, the

Page 51

1  person that came in, that's a whole different subject.
2  I can't tell you why she didn't -- why she did the
3  warrant, but it's obviously he didn't come in.  And
4  his theory was he wasn't on probation, and her theory
5  was he was on probation.  So the only way to identify
6  that is go to pull the transcripts to see what the
7  judge said whether he was on probation or not.
8      Q.    Okay, and you're saying there wasn't
9  really a good-faith effort to figure out whether he
10  was on probation before Florence filled out her
11  affidavit for the warrant; is that right?
12      A.    Well, that's what I'm saying, but it was
13  a good-faith effort to say, hey, we tried to find him
14  and he wasn't nowhere in place, so that's why the
15  warrant was tolled in the first place.  And that's the
16  whole -- that's the whole point of tolling the
17  warrant.
18      Q.    Got it.  Well, thank you very much.  I
19  don't think that I have much more.  Let me just check
20  one second.
21      A.    Yes, ma'am.
22      Q.    All right.  Is there anything that I
23  haven't asked you about that you think I should know
24  to get a complete understanding of this situation?
25      A.    No.  I mean, you pretty much were

Page 52

1  thorough and everything.  And all I can say is that,
2  you know, that's the whole -- and I'm just going to
3  kind of pick it back up with what I just said.  The
4  whole purpose in tolling this warrant -- like I said,
5  I don't know why the warrant was done.
6          Well, I know why the warrant was done,
7  but I don't know her theory behind why she did the
8  warrant.
9          But from my standpoint the reason why I
10  tolled the warrant is because this guy already had a
11  warrant.  We made a good-faith effort to try to find
12  this guy.  We couldn't find him, and based on deputy
13  testimony he wasn't where he was supposed to be at,
14  and I tolled the warrant based off that.  So --
15      Q.    And it was your understanding that
16  tolling it would prolong his probation, right?
17      A.    No.  Well, that, too.
18          The whole point of tolling the warrant is
19  we couldn't find the guy.  And to keep the probation
20  from running out, we want to toll the warrant and stop
21  it so that when he did get captured then the warrant
22  would be somewhat valid.  Because if you didn't toll
23  the warrant, everything would just run out.
24      Q.    Right.  And so you told the judge that a
25  diligent search had been made, he needed to toll it?

Dashawn Gervin vs.
Pamela Florence, et al.

Hoke Hampton
April 5, 2022

---

Page 53

1    **A.    That's correct.**

2    Q.    Okay.

3        **MS. FUNT:** All right.  Well, thank you

4    very much.  I really appreciate your time today,

5    and I apologize again for my need to take a

6    break in the middle of it.  That was not ideal,

7    but if there's no other questions from Laura.

8        Sorry, we can't hear you.

9        **MS. LONES:** I'm sorry.  I have no

10    questions.

11        **MS. FUNT:** Okay.  And I think read and

12    sign?

13        **MS. LONES:** Read and sign.

14        **MS. FUNT:** All right.  We will be done

15    for today.  Thank you very much.

16        **MS. LONES:** Thank you all.  I will see

17    you-all in a week, I guess.

18        **MR. GREENAMYRE:** And, Mr. Hampton, thank

19    you again.  We appreciate you coming here and

20    talking with us today.

21        **THE WITNESS:** Okay.  Thank you-all, and I

22    appreciate everything.

23        **MR. LEMMON:** Going off the record at

24    2 o'clock.

25        (Proceedings concluded at 2:00 p.m.)

---

Page 54

1                    E R R A T A

2    DASHAWN GERVIN,            )

3              Plaintiff,      )   CIVIL ACTION FILE

4         vs.                  )   NO. 1:21-CV-00067-LAG

5    PAMELA FLORENCE, HOKE      )
     HAMPTON, and TANDRIA       )
6    MILTON, in their           )
     individual capacities,     )
7                              )
                    Defendants.)
8    - - - - - - - - - - - - - )

9

10        I, the undersigned, HOKE HAMPTON, do hereby

11    certify that I have read the foregoing transcript of

12    my deposition and that:

13    _____  1)   There are no changes noted.

14    _____  2)   Changes are noted below.

15        To assist you in making changes, please use this

16    form.  If additional pages are needed, please furnish

17    same and attach them to this sheet.

18    Page_____ Line_____ should read:_____

19    Reason for change:_____

20    Page_____ Line_____ should read:_____

21    Reason for change:_____

22    Page_____ Line_____ should read:_____

23    Reason for change:_____

24    Page_____ Line_____ should read:_____

25    Reason for change:_____

---

Page 55

1    DEPOSITION OF HOKE HAMPTON

2    Page_____ Line_____ should read:_____

3    Reason for change:_____

4    Page_____ Line_____ should read:_____

5    Reason for change:_____

6    Page_____ Line_____ should read:_____

7    Reason for change:_____

8    Page_____ Line_____ should read:_____

9    Reason for change:_____

10    Page_____ Line_____ should read:_____

11    Reason for change:_____

12    Page_____ Line_____ should read:_____

13    Reason for change:_____

14    Page_____ Line_____ should read:_____

15    Reason for change:_____

16    Page_____ Line_____ should read:_____

17    Reason for change:_____

18    Page_____ Line_____ should read:_____

19    Reason for change:_____

20

21                    HOKE HAMPTON

22    Sworn to and subscribed before me this

23    _____ day of _____, 2022.

24    _____
     Notary Public

25    My commission expires _____

---

Page 56

1                C E R T I F I C A T E

2

3

4        I, SARAH M. BENTLEY, Certified Court

5    Reporter, Registered Professional Reporter and Notary

6    Public, do hereby certify that previous to the

7    commencement of the examination, the witness was duly

8    sworn by me; that the said proceedings were taken in

9    machine shorthand by me at the time and place

10    aforesaid and were thereafter reduced to typewritten

11    form under my direction, Pages 1 - 57; that the

12    foregoing is a true, complete, and correct transcript

13    of said proceedings.

14        I further certify that I am not employed

15    by, related to, nor counsel for any of the parties

16    herein, nor otherwise interested in the outcome of

17    this litigation.

18        IN WITNESS WHEREOF, I have affixed my

19    signature and seal this 12th day of April, 2022.

20

21

22

23        SARAH M. BENTLEY, CCR-B-1745

24

25

---

**A**

**able (1)**
45:14
**above-named (1)**
33:3
**accountable (2)**
20:10,12
**accurate (2)**
16:18,23
**accurately (1)**
17:6
**action (1)**
20:18
**actions (1)**
20:10
**actual (1)**
8:10
**actually (16)**
7:12;12:16;13:16;
23:25;26:7;32:12,20;
33:5,17;34:19;35:8,12;
38:21;44:15;47:12,20
**add (1)**
37:19
**additional (1)**
35:13
**administer (1)**
17:7
**admit (1)**
21:18
**adult (1)**
9:10
**adverse (1)**
20:18
**affidavit (33)**
16:22;18:7,13;21:12,
16;22:3;24:12,20;26:6;
27:23;28:16,17,22;
29:1,17;30:13,17;
31:19,22;32:3;34:20,
23;35:3,14;36:23;
37:10,19,21;38:15;
45:16;49:17,21;51:11
**affidavits (3)**
16:17,22;29:9
**afternoon (3)**
4:18,19,20
**again (2)**
53:5,19
**against (4)**
12:21;14:20,23;
20:18
**age (1)**
9:22
**agency (2)**
7:23;21:20
**ago (4)**
13:10,10,11;46:5
**agree (28)**
9:6;16:16,21;17:1,5,
14,21;18:6,9,10,15,19,

23;19:2,5,6;20:6,12;
26:5,12;39:14;40:17;
43:9,10,13,22;46:13;
49:19
**agreement (2)**
4:9;37:6
**ahead (1)**
44:13;50:5
**ain't (2)**
14:8;33:2
**air (1)**
35:6
**Albany (5)**
4:7;9:10;11:3,4,18
**allegations (2)**
13:20
**allow (2)**
19:7;46:23
**allowed (1)**
19:12
**almost (3)**
11:25;33:6;48:20
**along (1)**
4:21
**always (6)**
15:3,3,8,10,14,20
**Amendment (1)**
17:2
**apologize (2)**
44:13;53:5
**appears (1)**
32:3
**apply (1)**
16:13
**appreciate (4)**
19:20;53:4,19,22
**around (1)**
25:2
**arrest (4)**
17:2;19:8,12;20:7
**arrested (1)**
8:1
**assigned (1)**
24:5
**at-risk (1)**
9:22
**attached (2)**
22:12;28:11
**attempt (1)**
32:14
**attend (1)**
6:7
**August (1)**
36:19
**automatic (1)**
43:18
**automatically (2)**
33:19;37:10
**available (2)**
17:11,23
**aware (3)**
14:25;47:11,14
**away (1)**

48:16

**B**

**bachelor's (2)**
10:24;11:2
**back (28)**
6:8;7:7;8:16;10:4;
11:19;13:9,15;19:17;
20:1;25:9,14,23,24;
26:11;27:6;28:20;30:4;
32:2;33:20,24,25;37:2,
19;45:2;47:4;48:23;
49:8;52:3
**background (2)**
16:11,13
**banished (1)**
47:8
**banishment (3)**
48:3,12,16
**banishments (3)**
46:22,22;48:9
**banned (3)**
7:13,14;30:9
**based (6)**
34:22;35:14;36:22;
37:6;52:12,14
**baseline (1)**
20:5
**basic (1)**
32:22
**basically (3)**
16:12;19:11;43:6
**became (1)**
22:20
**becoming (1)**
9:18
**behind (2)**
49:10;52:7
**besides (1)**
6:15
**best (3)**
5:21;17:10;25:15
**better (3)**
43:16,16,17
**beyond (1)**
36:22
**bit (9)**
5:1,13;15:23;25:7,7;
27:17;36:4;37:1;42:11
**blanks (1)**
33:6
**blow (1)**
36:3
**boat (1)**
21:8
**both (4)**
26:19;27:1,19;29:5
**box (5)**
42:21,24;43:5,11;
44:15
**break (3)**
6:6;19:15;53:6

**Brief (1)**
28:6
**briefly (2)**
9:17;10:23
**burglary (1)**
32:15
**bus (2)**
47:12,23
**business (1)**
15:14

**C**

**called (1)**
15:18
**came (4)**
7:19;10:3;25:3;51:1
**Camilla (4)**
38:2;41:17;46:9,14
**Can (26)**
4:11;5:5;6:9,13;
9:17;15:22;19:1,17;
20:17,22;22:8,15;
23:17;26:25;27:6;
32:14;36:3;39:3;42:5,
11;43:9,10;46:7,17,17;
52:1
**captured (4)**
35:8,20;37:18;52:21
**care (2)**
10:12,17
**case (28)**
4:5,8,22;6:17,20,22,
24;7:20;15:4;16:14,23;
21:24;22:15,20;23:4,5,
8,11,13,18,24;26:11;
28:18;31:7;39:21,23;
40:4,23
**caseload (1)**
38:3
**cases (1)**
23:15
**cause (1)**
17:3
**caused (1)**
20:14
**change (1)**
33:4
**check (4)**
26:17;39:17;49:8;
51:19
**checked (5)**
29:18;30:5;42:24;
43:5,12
**checking (1)**
48:21
**checkmark (2)**
40:12;44:4
**checkmarks (3)**
40:19,20,21
**Circuit (9)**
7:14,15;26:22;30:2,
10,10;32:17;40:4,5,10,

15;41:10;46:11,16,21;
48:10,11,13,18;49:1
**circuits (2)**
48:10,11
**citizens (1)**
17:2
**City (1)**
11:18
**claim (2)**
12:21,22
**clarify (2)**
5:22;22:1
**clear (1)**
40:14
**Colquitt (1)**
9:15
**coming (1)**
53:19
**commit (1)**
32:15
**common (1)**
40:24
**communication (1)**
27:8
**community (4)**
10:12,19,19;17:15
**compared (1)**
25:25
**complaint (1)**
12:24
**complaints (3)**
14:23;15:4;16:2
**complete (1)**
16:18,24;51:24
**completed (7)**
5:15;11:14,15;28:16,
18,22,25
**compliance (3)**
19:8;38:23;39:3
**compliant (1)**
19:13
**concerns (1)**
25:16
**concluded (1)**
53:25
**conditions (7)**
26:8;13;29:18;30:6,
14;39:16;44:15
**conduct (2)**
20:13,14
**confirm (2)**
20:17;46:9
**confuse (1)**
22:7
**confused (1)**
26:16
**confusing (1)**
5:21
**Constitution (1)**
19:6
**conversation (1)**
5:13
**coordinator (1)**

Dashawn Gervin vs.
Pamela Florence, et al.

Hoke Hampton
April 5, 2022

10:13
**copy (11)**
17:18;27:20;28:21,
24;29:3,4,6,6;45:14,15,
18
**Corps (6)**
9:19,20;10:12,18;
11:22;12:6
**County (7)**
7:13;8:1;9:13,15;
33:4,5;47:5
**couple (4)**
5:2;27:2;45:11;
48:23
**course (4)**
11:1,4;15:2;25:6
**courses (1)**
11:3
**court (5)**
12:17;16:7;18:3,15;
19:4
**criminal (1)**
32:14
**current (1)**
10:15
**currently (2)**
10:11;23:8
**cut (1)**
15:22
**cuts (1)**
42:14

**D**

**damages (1)**
20:13
**Dashawn (9)**
4:5,22;7:8;24:6;26:6,
12,20;34:18;35:12
**date (3)**
33:4,10;47:21
**dates (1)**
47:20
**day (5)**
23:16;30:4;33:1;
40:14;41:1
**days (5)**
21:22;23:21,23;28:4;
31:10
**DCS (3)**
7:24;26:23;29:2
**deal (3)**
31:6;48:15,17
**dealing (1)**
10:20
**decisions (1)**
17:12
**defendant (2)**
16:4;33:3
**defendant's (1)**
32:4
**degrees (1)**
11:11

**Department (8)**
17:15;23:2,22;24:1,
23;44:21;45:3;48:1
**deposition (5)**
4:23;6:16;8:10;9:7;
22:8
**deputy (4)**
34:7,15,17;52:12
**detail (1)**
8:14
**determine (1)**
16:8
**devices (1)**
9:7
**Different (2)**
48:10;51:1
**diligent (10)**
32:5;33:18;34:1,3,
15;50:10,12,17,21;
52:25
**directed (2)**
42:17,19
**disagreement (1)**
14:14
**discipline (2)**
14:20;20:18
**discovery (1)**
35:23
**discussed (1)**
6:13
**District (2)**
4:8;7:13
**Division (1)**
4:7
**document (11)**
19:4;22:9,15;23:14;
28:9;29:22;30:12;40:2;
41:8;42:1;43:25
**documents (3)**
6:14;8:17;18:3
**done (14)**
6:9,14;7:16;21:23;
22:9;27:17;33:25;
34:17;48:20;49:16,20;
52:5,6;53:14
**down (3)**
5:8;19:3;43:23
**dress (1)**
40:25
**driven (2)**
26:2;47:22
**drugs (2)**
13:20,22
**duly (1)**
4:14
**during (7)**
6:18;9:7;11:22;
26:13;40:10,15;41:10

**E**

**earlier (1)**
30:8

**education (4)**
10:23,24;11:14,15
**EEOC (9)**
12:15,17,18,20,23,
25;13:2,18;14:16
**effect (1)**
35:3
**effort (5)**
50:7,21;51:9,13;
52:11
**eight (2)**
21:8;48:19
**Either (1)**
47:18
**electronic (1)**
9:6
**else (4)**
6:15;31:15,21;34:12
**elsewhere (1)**
42:20
**end (4)**
22:12;28:11;35:10;
41:1
**enforcement (2)**
32:6;33:18
**enough (1)**
43:15
**enrolled (1)**
11:4
**ensure (1)**
38:18
**enter (3)**
24:19;40:3,5
**entered (2)**
36:18;37:9
**entries (1)**
22:16
**entry (1)**
23:4
**est (2)**
33:21;34:2
**even (9)**
21:24;29:25;30:5;
37:22;38:10;40:1,12;
41:12;43:20
**exactly (3)**
6:25;25:18;34:14
**EXAMINATION (1)**
4:16
**examined (1)**
4:15
**example (4)**
15:4,6,20;46:20
**exculpatory (1)**
18:12
**Exhibit (5)**
22:6,11;28:10,15;
32:2
**extended (4)**
34:22;36:22;37:6,11
**extent (2)**
10:15;21:15
**extra (1)**

38:19
**eye (2)**
14:5,6

**F**

**face (1)**
14:12
**failed (1)**
32:17
**fair (2)**
5:23,24
**fairly (1)**
17:6
**false (1)**
18:8
**familiar (2)**
44:21;47:19
**far (7)**
15:12;16:2;21:6,6;
25:15,16;48:4
**fault (2)**
15:10,13
**federal (1)**
4:10
**feel (2)**
5:12;6:2
**felt (1)**
14:14
**few (2)**
11:2;15:12
**field (1)**
34:6
**figure (2)**
47:19;51:9
**figured (1)**
38:6
**file (10)**
6:17,17,20,22,24;
7:7;8:10,19;29:4;38:16
**filed (4)**
12:21,22;14:16,23
**fill (6)**
22:2;24:12;26:24;
30:17;32:12;33:6
**filled (3)**
31:18;35:4;51:10
**filling (5)**
26:6;30:12;31:22;
49:16,21
**find (8)**
13:3;28:24;38:11;
50:21;51:13;52:11,12,
19
**fine (4)**
9:8,8;15:25,25
**finish (2)**
11:3;44:11
**fired (1)**
13:25
**first (7)**
4:14,24;10:5;20:25;
22:19;31:13;51:15

**five (4)**
9:23;25:8;38:19;
46:5
**flag (1)**
27:15
**flew (1)**
43:1
**Florence (14)**
4:6;7:16;21:12;22:2;
24:8,9,12,19,25;27:13;
30:16;41:22;49:20;
51:10
**follow (2)**
17:15;47:6
**following (1)**
24:23
**follows (1)**
4:15
**form (3)**
32:22;33:8,17
**format (2)**
32:11,19
**found (1)**
28:9
**four (1)**
46:5
**Fourth (2)**
17:1;33:1
**fresh (1)**
21:7
**front (3)**
21:18;25:5;42:21
**full (1)**
19:8
**fully (3)**
5:15;6:1;19:13
**FUNT (12)**
4:4,17,21;19:15,19;
20:3;22:14;28:7,13;
53:3,11,14

**G**

**Gamble (5)**
11:19,21;12:3,8,9
**Gamble's (1)**
13:5
**gap (4)**
10:5;11:16,21;12:2
**gave (1)**
30:16
**general (8)**
29:18;30:6,14;32:10,
11,19;39:16;44:15
**generally (2)**
16:2;20:6
**Georgia (16)**
4:8;7:14;9:11,16;
10:4;11:9;30:10;32:16;
40:10,14;41:10;46:10,
16;48:10,13;49:1
**Gervin (11)**
4:5,22;7:8;24:6;

26:12,20;38:4,7,10;
41:16;47:11
**Gervin's (5)**
20:19;26:7;34:19;
35:12;44:25
**gets (4)**
5:16;35:7,9,10
**given (1)**
4:23;47:12
**gleaned (1)**
8:5
**goes (1)**
15:9
**good (10)**
4:18,18,19,20;20:7;
25:12,13;28:3;41:21;
44:8
**good-faith (4)**
50:7;51:9,13;52:11
**gosh (1)**
13:8
**gotch (1)**
36:6
**graduate (3)**
11:3,4,10
**great (5)**
20:4;49:11,15,20,23
**Greenamyre (2)**
4:21;53:18
**Greyhound (2)**
47:12,23
**ground (1)**
5:2
**guess (11)**
23:23;30:4;36:11,14;
37:4,25;38:9;44:8;
47:25;48:6;53:17
**guy (4)**
27:15;52:10,12,19

**H**

**half (3)**
11:25;12:1,4
**Hampton (7)**
4:6,13;15:5,6,21;
23:10;53:18
**hand (1)**
27:12
**happen (2)**
27:18;37:11
**happened (7)**
13:9;21:20;35:12,19;
37:25;38:1;43:7
**happens (6)**
20:15;23:12;35:19;
37:13,17;48:13
**hard (4)**
5:17;29:4,5;45:18
**head (1)**
5:8
**hear (4)**
16:1;31:4;50:8;53:8

**hearing (6)**
36:19,20;37:12,14,
17;49:9
**held (4)**
8:2;14:18;20:9,12
**helpful (1)**
15:24
**herself (1)**
24:20
**hey (4)**
47:1,8,9;51:13
**High (2)**
10:25;11:1
**highlighted (1)**
32:14
**hindsight (1)**
25:14
**Hoke (3)**
4:6,13;23:10
**Hold (7)**
22:18,24;28:2;38:5;
40:8;42:3;49:5
**holds (1)**
26:9
**home (5)**
8:24;9:1,2,14;42:20
**honest (5)**
16:19,24;20:24;
29:20;31:24
**hopefully (1)**
5:12;6:9

**I**

**ideal (1)**
53:6
**identification (2)**
22:12;28:11
**identified (1)**
45:10
**identify (1)**
51:5
**ignore (1)**
40:20
**ignoring (1)**
40:21
**ill (1)**
25:20
**immediately (2)**
46:24;47:2
**important (2)**
16:17;18:12
**imposed (1)**
26:13
**impression (1)**
25:10
**incarcerated (2)**
35:9,21
**incident (1)**
8:12
**include (3)**
7:10;8:15;18:2
**includes (2)**

10:12;20:13
**inconvenience (1)**
19:16
**incorrect (1)**
39:6
**independently (1)**
18:20
**individual (3)**
50:7,13,18
**individuals (2)**
9:21;20:7
**information (5)**
8:5;17:11,23;18:8,12
**inserted (1)**
32:22
**inside (1)**
46:10
**instances (1)**
18:2
**instructed (3)**
21:22;22:2;24:11
**instruction (1)**
30:17
**insubordination (1)**
14:7
**intake (1)**
7:16
**intent (3)**
5:22;49:10,25
**intentions (1)**
41:21
**into (5)**
14:9;27:10;38:15;
45:13;47:1
**introduced (1)**
46:3
**inventus (2)**
33:22;34:3
**investigation (1)**
17:22;18:2;27:18
**involved (1)**
22:20
**involvement (3)**
20:25;21:15,23
**issue (2)**
7:2;15:9

**J**

**Jail (7)**
8:2,3;15:8,9;36:15;
47:13,22
**January (2)**
35:24;47:21
**Job (7)**
9:19,20;10:5,12,18;
11:21;12:5
**judge (22)**
7:12;26:15,15;30:7,
8;34:21;35:4,13;39:7,
10,20,21,25;40:10,15;
41:9;43:1,5;46:23;
49:13;51:7;52:24

**judge-ordered (1)**
40:16
**judge's (2)**
49:10,25
**judicial (4)**
30:2,10;40:4,5

**K**

**keep (3)**
50:15,16;52:19
**kind (9)**
7:15;10:18;14:10;
15:8,23;26:25;27:18;
50:19;52:3
**knew (1)**
26:3
**knowing (1)**
26:11
**knowingly (2)**
18:8,11
**known (2)**
15:11;16:7

**L**

**last (1)**
22:8
**later (10)**
7:18,19;21:9;23:21,
23;37:11,13;45:11,11,
12
**Laura (1)**
53:7
**law (3)**
19:12;32:5;33:17
**lawsuit (8)**
7:4;12:12,13;14:16;
16:5;38:9,11,24
**lawyer (3)**
5:1;6:13,15
**learning (3)**
30:22;31:10;38:4
**leave (3)**
18:11;46:24;47:10
**left (8)**
10:3;12:2,7,9;25:5;
37:24;38:2;47:20
**LEMMON (4)**
4:3;19:22;20:1;
53:23
**level (1)**
15:19
**life (1)**
48:5
**line (1)**
33:3
**list (1)**
12:9
**little (12)**
5:1,13;15:23;25:7,7;
26:17;27:17;33:7;36:3;
37:1;39:17;42:11

**locate (1)**
28:8
**located (1)**
9:14
**LONES (3)**
53:9,13,16
**long (6)**
8:3;9:20;13:10;
24:25;42:6;43:15
**longer (1)**
38:2
**look (15)**
8:14;13:15;25:4;
26:14,16;30:6;31:17;
33:20;40:7;42:6;44:8,
19;45:7;49:24;50:7
**looked (8)**
8:13,21;29:22;30:12;
34:8;45:7,21,22
**looking (11)**
18:2;25:14,24;26:10;
29:25;39:2,9,12,25;
41:16;47:25
**looks (1)**
22:20
**lot (7)**
25:19,22;26:3,16;
30:3,4;48:15
**loud (1)**
5:6
**Louis (1)**
47:24

**M**

**ma'am (3)**
19:18;21:13;51:21
**mad (1)**
5:17
**mainly (1)**
31:6
**making (2)**
5:7;17:11
**manager (3)**
14:5,9,13
**many (1)**
31:11
**mark (1)**
28:15
**marked (4)**
22:6,12;28:10,14
**matter (3)**
40:11,12,18
**May (11)**
22:21,24,25;23:1,6,
11,20,22;24:1;31:8,9
**maybe (16)**
11:24,25;12:1;13:10;
18:1;23:1,15;25:6,8;
30:23,23;31:10;45:11;
46:5;48:18,19
**mean (37)**
6:24;7:1,4;8:3;13:13,

23;14:4,10;15:2,22;
21:7;23:10;24:22;
25:12,24;26:10,18;
31:8;36:24;38:9;39:17,
17,18,24;40:11,24;
43:1,2,19,25;44:5;
46:24,25;48:18;49:12;
50:4;51:25
**means (5)**
34:16;40:15;41:2;
44:16;48:5
**meant (1)**
49:13
**meet (1)**
7:6
**meeting (1)**
6:7
**merged (1)**
46:4
**merry (2)**
26:25;47:4
**messed (1)**
15:13
**mid (1)**
35:6
**Middle (3)**
4:7;32:8;53:6
**might (1)**
39:15
**miles (1)**
9:10
**Milton (2)**
4:6;8:2
**mind (1)**
26:21
**minute (1)**
46:6
**minutes (1)**
19:17
**mirrors (1)**
50:19
**misdemeanor (2)**
10:1,3
**mistaken (1)**
45:22
**mistakes (1)**
43:8
**Mitchell (4)**
7:13;8:1;33:4,5
**modify (1)**
18:20
**moment (1)**
27:24
**months (8)**
25:8;30:1;32:16;
36:7,10,15;39:11;40:3
**more (11)**
6:2;15:23;19:1;26:2;
27:17;36:4;37:1;42:11;
48:17,23;51:19
**morning (1)**
4:18
**Moultrie (5)**

9:15,16;10:6;25:9;
26:2
**move (1)**
42:13
**much (8)**
19:19;32:18;35:16;
51:18,19,25;53:4,15
**must (5)**
16:22,23;17:22;
18:24;19:3

## N

**name (1)**
4:20
**named (2)**
16:4;38:11
**nature (1)**
8:22
**need (7)**
23:18;25:3;26:23;
27:14;42:13;47:3;53:5
**needed (1)**
52:25
**neighborhood (1)**
11:17
**new (1)**
24:6
**nine (7)**
30:1;36:7,11,22;
39:11,12;40:3
**nine-year (1)**
36:1
**nods (1)**
5:8
**non (3)**
33:21,21;34:2
**none (1)**
29:17
**non-verbal (1)**
5:9
**normally (2)**
47:5;48:5
**notarized (1)**
33:14
**note (1)**
23:24
**notes (1)**
22:16
**notice (2)**
4:9;29:21
**nowhere (1)**
51:14
**Number (2)**
42:16;50:14
**numbers (1)**
22:8

## O

**obligation (1)**
17:6
**obviously (1)**

51:3
**o'clock (1)**
53:24
**October (2)**
34:9;36:18
**off (9)**
10:17,25;15:22;
19:22;21:8;33:1;42:14;
52:14;53:23
**offender (1)**
10:9
**offenders (1)**
10:20
**office (13)**
8:11;10:6;26:2;
27:11;29:4;38:2;41:17;
42:2,9;46:10,15,23;
47:2
**officer (14)**
9:18;10:9;14:21,24;
15:15;16:18;17:14;
18:7,17,20;19:7;24:6,
17;34:6
**officers (9)**
17:5,9,10,22;18:11;
20:6;32:6,18;33:18
**officer's (1)**
15:10
**official (1)**
41:8
**often (2)**
48:3,7
**Ogeechee (3)**
11:5,7,8
**old (1)**
42:4
**omit (1)**
18:12
**once (3)**
21:19;23:13,13
**one (19)**
9:1,2;14:18;15:12;
19:1,10;22:1,5,9,18;
26:17;27:5,24;28:2,5;
43:13;48:21;50:14;
51:20
**online (1)**
11:5
**only (7)**
9:1,2;21:19,23;
24:21;31:9;51:5
**onto (3)**
35:10,17;37:20
**opinion (8)**
13:16;15:15,16;26:4;
39:6,16,18;40:13
**opportunity (4)**
6:1,19,21,23
**order (2)**
36:17;41:18
**original (1)**
22:13;28:12
**out (26)**

5:6;17:23;18:11;
21:15;22:3;24:12;26:6,
24;30:12,17;31:18,22;
32:12;33:7;34:4,15;
35:4;38:6,11;47:19;
49:16,21;51:9,10;
52:20,23
**over (10)**
5:16;8:13,14;25:7;
31:7;33:2;44:11;45:17;
46:20;48:21
**own (1)**
41:9

## P

**page (2)**
5:2;42:14
**Pamela (5)**
4:5;21:12;22:2;24:8,
9
**paperwork (7)**
7:16;26:24;27:11;
46:24;47:3,9,10
**parole (1)**
46:4
**part (5)**
33:16;45:19,23;48:3,
7
**particular (8)**
7:23;14:15;21:8;
23:16;30:21;35:7;38:1;
42:14
**parts (1)**
32:22
**passed (1)**
50:24
**pause (1)**
28:6
**paying (1)**
20:13
**pending (1)**
4:7
**people (2)**
16:1;43:8
**per (3)**
25:17;26:18;34:4
**Perfect (1)**
36:6
**performed (1)**
7:17
**period (2)**
8:3;11:23
**periods (1)**
11:13
**permissible (1)**
4:10
**permit (2)**
42:18,19
**person (10)**
15:8,9;23:14,16;
25:13,13,19;50:21,22;
51:1

**person's (3)**
18:16,24;19:3
**phone (2)**
9:6;15:5,7,21
**physical (2)**
8:19;45:15
**physically (2)**
8:25;46:14
**pick (2)**
27:6;52:3
**place (5)**
21:1;49:6,7;51:14,15
**placed (1)**
38:15
**plaintiff/defendant (1)**
7:1
**Plaintiff's (2)**
22:11;28:10
**pleadings (3)**
7:3;8:6,19
**please (2)**
4:11;36:4
**pm (3)**
19:24,25;53:25
**point (15)**
8:25;15:5;38:6;41:5;
42:10;44:12;45:24;
50:6,11,13,18,22,24;
51:16;52:18
**policies (1)**
44:22
**policy (13)**
21:2,2,21;25:16,17,
19,22;26:1,2,6,18;44:6,
14
**Portal (2)**
45:6,9,10;46:3
**position (3)**
10:16;15:3;43:4
**positions (1)**
14:18
**preparation (2)**
6:16;8:9
**pretty (5)**
6:9;16:2;32:18;
49:12;51:25
**previously (2)**
22:6,11
**primary (1)**
24:16
**prior (2)**
14:18;29:16
**probable (1)**
17:3
**probably (6)**
15:6,19;38:8;43:1,
17;49:19
**probated (3)**
40:2,24;41:1
**probation (89)**
7:7,8,12,13;8:10,11,
19;9:18,25;10:2,3;
14:21,24;15:10,14;

16:3,9,12,18;17:5,7,9,
10,14,21,24;18:6,10,
16,19;19:7,9;20:5,6,19;
24:6,16;26:7,21;27:13,
16,24;29:18;30:9,10;
32:18;36:1,9,12,16,19,
22;37:10,12,13,17;
38:19;39:7,12,16,24;
40:1,3,6,10,11,15,16,
16;41:2,10,22,23;42:2,
9;43:3,19,21;46:4,10,
14;49:14;50:23;51:4,5,
7,10;52:16,19
**probation/parole (1)**
  42:17
**probationary (3)**
  19:13;38:24;39:4
**probationer (4)**
  18:13;19:8,12;24:13
**procedures (2)**
  17:16,19
**proceedings (2)**
  12:17;53:25
**process (2)**
  7:22;16:3
**Proctor (6)**
  11:19,21;12:2,8,9;
  13:5
**produced (1)**
  35:23
**program (1)**
  12:10
**programs (1)**
  11:11
**progressed (1)**
  10:18
**prolong (1)**
  52:16
**protects (1)**
  17:2
**protocol (4)**
  7:24;25:16;47:5;
  49:22
**pull (2)**
  27:23;51:6
**pulled (1)**
  49:12
**purpose (1)**
  52:4
**purposes (2)**
  4:10;9:9
**pursuant (1)**
  4:9
**put (10)**
  13:7,13,16;15:7;
  32:20;34:16;39:7;40:1;
  41:12;43:19

**Q**

**quick (1)**
  6:7
**quickly (1)**

6:9

**R**

**raised (1)**
  27:15
**rare (1)**
  48:12
**rather (1)**
  31:14
**read (9)**
  6:17,17,19,22;7:3;
  8:4;50:5;53:11,13
**reading (1)**
  8:6
**real (1)**
  13:13
**really (25)**
  5:17;12:5;13:11;
  14:7;15:13;25:18;
  26:16;27:16;29:20;
  30:5,13;31:14;35:18;
  37:7;40:11,12,18;41:4;
  45:12,24;48:1;49:13;
  50:1;51:9;53:4
**reason (2)**
  12:7;13:6,13;20:7;
  52:9
**reasonable (2)**
  17:22;18:1
**reasonably (1)**
  17:11
**receive (1)**
  23:13
**Received (4)**
  23:4,5,11;30:1
**recess (1)**
  19:24
**recklessly (2)**
  18:8,11
**record (3)**
  4:3,4;5:7,10;6:8;
  19:22;20:1;53:23
**recruiter (1)**
  9:20
**refer (1)**
  22:6
**reference (3)**
  29:5;33:9;34:11
**regular (1)**
  5:13
**relatives (1)**
  9:10
**release (1)**
  47:2
**released (3)**
  36:20;47:13,22
**relied (2)**
  31:14;34:6
**rely (2)**
  31:21,23
**remember (6)**
  13:7,8,11,15;14:1,2

**repeat (1)**
  19:1
**report (15)**
  26:22,24;32:17;38:7;
  41:17;42:2,9,16;43:11;
  44:2,3,5,16;47:1;49:2
**reporting (1)**
  39:5
**reports (1)**
  17:12
**represent (1)**
  4:21
**require (1)**
  43:11
**required (2)**
  17:10;38:7
**requirements (1)**
  39:5
**respond (2)**
  5:15;6:3
**responding (1)**
  41:4
**responses (1)**
  5:6
**responsible (1)**
  16:8
**rest (1)**
  39:12
**result (5)**
  12:13,19,24;20:15;
  34:19
**resume (1)**
  25:4
**return (9)**
  30:2;32:16;40:8,9,
  13,14;41:10;46:15;
  49:1
**review (3)**
  7:7;28:21,25
**reviewed (6)**
  6:14;8:10,18;29:11,
  16;45:15
**revocation (1)**
  36:19
**right (75)**
  6:10;8:12,20,25;
  10:9;13:4;18:4;19:17;
  21:12,16,17,19,25,25;
  22:3;24:2,9,14,15,17,
  18,25;26:5;28:18,19;
  29:11,19,22;30:14;
  31:15,16,19,20;32:6,
  23;33:9,10,12,14;34:2,
  4,13,14;35:2;36:6,8,9,
  17;38:7,16,17,20;39:5;
  41:4,16,18;42:16;
  43:12,24;44:2,25;
  45:16,24;46:11,16;
  47:24;49:2,8,17;51:11,
  22;52:16,24;53:3,14
**roles (1)**
  10:11
**Roughly (1)**

25:2
**rules (7)**
  4:10;5:2;16:13;
  17:16,18;20:5;24:23
**run (1)**
  52:23
**running (3)**
  50:15,16;52:20

**S**

**Samantha (1)**
  4:20
**same (2)**
  5:2;22:9
**Sarah (3)**
  4:12;5:6,16
**saw (2)**
  29:17,24
**saying (18)**
  8:7,18;21:14;23:16;
  30:7,11;32:21;33:16;
  34:14;38:21,25;42:25;
  44:24;47:8,9;50:23;
  51:8,12
**scene (1)**
  7:19
**School (2)**
  11:1,1
**Scribe (7)**
  45:6,12,13,22,23,24;
  46:2
**scroll (1)**
  42:11
**se (1)**
  34:4
**search (8)**
  32:5;33:18;34:1,4,
  16;50:12,17;52:25
**second (3)**
  22:5,18;25:5;28:2,5;
  37:21;38:5;48:21;
  51:20
**seeing (2)**
  14:5;26:25
**seldom (1)**
  46:22
**sense (2)**
  5:18;40:24
**sent (2)**
  47:12,23
**sentence (42)**
  16:23;18:3,16,21,24,
  24;19:3,4;26:13;27:21;
  28:20,21,25;29:16;
  31:18;33:10;34:12,19,
  22;35:10,12,17;36:1;
  37:20;39:2,10,13,21;
  40:24;41:1,21;42:4;
  43:10,10,23;45:8,14;
  46:15;48:8,24;49:6,10
**sentenced (10)**
  30:1;32:15;33:5;

25:24;37:2;39:4,7,8,10,
20
**sentences (1)**
  48:4
**sentencing (5)**
  8:22;26:22;41:18;
  44:25;49:9
**serve (9)**
  35:25,25;36:1,7,10;
  39:11,11;40:3;41:20
**served (3)**
  32:15;36:11,15
**service (3)**
  10:12,19,20
**serving (1)**
  14:21
**sets (1)**
  18:15
**several (1)**
  45:11
**sex (2)**
  10:9,20
**sheet (1)**
  18:25
**short (2)**
  7:18,19
**shortly (1)**
  46:7
**show (4)**
  7:15;27:20;28:16;
  35:22
**shows (2)**
  22:19;35:24
**shy (1)**
  25:7
**side (2)**
  14:11,11
**sides (2)**
  26:19;27:19
**sign (6)**
  26:24;27:11;46:23;
  47:2;53:12,13
**signature (1)**
  33:13
**signed (4)**
  7:16;34:20;35:4;
  41:9
**situation (1)**
  51:24
**six (3)**
  23:21,23;31:10
**six-year (1)**
  11:23
**small (1)**
  29:15
**smoke (1)**
  50:19
**software (2)**
  29:6;46:2
**Somehow (1)**
  28:8
**someone (1)**
  44:16

**someone's (2)**
  16:9;43:23
**somewhat (1)**
  52:22
**somewhere (2)**
  11:17;44:6
**sorry (14)**
  9:13;19:16;21:4;
  22:24;23:5;28:2,5;
  31:4;42:18;44:10;
  45:17;50:8;53:8,9
**sounds (1)**
  37:5
**South (11)**
  7:14;30:10;32:16;
  40:9,14;41:10;46:10,
  16;48:10,13;49:1
**Southern (3)**
  46:21;48:11,18
**speak (2)**
  25:21;26:17
**specific (1)**
  27:2
**specifically (1)**
  45:7
**spit (1)**
  33:7
**spite (1)**
  25:21
**spot (1)**
  42:14
**spot-on (1)**
  26:1
**squashed (1)**
  15:19
**St (1)**
  47:24
**standard (1)**
  34:5
**standpoint (2)**
  26:23;52:9
**start (2)**
  7:20;23:17
**started (15)**
  9:24;10:1,17,25;
  11:18,19;12:5;22:25;
  23:1,2,20,22,25;24:22;
  25:3
**starting (1)**
  7:23
**state (7)**
  4:14;10:4,25;11:2,3,
  4;16:8
**statement (1)**
  20:22
**States (1)**
  19:7
**Statesboro (1)**
  11:8
**station (1)**
  47:23
**status (1)**
  23:8

**stayed (1)**
  36:15
**still (4)**
  24:7,7;30:22;37:3
**stop (4)**
  6:3;50:15,15;52:20
**stopped (1)**
  35:8
**stops (2)**
  35:6,6
**straining (1)**
  29:13
**stuff (7)**
  5:9;21:7;26:4,16;
  30:5,6;31:1
**subject (1)**
  51:1
**submit (1)**
  18:7
**summary (1)**
  23:4
**supervise (1)**
  17:6
**supervising (1)**
  7:20
**supervision (9)**
  16:12;17:16;23:5,5,
  11,15,17;38:3;44:22
**supervisor (9)**
  15:18;24:24;25:1,11,
  24,25;42:17,18,19
**supposed (4)**
  21:2,21;44:5;52:13
**sure (14)**
  4:25;12:5;19:2;
  20:23;27:7;34:25;
  41:11;42:5;45:24;
  46:19;47:17;49:12,22;
  50:12
**swore (2)**
  33:12,14
**sworn (2)**
  4:11,14
**system (7)**
  29:3,6;45:6,6,7,13;
  46:2

**T**

**tack (1)**
  35:13
**tacked (2)**
  35:10,17
**tailor (1)**
  15:23
**talk (4)**
  6:15;27:2;33:2;
  45:17
**talked (1)**
  4:25
**talking (3)**
  5:16;44:11;53:20
**Tandria (2)**

  4:6;8:2
**tasks (1)**
  24:13
**Tech (3)**
  11:5,7,8
**telling (5)**
  6:12;40:22;41:6,12;
  47:7
**ten (10)**
  29:25;32:13,15;
  35:25;36:10;37:3;
  39:10,22;40:2;41:23
**terminated (14)**
  12:10,10,11,12,22;
  13:3,17;14:4,12,14,15,
  17;38:12,13
**termination (1)**
  13:14
**terms (8)**
  18:16,20,23;19:2,13;
  38:24;39:4;43:23
**testified (1)**
  4:15
**testimony (1)**
  52:13
**theory (4)**
  39:9;51:4,4;52:7
**thinking (2)**
  25:23;45:21
**thorough (2)**
  32:5;52:1
**thought (2)**
  37:5;49:1
**ticket (1)**
  47:12
**timeframe (1)**
  37:4
**timeline (1)**
  35:23
**times (1)**
  30:3
**today (3)**
  53:4,15,20
**together (1)**
  46:4
**told (7)**
  7:12;24:24;27:9,9,
  10;31:11;52:24
**toll (11)**
  16:22;21:2,21;50:5,
  9,10,16,20;52:20,22,25
**tolled (13)**
  7:24,25;31:9;34:19,
  24,25,25;35:5,9;37:19;
  51:15;52:10,14
**tolling (26)**
  21:16;22:3;24:20;
  28:16,22;29:1,9,17;
  30:13,18;34:20;35:3,
  14;36:17,23;37:6,10;
  38:15;50:11,13,18,22;
  51:16;52:4,16,18
**took (5)**

  14:10,11;31:7;49:6,6
**tool (1)**
  49:11
**top (1)**
  33:2
**touch (1)**
  46:18
**training (1)**
  30:25
**transcript (5)**
  5:7;22:13;28:12;
  49:9,13
**transcripts (2)**
  50:5;51:6
**transferred (1)**
  25:9
**transpired (2)**
  6:18;7:2
**travelled (1)**
  46:14
**trial (1)**
  9:9
**tried (1)**
  51:13
**true (2)**
  26:9;37:7
**truth (2)**
  4:14;33:14
**try (3)**
  5:21;49:25;52:11
**trying (7)**
  8:17;22:7;27:23;
  28:8;32:7;33:2;47:19
**twice (5)**
  29:23;30:12;31:18;
  48:18,19
**two (9)**
  10:2;11:25;12:1;
  25:2,6,7,7;26:14;32:16
**type (1)**
  33:7
**typed (1)**
  32:18
**typical (1)**
  49:22
**typically (2)**
  29:8;50:4

**U**

**ultimately (1)**
  26:15
**unchecked (1)**
  44:15
**under (5)**
  4:10;19:12;23:14,17;
  38:2
**underage (2)**
  9:21,22
**underlined (1)**
  32:23
**unemployment (7)**
  11:13,16,22;12:2,3,

  4;13:13
**unfairly (1)**
  12:10
**unfortunately (1)**
  48:6
**United (1)**
  19:7
**University (1)**
  11:2
**unknown (1)**
  32:4
**up (12)**
  7:15;15:13;27:6,23;
  33:3;36:3,25;40:25;
  42:11;44:19;46:7;52:3
**upon (1)**
  47:2
**use (4)**
  9:6;17:10;32:11,19
**used (1)**
  32:21
**using (1)**
  17:22

**V**

**Valdosta (4)**
  10:25,25;11:1,2
**valid (1)**
  52:22
**value (1)**
  14:12
**verbal (1)**
  31:6
**verbally (1)**
  30:18
**verify (1)**
  45:5
**versus (1)**
  4:5
**video (1)**
  20:1
**viewed (1)**
  8:23
**violate (1)**
  26:17
**violated (4)**
  26:5,8,12,18
**violating (2)**
  16:9;46:15
**violation (4)**
  17:24;26:7;38:22;
  41:18
**visit (2)**
  42:18,19

**W**

**wait (1)**
  5:14
**warrant (47)**
  7:17,21,24,25;16:16,
  21;17:24;18:7,13;21:1,

3,6,21;23:8;29:3;
33:20,23,24,25;34:12,
25;35:5;45:2;49:6;
50:6,11,14,17,19,20,22,
25;51:3,11,15,17;52:4,
5,6,8,10,11,14,18,20,
21,23
**warrants (2)**
50:9,10
**way (12)**
7:15;14:10;26:25;
28:4;30:7,8;44:8;47:4,
13,18,23;51:5
**ways (2)**
26:14;27:1
**week (4)**
30:23;31:10,13;
53:17
**weren't (3)**
24:5,16;44:25
**what's (2)**
22:6;35:2
**whereabouts (1)**
32:4
**whole (14)**
7:1;25:18;26:3;43:1;
50:10,13,18,22;51:1,
16,16;52:2,4,18
**willed (1)**
25:20
**withdraw (1)**
38:15
**within (3)**
9:10;21:21;37:3
**without (3)**
6:12;17:2;46:15
**witness (4)**
4:11;19:18,21;53:21
**wondering (1)**
13:25
**words (2)**
31:12;40:1
**work (6)**
9:18;10:8;16:12;
28:4;31:14;48:11
**worked (2)**
9:19,20
**working (1)**
28:1
**worry (1)**
30:13
**wow (1)**
4:25
**wrap (1)**
46:7
**write (2)**
21:11,15
**writing (2)**
16:17;41:9
**written (8)**
5:7,8;18:24;19:3;
30:8;43:11,23;44:1
**wrong (1)**

15:15
**wrongdoing (3)**
13:21,23,24
**wrongful (2)**
20:13,14
**wrongfully (6)**
12:12,22;13:3,17;
16:9;38:12
**wrongly (2)**
14:4,15
**wrote (2)**
32:3,10

**Y**

**year (4)**
11:25;12:1,4,4
**years (33)**
9:23;10:2;11:25;
12:1;13:10,11;21:8;
25:2,6,7,8;29:25;30:1;
32:13,15;35:25;36:7,
10,12,22;37:3;38:19;
39:11,11,12,22;40:2,3;
41:23;45:11,11;46:5;
48:19
**you-all (2)**
53:17,21
**youth (1)**
9:23
**yup (2)**
22:24;23:9

**Z**

**Zack (1)**
4:21

**1**

**1 (1)**
22:9
**1:13 (2)**
19:25;20:2
**1:21-CV-00067-LAG (1)**
4:8
**100 (1)**
23:15
**12 (7)**
30:1;32:16;36:7,10,
15;39:11;40:3
**12:31 (1)**
4:3
**12:49 (2)**
19:23,24
**12:50 (1)**
6:8
**13 (3)**
28:10,15;32:2
**13th (8)**
23:1,6,11,20,21,22;
24:1;31:8
**14 (1)**

13:11
**150 (1)**
9:10
**16 (2)**
9:22;37:25
**18 (1)**
13:10
**18th (1)**
47:21
**1987 (1)**
11:19
**19th (3)**
22:21,24;31:9

**2**

**2 (2)**
22:10;53:24
**2:00 (1)**
53:25
**20 (1)**
19:17
**20/20 (1)**
25:15
**2000 (4)**
11:20,20;37:25;
47:16
**2006 (4)**
11:17,20,24;13:9
**2012 (5)**
35:24;37:2;45:2;
47:21;49:7
**2013 (2)**
21:20;31:8
**2014 (11)**
10:4;21:20;22:21,24;
23:6,11;24:1;25:3;
31:8,8;36:18
**2016 (1)**
25:9
**2018 (1)**
47:16
**2019 (2)**
31:9;36:19
**2022 (1)**
37:3
**23rd (1)**
34:8
**24 (1)**
9:22

**3**

**3 (3)**
22:6,10,11
**30 (1)**
21:22
**31st (1)**
36:18

**4**

**4 (1)**

42:16
**4th (1)**
35:24

**7**

**7th (1)**
36:19